**Lee Cirsch (CA State Bar No. 227668)**
THE LANIER LAW FIRM, P.C.
10866 Wilshire Blvd., Suite 400
Los Angeles, California 90024
Telephone: 310-277-5100
Facsimile: 310-277-5103
lee.cirsch@lanierlawfirm.com

W. Mark Lanier *Pending Pro Hac Vice*
wml@lanierlawfirm.com
Eugene R. Egdorf *Pending Pro Hac Vice*
gene.egdorf@lanierlawfirm.com
Benjamin T. Major *Pending Pro Hac Vice*
ben.major@lanierlawfirm.com
Ryan D. Ellis *Pending Pro Hac Vice*
ryan.ellis@lanierlawfirm.com
THE LANIER LAW FIRM, P.C.
6810 FM 1960 West
Houston, Texas 77069
Telephone: 713-659-5200
Facsimile: 713-659-2204

Arthur R. Miller *Pending Pro Hac Vice*
Arthur.miller@lanierlawfirm.com
THE LANIER LAW FIRM, PLLC
126 East 56th Street, 6th Floor
Tower 56
New York, New York 10022
Telephone: 212-421-2800
Facsimile: 212-421-2878

*Attorneys for Class Representative Plaintiffs, William Michael Hicks and Kenneth Harms, and Individual Plaintiffs, Matthew Achatz, Brandon Antus, Chad Antus, Andrew Barnes, Chris Berry, Michael Bestor, Duane Bock, David Brooker, Mark Carnes, Steve Catlin, Bruce Clendenen, Graeme Courts, Michael Darby, Henry Diana, Don Donatello, Michael Doran, James Edmondson, Dean Elliott, Joseph Etter, Brent Everson, Micah Fugitt, Damon Green, Jay Haas, Jr., Steven Hale, Matthew Hauser, Adam Hayes, William Heim, Christian Heath Holt, Jonathan Jakovac, Tom Janis, Jimmy Johnson, Chris Jones, Nick Jones, Steve Kay, Anthony Knight, Shay Knight, Mitch Knox, Kurtis Kowaluk, Ronald Levin, John Limanti, Brennen Little, Damian Lopez, Scott Martin, Rich Mayo,*

1  *Jr., Daniel McQuilken, Eric Meller,*
   *Matthew Minister, Charles Mohr, Todd*
2  *Montoya, Tony Navarro, Donald Nelson,*
   *Travis Perkins, Joseph Pyland, Brian*
3  *Reed, Chad Reynolds, Miguel Rivera,*
   *David Robinson, Scott Sajtinac, Andrew*
4  *Sanders, Fred Sanders, Corby Segal,*
   *Shawn Segars, Brian Smith, Russell Stark,*
5  *Brad Swearingen, Paul Tesori, Robert*
   *Thompson, Scott Tway, Steve Underwood,*
6  *Mark Urbanek, Rusty Uresti, Brett*
   *Waldman, Neil Wallace, Aaron Wark,*
7  *Jeffery Willett, Barry Williams, Michael*
   *Mazzeo, Jon Yarbrough and Justin York.*

8

9                    UNITED STATES DISTRICT COURT

10                  NORTHERN DISTRICT OF CALIFORNIA

11                  _____ DIVISION

12  William Michael Hicks and Kenneth Harms, as )   Case No.
    Class Representative Plaintiffs and Individual )
13  Plaintiffs, Matthew Achatz, Brandon Antus,    )
    Chad Antus, Andrew Barnes, Chris Berry,       )
14  Michael Bestor, Duane Bock, David Brooker,    )
    Mark Carnes, Steve Catlin, Graeme Courts      )
15  Bruce Clendenen, Michael Darby, Henry         )
    Diana, Don Donatello, Michael Doran, James    )
16  Edmondson, Dean Elliott, Joseph Etter, Brent  )
    Everson, Micah Fugitt, Damon Green, Jay       )
17  Haas, Jr., Steven Hale, Matthew Hauser, Adam  )
    Hayes, William Heim, Christian Heath Holt,    )
18  Jonathan Jakovac, Tom Janis, Jimmy Johnson,   )
    Chris Jones, Nick Jones, Steve Kay, Anthony   )
19  Knight, Shay Knight, Mitch Knox, Kurtis       )   **PLAINTIFFS' ORIGINAL CLASS**
    Kowaluk, Ronald Levin, John Limanti,          )   **ACTION COMPLAINT FOR DAMAGES**
20  Brennen Little, Damian Lopez, Scott Martin,   )
    Rich Mayo, Jr., Daniel McQuilken, Eric        )   **DEMAND FOR JURY TRIAL**
21  Meller, Matthew Minister, Charles Mohr, Todd  )
    Montoya, Tony Navarro, Donald Nelson,         )
22  Travis Perkins, Joseph Pyland, Brian Reed,    )
    Chad Reynolds, Miguel Rivera, David           )
23  Robinson, Scott Sajtinac, Andrew Sanders,     )
    Fred Sanders, Corby Segal, Shawn Segars,      )
24  Brian Smith, Russell Stark, Brad Swearingen,  )
    Paul Tesori, Robert Thompson, Scott Tway,     )
25  Steve Underwood, Mark Urbanek, Rusty          )
    Uresti, Brett Waldman, Neil Wallace, Aaron    )
26  Wark, Jeffery Willett, Barry Williams, Michael )
    Mazzeo, Jon Yarbrough and Justin York.        )
27                                                )
    and all others similarly situated,            )
28                                                )
                    Plaintiffs,                    )

1      vs.                              )

2                                  )

3   PGA TOUR, Inc.,                 )

                                     )

Defendant.       )

_____)

**PLAINTIFFS' ORIGINAL CLASS COMPLAINT AND JURY DEMAND**

**INTRODUCTION**

1.     This is a class action lawsuit brought by professional golf caddies employed by professional golfers who compete on one or more of Defendant's golf tours.  The purposes of this lawsuit are to compensate caddies who have been forced to wear the logos of Defendant's corporate sponsors without remuneration, and to preclude Defendant from forcing caddies to provide these endorsement services gratuitously in the future.  The main issue in this lawsuit is whether Defendant may lawfully compel caddies to wear "bibs" (pictured below) during professional golf tournaments and then retain for itself the tens of millions of dollars in advertising revenue generated by those bibs annually.



## I. A BRIEF HISTORY

2. Golf has not always attracted fanfare or produced wealth. Early professional golfers were generally poor and survived on meager wages earned by making golf clubs and balls, managing the course shop, giving golf lessons, or working as a caddie. Early professional golfers merely served golf club members. They were not permitted in the clubhouse and commanded a low social status. Even the most proficient professional golfers could hardly be deemed "affluent" until the 1950s.

3. Similar to professional golfers, professional caddies had very humble beginnings. Caddies were originally golf club servants chosen by a club member to carry his bag and to locate errant balls. Given the rudimentary grooming of early golf courses, the first caddies were often called upon to locate each ball driven down the fairway.

4. As time passed, caddies became experts in course geometry and topography and provided players an advantage over competitors who lacked such a resource. Given the knowledge and skill that good caddies possess, it is no surprise that golfing greats such as Ben Hogan, Byron Nelson, and Sam Snead caddied at local clubs in their youth.

5. Since the 1950s, enthusiasm for professional golf, by spectators and sponsors alike, has provided vast opportunities for wealth to the sport's participants. Defendant, with gross annual revenue of approximately $1 billion, has benefitted immensely from that enthusiasm, initially stirred by famous players such as Arnold Palmer and by celebrities like Bob Hope.

6. As professional golf has become more popular and competitive, caddies have become an integral part of the sport. Employed by their respective golfer—not by Defendant— caddies are expected to have considerable expertise in course topography and geometry. Caddies must know the correct yardage for every lie on every hole, and they must be skilled in reading greens. Caddies also serve as coaches, strategists, general assistants, cheerleaders, counselors, and friends. One esteemed sports journalist has described caddies as "traffic cops, psychiatrists[,] meteorologists[,] chauffeurs, butlers, and bodyguards, buddies, sidekicks and frequent dinner companions." Another journalist likens good caddies to "accomplished sports psychologists, like corner men in boxing." Caddies help their player maintain confidence in aspects of play such as

club selection and reading greens. Although it is axiomatic that success in professional golf comes down to making good shots, caddies are undeniably instrumental in supporting the level of competition that contributes to Defendant's success.

7.      The job market for caddies highlights their importance to professional golf. For example, it is quite common and acceptable for a struggling golfer to terminate his caddie because of poor tournament results. If caddies merely carried bags, certainly they would not be terminated as a result of poor play. Additionally, the market for skilled caddies can become quite competitive. It is not uncommon for players to recruit other players' caddies using the attraction of better tournament finishes and, therefore, greater income potential for the caddie.

## II. DEFENDANT'S TREATMENT OF CADDIES GENERALLY

8.      Despite the caddies' contribution to professional golf, Defendant has treated caddies as second-class participants of the game. The Barclays tournament in 2013 provides a microcosm of Defendant's treatment of caddies. During a rain delay, caddies and members of some of the caddies' families retreated to a shelter designated for caddies. Although the shelter was not crowded, security officials entered the shelter, demanded identification, and began to shout and berate caddies and their families. While caddies who produced credentials were permitted to remain in the shelter, caddies' wives and children were put out into the rain by security personnel.

9.      Additionally, Defendant has denied caddies basic health care coverage and access to pension plans. During tournament play, Defendant forces caddies to use portable lavatories that lack running water and denies caddies access to areas of tournament venues necessary for caddies to perform their duties fully. The list goes on.

## III. THE CONDUCT AT ISSUE IN THIS LAWSUIT

10.      This suit arises from Defendant's practice of unlawfully forcing Plaintiffs to wear the bibs, pictured above in paragraph 1. The bibs bear the logos of Defendant's sponsors and enjoy significant exposure to live tournament audiences, television audiences, and webcast audiences. The value of the bibs is approximately $50 million annually. Caddies receive none of

1   that revenue and never have consented to Defendant's commercial use of their likenesses and

2   images.

3          11.    The plain text of Defendant's "regulations" permits caddies to endorse their own

4   sponsors' products and services in the space occupied by the bibs, and Defendant does not employ

5   the caddies.   Nevertheless, Plaintiffs have continued to wear the bibs in acquiescence to

6   Defendant's threats to interfere with the caddie-player relationship and to further limit Plaintiffs'

7   endorsement opportunities.

8          12.    In this lawsuit the class of caddies defined below seeks injunctive relief that will

9   prohibit Defendant from continuing the wrongful conduct that gives rise to this suit.  The caddies

10   also seek actual damages and disgorgement of the monies Defendant unlawfully acquired as a

11   result of appropriating the caddies' endorsement services.

12

13                               **<u>PARTIES</u>**

14          13.    Defendant PGA TOUR, Inc. ("**PGA TOUR**"), is a Maryland corporation with a

15   permanent place of business in San Francisco, California.

16          14.    Plaintiffs[1] allege that this case is suitable as a class action under Federal Rule of

17   Civil Procedure 23.  Alternatively, Plaintiffs aver that the class proposed below should be certified

18   as to certain causes of action if it is not certified for all claims and requests for relief.  In the

19   further alternative, in the event the class is not certified for this action or any portion thereof, the

20   named Plaintiffs bring this action in their individual capacities as set forth below.

21          15.    Named plaintiff William Michael "Mike" Hicks is the proposed class

22   representative.  Mr. Hicks has caddied at Defendant PGA TOUR events for approximately thirty-

23   three years.  Among others, Mr. Hicks has caddied for professional golfers Payne Stewart, Greg

24   Norman, Steve Stricker, Justin Leonard and Josh Teater.  Mr. Hicks resides in North Carolina.

25   _____

26        [1] Note that in this Complaint, unless otherwise noted or demanded by context, "Plaintiffs"

27   refers to the proposed class representatives, the proposed class, and the named plaintiffs

28   disjunctively and collectively.

16.     Named plaintiff Kenneth "Kenny" Harms is the alternate proposed class representative.  Mr. Harms has been a professional tour caddy since 1991.  Mr. Harms has caddied for professional golfers Kevin Na, Hale Irwin, Aaron Baddeley, Hubert Green, Ray Floyd, Gary Player, Lee Trevino, David Eger, Jan Stephenson, Emilee Klein, Lynn Connelly and Michelle Wie.  Mr. Harms resides in Florida.

17.     Plaintiffs Bruce Clendenen, Nick Jones, Anthony Knight and Corby Segal have served as caddies on one or more of Defendant's golf tours and reside in the State of California.

18.     Plaintiffs Chad Antus, Steve Catlin, Graeme Courts, Don Donatello, Michael Doran, Dean Elliott, Brent Everson, Damon Green, Tom Janis, Steve Kay, Kurtis Kowaluk, John Limanti, Eric Meller, Matthew Minister, Charles Mohr, Travis Perkins, Joseph Pyland, Brian Reed, Chad Reynolds, Miguel Rivera, Andrew Sanders, Brian Smith, Paul Tesori, Scott Tway, Steve Underwood, Mark Urbanek and Aaron Wark have served as caddies on one or more of Defendant's golf tours and reside in the State of Florida.

19.     Plaintiffs James Edmondson, Micah Fugitt, Matthew Hauser, Bill Heim, James Johnson, Brennan Little, Damian Lopez, Scott Martin, Richard Mayo, Jr., Donald Nelson, Scott Sajtinac, Russell Stark, Rusty Uresti, Brett Waldman and Jon Yarbrough have served as caddies on one or more of Defendant's golf tours and reside in the State of Texas.

20.     Plaintiffs Henry Diana, Joseph Etter and David Robinson have served as caddies on one or more of Defendant's golf tours and reside in the State of Georgia.

21.     Plaintiffs Michael Bestor, Steven Hale, Ronald Levin and Fred Sanders have served as caddies on one or more of Defendant's golf tours and reside in the State of Colorado.

22.     Plaintiffs Duane Bock, Mark Carens, Adam Hayes and Barry Williams have served as caddies on one or more of Defendant's golf tours and reside in the State of North Carolina.

23.     Plaintiffs Andrew Barnes, Pete Jordan, Neil Wallace and Justin York have served as caddies on one or more of Defendant's golf tours and reside in the State of Arizona.

24.     Plaintiffs Chris Berry, Jonathan Jakovac and Chris Jones have served as a caddies on one or more of Defendant's golf tours and reside in the State of Nevada.

25.     Plaintiffs Jay Haas, Jr., Shay Knight, Shawn Segars and Brad Swearingen have served as caddies on one or more of Defendant's golf tours and reside in the State of South Carolina.

26.     Plaintiff Jeffery Willett has served as a caddy on one or more of Defendant's golf tours and resides in the State of Maine.

27.     Plaintiff Brent Henley, Calvin Henley and Mitchell Knox have served as a caddies on one or more of Defendant's golf tours and resides in the State of Tennessee.

28.     Plaintiff Matthew Achatz has served as a caddy on one or more of Defendant's golf tours and resides in the State of Michigan.

29.     Plaintiff David Brooker has served as a caddy on one or more of Defendant's golf tours and resides in the State of Connecticut.

30.     Plaintiff Michael Darby has served as a caddy on one or more of Defendant's golf tours and resides in Richmond, British Columbia, Canada.

31.     Plaintiff Christian Heath Holt has served as a caddy on one or more of Defendant's golf tours and resides in the State of Missouri.

32.     Plaintiff Todd Montoya has served as a caddy on one or more of Defendant's golf tours and resides in Belen, New Mexico.

33.     Plaintiff Tony Navarro has served as a caddy on one or more of Defendant's golf tours and resides in the State of Illinois.

34.     Plaintiffs Brad Antus and Michael Mazzeo have served as caddies on one or more of Defendant's golf tours and reside in the State of Pennsylvania.

35.     Plaintiff Daniel McQuilken has served as a caddy on one or more of Defendant's golf tours and resides in the State of New Jersey.

## JURISDICTION AND VENUE

### I. SUBJECT MATTER JURISDICTION

36.     This Court has subject matter jurisdiction because this is a civil action arising under the laws of the United States.  *See* 28 U.S.C. § 1331.  Specifically, Plaintiffs seek to prosecute civil claims under the Sherman Act, 15 U.S.C. § 1 *et seq.*, the Clayton Act, 15 U.S.C. § 12 *et seq.*, and the Lanham Act, 15 U.S.C. § 1050 *et seq.*

37.     This Court also may exercise jurisdiction under 28 U.S.C. § 1337(a) because this is a civil action arising under an act of Congress regulating commerce or protecting trade and commerce against restraints on trades and monopolies.

38.     This Court may exercise jurisdiction under 28 U.S.C. § 1332(d) because this is a class action involving damages exceeding $5,000,000 exclusive of costs  and interest, and one or more members of the proposed class is a citizen of a state other than Maryland and Florida. The proposed class consists of more than 100 members.

39.     This Court has supplemental subject matter jurisdiction over Plaintiffs' state law claims under 28 U.S.C. § 1367.  The Court has original jurisdiction over Plaintiffs' Sherman Act and Lanham Act claims, and Plaintiffs' state law claims are so related to Plaintiffs' federal law claims that they form part of the same case or controversy.

### II. PERSONAL JURISDICTION

40.     This Court may exercise personal jurisdiction over Defendant PGA TOUR under 15 U.S.C. § 22 based on Defendant's national contacts.  Defendant PGA TOUR is a Maryland Corporation with a permanent place of business in San Francisco, California.  Further, PGA TOUR advertises its "headquarters" as Ponte Vedra Beach, Florida.  Defendant PGA TOUR has designated registered agents within the United States.  Defendant PGA TOUR organizes, manages, and promotes numerous professional golf tournaments throughout the United States each year, and Defendant PGA TOUR's gross revenue is approximately $1 billion annually. Finally, Defendant owns and operates approximately thirty-five golf courses in the United States.

41.     This Court also may exercise personal jurisdiction over Defendant PGA TOUR under California's long-arm statute, which is coextensive with constitutional due process limits.

See Cal. Civ. Proc. Code § 410.10. Defendant PGA TOUR maintains a permanent office in San Francisco, California, and owns and manages several golf courses throughout the state of California. Additionally, Defendant organizes and promotes numerous golf tournaments throughout the state of California, and those tournaments give rise to Plaintiffs' claims.

42. Given Defendant's systematic and continuous contacts with California and the substantial connection between Plaintiffs' claims and those contacts, this Court may exercise specific and general personal jurisdiction over Defendant PGA TOUR.

**III. VENUE**

43. Venue is proper in the Northern District of California under Sections 4 and 12 of the Clayton Act, codified at 15 U.S.C. §§ 15, 22. Defendant PGA TOUR may be found in this district and transacts business in this district. Additionally, a substantial part of Defendant's misconduct and the damages caused by that misconduct occurred in this district.

44. Venue is also proper in this district because Defendant resides here. *See* 28 U.S.C. § 1391(b)(1), (c)(2), and (d). Defendant PGA TOUR has organized and promoted numerous tournaments within the Northern District of California, and those tournaments provide a primary basis for Plaintiffs' claims and damages. Defendant PGA TOUR maintains a permanent office within the Northern District of California. Defendant owns and manages two golf courses located on real property owned by Defendant within the Northern District of California.

45. Venue is proper in the Northern District of California because a substantial part of the events or omissions giving rise to the claim occurred in the Northern District of California. Plaintiffs' claims arise from harm and conduct occurring at Defendant's golf tournaments, and several of those tournaments are organized and promoted in this district.

46. This action should be assigned in accordance with Rule 3-2(c) and 3-2(d) of the Northern District of California Civil Local Rules ("**Local Rules**"). This case should be assigned to the San Francisco or Oakland division because Defendant resides in the division for venue purposes and a substantial part of the events or omissions which give rise to the claim occurred in one or more of the counties identified in Local Rule 3-2(d). Additionally, these divisions have vast experience in adjudicating similar cases, such as *Samuel Michael Keller v. Electronic Arts*

*Inc. et al.*, 4:09-cv-01967-CW (Wilken, J., Oakland division); *Edward C. O'Bannon, Jr. v. National Collegiate Athletic Association et al.*, 4:09-cv-03329-CW (Wilken, J., Oakland division); and *Cohen v. Facebook, Inc*., No. C 10–5282 RS (N.D. Cal. 2011) (Seebork, J., San Francisco division).

## FACTUAL BACKGROUND

### I. PLAINTIFFS' RELATIONSHIP WITH DEFENDANT

47.      Defendant PGA TOUR organizes and promotes three tours of professional golf tournaments held across the United States.  Although the PGA TOUR is the most prominent and profitable, Defendant also organizes and promotes the Champions Tour and Web.com Tour. These tours are collectively referred to as the "**Three Tours.**"

48.      Plaintiffs are caddies employed by players competing on one or more of the Three Tours.  While Defendant requires professional golfers to employ caddies for all practice, Pro-Am and tournament rounds, no agency relationship exists between Plaintiffs and Defendant, its affiliates, or its partners.  Instead, Plaintiffs are independent contractors for professional golfers who compete in professional golf tournaments organized and promoted by Defendant.

49.      Plaintiffs and Defendant are parties to numerous contracts.  These contracts are described in detail below and provide a basis for Plaintiffs' claims.

### II. THE ENDORSEMENT POLICY

50.      Defendant's Player Handbook & Tournament Regulations ("**Handbook**") includes a provision titled, "Player Endorsement Policy" ("**Endorsement Policy"**).  The Endorsement Policy generally requires endorsements to be "tasteful and in accordance with standards of decorum expected of professional golfers."  The Endorsement Policy's chief concern is preserving the image and reputation of the PGA TOUR and, thus, the Endorsement Policy limits endorsements of tobacco, alcohol,[2] and gaming.  In the interest of "taste," the Endorsement Policy

---

[2]  Although Players and caddies are prohibited from endorsing companies selling alcohol, Defendant endorses Grey Goose vodka as the "official spirit" of the PGA Tour.

limits placement and size of sponsor logos. Otherwise, the Endorsement Policy does not limit endorsements.

51.     Pursuant to Defendant's Endorsement Policy, professional golfers playing in tournaments organized and promoted by Defendant often wear various sponsor logos on their attire, including their shirts. Because players may choose to wear various sponsors' logos, some sponsors negotiate exclusive endorsement deals with players under which a player will wear only the sponsor's logo.

52.     Under Defendant's rules and contractual provisions drafted by Defendant, caddies are permitted to endorse products under the Endorsement Policy to the same extent as players. Defendant's Handbook provides, "Caddies' clothing must conform to the Player Endorsement Policy." As set forth in detail below, Plaintiffs have entered numerous contracts with Defendant that include the same or similar language. Thus, Defendant expressly permits caddies to wear various sponsor logos on their attire—including shirts. However, as set forth below, Defendant constricts Plaintiffs' endorsement potential and usurps Plaintiffs' endorsement opportunities.

### III. DEFENDANT PGA TOUR FORCES PLAINTIFFS TO ENDORSE THE PRODUCTS AND SERVICES OF DEFENDANT'S SPONSORS.

53.     Notwithstanding the language in the Handbook, Endorsement Policy, and relevant contracts, Defendant has forced Plaintiffs to endorse the products and services of Defendant PGA TOUR's sponsors without remuneration. The specific mechanism through which Defendant perpetuates this misconduct is known as the "bib," pictured in paragraph 1 above.

54.     As the photographs show, the bibs bear sponsor logos. The sponsors represented by those logos pay Defendant for the bib space. No one, however, pays Plaintiffs to wear these bibs. Defendant PGA TOUR has threatened to prohibit Plaintiffs from providing caddie services at tournaments organized and promoted by Defendant PGA TOUR if Plaintiffs refuse to wear the bibs. Additionally, Defendant PGA TOUR has contacted tour players to determine whether players would be willing to terminate their agreements with caddies who refuse to wear the bibs. Defendant PGA TOUR has demonstrated that if Plaintiffs do not supply the marketing medium for

1   Defendant's sponsors by wearing bibs, Defendant will interfere with the relationships between
2   Plaintiffs and the players for whom they work.

3       55.     Defendant PGA TOUR's coercive conduct has recently reached new heights.   In
4   2013, many Plaintiffs joined the Association of Professional Tour Caddies ("**APTC**"), a trade
5   association of professional golf caddies who work with some of the top professional golfers in the
6   world.  Many Plaintiffs joined the APTC to improve the Plaintiffs' profession in general and to
7   represent Plaintiffs' collective professional interests.

8       56.     In retaliation for many Plaintiffs' membership in the APTC, and in a further effort
9   to compel Plaintiffs to don the bibs during tournaments, Defendant PGA TOUR has threatened to
10  prohibit caddies from receiving endorsement money from any sponsor that competes with
11  Defendant's sponsors or from any of Defendant's sponsors who reduce their investment in
12  Defendant because of an endorsement agreement with one or more of the Plaintiffs.  Believing
13  they have no reasonable choice but to comply with Defendant PGA TOUR's demands, Plaintiffs
14  have continued to wear the bibs without compensation.[3]

15      57.     With respect to marketing activities stemming from actual tournament play, the bib
16  provides the greatest source of marketing exposure.  Thus, the bib provides the most valuable
17  marketing medium between commercials during tournament broadcasts.  On information and
18  belief, the annual value of the bib exceeds $50 million.  However, Plaintiffs are paid nothing to
19  wear bibs and, therefore, endorse the products and services of bib sponsors without compensation.
20  Plaintiffs are made to serve as billboards to advertise, at the direction of the PGA Tour, for some
21  of the most profitable companies in the world without compensation. Instead of compensating
22  Plaintiffs for wearing the bib, Defendant PGA TOUR "incentivizes" Plaintiffs by refraining from

23

24

_____

25      [3] In a meeting with several caddies, one of Defendant's top executives indicated Defendant
26  would not discuss compensation for the bib by saying "the bib is off the table."  Defendant's
27  executive went on to say "it may not be right, but that is how it has been and how it will be" when
28  referring to Defendant's refusal to compensate Plaintiffs for serving as glorified billboards.

1  following through on its threats to interfere with Plaintiffs' relationships with their respective

2  players and by refraining from interfering with Plaintiffs' other endorsement opportunities.

3      58.    Defendant PGA TOUR has always known that Plaintiffs expect payment for

4  wearing corporate logos.  For instance, Plaintiffs have the option to wear caps bearing the logo of

5  Nature Valley, one of Defendant's corporate sponsors.  Defendant PGA TOUR has fashioned a

6  formula for compensating caddies who choose to wear the Nature Valley caps during tournament

7  play.  Given that Defendant knows that Plaintiffs expect payment for their endorsement of

8  Defendant's sponsors on Plaintiffs' headwear, Defendant cannot reasonably deny knowing that

9  Plaintiffs expect to be paid to endorse sponsors on their other attire, including bibs.[4]

10     59.    Plaintiffs' expectation of payment is evident in other ways.  Defendant has entered

11 enforceable agreements under which the Endorsement Policy applies to Plaintiffs, and the

12 Endorsement Policy permits Plaintiffs to endorse products for pay—even though Defendant

13 unlawfully limits that right in practice.  Thus, Defendant PGA TOUR cannot reasonably deny

14 knowing that Plaintiffs expect payment for endorsing sponsors' products and services.

15     60.    Defendant made a calculated decision to use Plaintiffs, their likenesses, and their

16 images to endorse Defendant's sponsors.  Plaintiffs are recognizable among members of the

17 audience that Defendant PGA TOUR targets with the bibs.  By forcing Plaintiffs to wear the bibs,

18 Defendant PGA TOUR benefits from its commercial use of Plaintiffs' likenesses and images and

19 their status as professional caddies.  Plaintiffs never have consented to the commercial use of their

20 likeness by Defendant PGA TOUR, its affiliates and partners, or its local tournament organizers.

21 **IV. THE MARKET AT ISSUE AND THE HARM CAUSED TO THAT MARKET**

22     61.    Simply stated, the market affected by Defendant's conduct is the national market

23 for the endorsement of products and services by participants in professional golf tournaments

24 _____

25     [4] Defendant has recently threatened to force all caddies to wear the Nature Valley hat

26 pursuant to an alleged exclusivity provision in the contract between Nature Valley and Defendant.

27 While Defendant has proudly proclaimed that Plaintiffs are not a party to that contract, Defendant

28 seems intent on enforcing its provisions against Plaintiffs.

1  ("**Endorsement Market**").  Alternatively, the geographic scope of the Endorsement Market is

2  North America.

3      62.    Defendant PGA TOUR's tournaments take place in various states across the

4  country and are organized in part by a local tournament organizer, which generally is a nonprofit

5  entity.  Spectators in attendance view the tournament live, and the tournaments generally are

6  televised, broadcast on the Internet, and viewable on video-on-demand platforms.

7      63.    The consumers in the Endorsement Market are companies who employ

8  professional golf tournament participants to endorse products and services during professional golf

9  tournaments ("**Endorsement Consumers**").  By employing tournament participants to endorse

10  products and services at professional golf events, Endorsement Consumers target a narrow

11  audience.  The average audience for PGA golf tournaments is unique in that it is primarily

12  comprised of golf fans who are generally much more affluent than audiences for other American

13  professional sports.

14      64.    The supply of endorsers in the Endorsement Market is naturally limited to

15  professional golfers and to Plaintiffs and other caddies participating in professional golf

16  tournaments because they are most visible to live and broadcast audiences.  Thus, the supply chain

17  in the Endorsement Market is susceptible to this natural limit, and no other endorsers could break

18  into the market even if it would be profitable for them to do so.

19      65.    Defendant knows that supply in the Endorsement Market is limited.  Defendant's

20  unlawful manipulation of the market demonstrates its awareness.  By employing coercive

21  measures to force Plaintiffs to wear bibs, Defendant has hijacked a chain of supply of endorsement

22  opportunities and foreclosed competition in the Endorsement Market.

23      66.    The harm to the Endorsement Market is pronounced.  For instance, the bib

24  effectively reduces the number of endorsement deals Plaintiffs may obtain individually.  Plaintiffs'

25  shirts provide a valuable marketing medium.  However, the bib occupies so much of the Plaintiffs'

26  shirts that no room is left for Plaintiffs to place logos of their own sponsors.   Thus, not only is

27  Defendant PGA TOUR using Plaintiffs as human billboards without compensating them,

28

1    Defendant is drastically abridging Plaintiffs' capacity to wear the logos for companies whose
2    products and services Plaintiffs wish to endorse.

3         67.    Absent Defendant PGA TOUR's unlawful conduct, Plaintiffs could endorse a much
4    broader scope of products and services. Specifically, the bibs that Defendant forces Plaintiffs to
5    wear generally bear the logo of only one to three sponsors. And all Plaintiffs are forced to wear
6    identical bibs during a given tournament. Thus, the same one, two, or three logos appear on every
7    caddie's bib during tournament play. This practice limits potential Endorsement Consumers'
8    ability to enter the Endorsement Market because many Endorsement Consumers who might pay a
9    single caddie to endorse products in the bib space find that it is cost prohibitive to purchase bib
10   space under Defendant's bib program. And even if it is not cost prohibitive, many Endorsement
11   Consumers are shut out of the market simply because no space is available. Without Defendant's
12   illegal restraint on this market, Plaintiffs would separately enter their own endorsement
13   agreements, resulting in greater supply and variety of endorsement opportunities in the
14   Endorsement Market. Absent Defendant's restraint on trade, supply would increase, and prices in
15   the Endorsement Market would be governed by competition—not coercion.

16        68.    The bib also prevents Plaintiffs from entering exclusive endorsement deals with
17   sponsors. In some instances, a sponsor will want a player or caddie to wear only that sponsor's
18   logos during tournaments. Because an exclusive endorsement deal prohibits or limits a player or
19   caddie from endorsing other products during golf tournaments, the exclusive sponsor is willing to
20   pay a premium to the player or caddie. Although players are free to enter these exclusive
21   endorsement deals, the bibs preclude Plaintiffs from entering exclusive endorsement deals because
22   Plaintiffs have no control over which sponsors' logos are placed on the bibs by Defendant. In
23   other words, so long as Plaintiffs must wear the bibs, no endorsement deal with a caddie can truly
24   be "exclusive."

25        69.    Finally, Defendant has artificially reduced the value of Plaintiffs' non-bib
26   endorsements by making the bib prominent in size and color, and by placing logos on the bibs that
27   vastly exceed the size that Defendant "approves" for non-bib endorsements. The brightly-colored

28

bibs and large logos command greater attention than the other Defendant-approved logos, thereby depressing the value that Plaintiffs can obtain for wearing the logos of non-bib sponsors.

## CAUSES OF ACTION

### I. SHERMAN ACT

70.     Plaintiffs incorporate the allegations in paragraphs 1 - 69 in this section for all purposes as if fully restated.

#### A. *Defendant PGA TOUR Violated Section 1 of the Sherman Act.*

71.     Defendant's conduct violates section 1 of the Sherman Act, which prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations."  Defendant has engaged in multiple unlawful combinations, contracts, or conspiracies in its efforts to restrain trade unreasonably.

72.     Defendant and its local tournament organizers, through a contract, combination and/or conspiracy, have cooperated in an effort to limit competition unlawfully.  On information and belief, local tournament organizers were aware of Defendant's efforts to coerce Plaintiffs into endorsing the products and services of Defendant's sponsors without remuneration.  Local tournament organizers also knew that Defendant's coercion would limit supply in the Endorsement Market and would unreasonably hinder Plaintiffs' ability to compete in the market. However, because local tournament organizers stood to profit from Defendant's unlawful restraint on trade, the local tournament organizers, by enforcing Defendant's bib requirement, consciously participated in the scheme of forcing Plaintiffs to wear the bibs and prohibiting Plaintiffs from exercising their rights under the Endorsement Policy.  The combination between Defendant PGA TOUR and its local tournament organizers artificially reduces supply and boosts the price paid for endorsements during professional golf tournaments, and both parties to the combination derive a profit from their conduct.

73.     Defendant also has coerced Plaintiffs into a combination with Defendant that unreasonably restrains trade.  Specifically, Defendant has threatened to interfere with Plaintiffs'

relationship with their respective players and with Plaintiffs' individual sponsors if Plaintiffs do not wear the bibs and endorse Defendant's sponsors without compensation. Plaintiffs have unwillingly acquiesced to Defendant's demands and threats by wearing the bibs without compensation, thereby unwillingly contributing to Defendant's unreasonable restraint on trade. And through this combination, forged in coercion and acquiescence, Plaintiffs, the Endorsement Market, and Endorsement Consumers have suffered harm.

74. The intended and actual product of Defendant's restraints on trade was to raise, fix, peg, or stabilize the price paid for endorsements at professional golf tournaments by unlawfully limiting channels of supply. By forcing Plaintiffs to wear the bibs, Defendant has unlawfully gained control of supply in the Endorsement Market, and accordingly, exerts unlawful control over the prices paid for endorsements. Defendant's restraint on trade should receive *per se* scrutiny. Accordingly, Defendant should be required to proffer evidence that its conduct does not constitute an unreasonable restraint on trade.

75. Defendant artificially reduced output in the Endorsement Market by nearly eliminating Plaintiffs as a channel of supply for endorsement services. Defendant's restraint on trade should receive *per se* scrutiny. Accordingly, Defendant should be required to proffer evidence that its conduct does not constitute an unreasonable restraint on trade.

76. Defendant cannot demonstrate that its conduct serves procompetitive purposes. Even if Defendant could identify a procompetitive purpose, a less restrictive restraint would achieve the same procompetitive purpose.

77. Endorsement Consumers, and consequently Plaintiffs, have suffered numerous harms, including (1) having access to fewer and less diverse sources of supply in the Endorsement Market; (2) paying above market value for endorsements; and (3) being priced out of the Endorsement Market altogether. Further, given the prominence of the bib's size and color, Endorsement Consumers who employ Plaintiffs to endorse products and services receive less value than they bargained for because their logos are covered or overshadowed by the bibs.

78.     Plaintiffs have suffered damages.  Specifically, Plaintiffs have suffered a loss equivalent to the amount of money they could have earned had they been permitted to endorse products and services in the space occupied by the bibs.

79.     Defendant has unlawfully profited by its anticompetitive conduct.  On information and belief, the value of the bib is believed to be in excess of $50 million for the past tournament season alone and similar sums in other seasons.

### B. Defendant PGA TOUR Violated Section 2 of the Sherman Act

80.     Defendant PGA TOUR's conduct violates Section 2 of the Sherman Act, codified at 15 U.S.C. § 2, which makes it unlawful to monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several states.

81.     As demonstrated above, Defendant PGA TOUR has monopoly power in the Endorsement Market or, alternatively, there is a dangerous probability that Defendant may be able to achieve monopoly power.  Professional golfers and their caddies are the primary sources of supply in the Endorsement Market.  Defendant knows that entry into the market by others is closed.  Further, Defendant has successfully exercised control over the caddies' capacity to endorse their sponsors' products and services.  Through coercion, Defendant has forced Plaintiffs to wear bibs bearing sponsors' logos that far exceed the size and prominence of those that Plaintiffs and players are permitted to wear.  Defendant forces Plaintiffs to wear the bibs without compensation.  As a result of Defendant's monopolistic conduct, Defendant has drastically reduced supply in the Endorsement Market and has forced Endorsement Consumers to pay higher prices, leave the market, or not enter the market in the first place.

82.     Further, other than this lawsuit, there appears to be no impediment to Defendant's ability to take over the other source of supply in the Endorsement Market—the players.  For instance, Defendant has attempted to justify forcing Plaintiffs to wear the bibs by suggesting it is part of Defendant's "uniform" requirement.  If Defendant's justification survives scrutiny in this lawsuit, Defendant could similarly apply a "uniform" requirement to professional golfers competing on the Three Tours.  If both players and caddies are compelled by Defendant to endorse

1   the products and services of Defendant's sponsors without payment, Defendant will have absolute

2   control over the Endorsement Market, its supply, and the prices paid in that market for player and

3   caddie endorsements during tournament play.

4        83.    Endorsement Consumers in general have suffered numerous harms because of

5   Defendant's monopolistic conduct, including (1) having access to fewer and less diverse sources

6   of supply in the Endorsement Market; (2) paying above market value for endorsements; and (3)

7   being priced out of the Endorsement Market altogether.  Further, given the prominence of the

8   bib's size and color, Endorsement Consumers who employ Plaintiffs to endorse products and

9   services receive less value than they bargained for because their logos are covered or

10   overshadowed by the bibs.

11        84.    Plaintiffs have suffered damages due to Defendant's monopolistic conduct.

12   Specifically, Plaintiffs have suffered a loss equivalent to the amount of money they could have

13   earned had they been permitted to endorse products and services in the space occupied by the bibs.

14        85.    Defendant has unlawfully profited by its monopolistic conduct.  On information

15   and belief, the value of the bib is believed to be in excess of $50 million for the past tournament

16   season alone and similar sums in other seasons.

17   **II.  RIGHT OF PUBLICITY/MISAPPROPRIATION OF LIKENESS**

18        86.    Plaintiffs incorporate the allegations in paragraphs 1 – 85 in this section for all

19   purposes as if fully restated.

20        87.    By forcing Plaintiffs to wear the bibs, Defendant knowingly and intentionally used

21   the images and likenesses of Plaintiffs for marketing purposes without Plaintiffs' consent.

22   Specifically, Defendant used Plaintiffs' likenesses and images at professional golf tournaments

23   and in broadcasts of those tournaments to endorse the products and services of bib sponsors.

24   Defendant also used Plaintiffs' likenesses and images to market bib space to potential

25   Endorsement Consumers.

26        88.    Plaintiffs never consented to Defendant's use of their likenesses and images for

27   commercial purposes.  Rather, Defendant PGA TOUR forced Plaintiffs to wear the bibs by

28   threatening to interfere with Plaintiffs' relationships with their respective players and individual

1   sponsors.   Defendant threatened to impose further limits on Plaintiffs' right to endorse their

2   individual sponsors if Plaintiffs refused to wear the bibs.  Reasonably prudent people in Plaintiffs'

3   position would have succumbed to Defendant PGA TOUR's threats just as Plaintiffs did.  Given

4   the vulnerable position that Plaintiffs were in and Defendant's knowledge of Plaintiffs'

5   vulnerability, Defendant successfully coerced Plaintiffs into wearing the bibs.

6         89.    Defendant used Plaintiffs' likenesses and images to serve a commercial purpose—

7   to endorse the products and services of Defendant's sponsors. In return, Defendant's sponsors paid

8   Defendant various sums of money.  Defendant used Plaintiffs' likenesses and images to market the

9   bibs in order to lure new bib sponsors to purchase bib space from Defendant.

10         90.    Had Plaintiffs been paid for the use of their likenesses and images, Plaintiffs could

11   have collectively earned over $50 million during the 2013-2014 golf season and similar sums

12   during other seasons at issue in this lawsuit.  Plaintiffs seek to recover the sums they would have

13   earned had they been paid for the use of their likenesses and images in promoting the goods and

14   services advertised on the bibs.

15         91.    Further, as a result of Defendant's misappropriation of Plaintiffs' likenesses and

16   images, and violation of their right to publicity, Defendant PGA TOUR received millions of

17   dollars.  Plaintiffs seek an order disgorging monies received by Defendant as a result of its

18   misappropriation of Plaintiffs' likenesses and images, and awarding those monies to Plaintiffs.

19   **III. BREACH OF CONTRACT**

20         92.    Plaintiffs incorporate paragraphs 1 – 91 in this section for all purposes as if fully

21   restated.

22         93.    Plaintiffs and Defendant entered one or more written contracts.   Defendant

23   breached those contracts, and Plaintiffs suffered injury as a result of Defendant's breaches.

24         94.    Defendant PGA TOUR is a lawfully-formed corporation with the capacity to enter

25   enforceable agreements, including those at issue here.  Among the essential terms of the contracts

26   at issue is Defendant PGA TOUR's agreement to permit Plaintiffs to exercise the same rights as

27   players under the Endorsement Policy.  In exchange for this right and others, Plaintiffs agreed to,

28   among other things, carry out their duties as caddies in accordance with Defendant PGA TOUR's

guidelines. For instance, Plaintiffs agreed to wear the types of shoes designated by Defendant, to refrain from entering the locker rooms at any time, to assist in maintaining the golf course by replacing divots, and to release Defendant PGA TOUR from liability for certain physical injuries that Plaintiffs might sustain during the course of a tournament.

95. Plaintiffs and Defendant PGA TOUR mutually assented to all material terms in the subject contracts. Their respective assent to the essential terms of the contracts is evidenced by their signatures on written contracts. Mutual assent is also evidenced by the parties' conduct. Specifically, Plaintiffs performed their caddie services in compliance with the terms of those contracts, and Defendant permitted Plaintiffs to caddie on the Three Tours without objection and issued Plaintiffs credentials for those tournaments.

96. Plaintiffs performed under the contracts by complying with their various duties under the terms, including those duties set forth above. Defendant PGA TOUR breached the contract by prohibiting Plaintiffs from exercising their rights under the Endorsement Policy. As set forth above, Defendant coerced Plaintiffs into wearing bibs that cover a significant part of the Plaintiffs' attire. Plaintiffs received no payment for wearing the bibs, which bore the logos of sponsors who paid Defendant PGA TOUR for endorsing their products and services. Additionally, because of the coverage of the bibs, Plaintiffs were unable to place logos at prime locations on their attire and, thus, could not sell endorsements as provided by the Endorsement Policy.

97. As a result of Defendant PGA TOUR's breaches of contracts, Plaintiffs have sustained damages in the amount that they would have earned had they been permitted to endorse products in accordance with the Endorsement Policy.

98. Defendant PGA TOUR unjustly profited from its breach of contract. Notwithstanding the contract terms, Defendant coerced Plaintiffs into wearing the logos of Defendant's sponsors without remuneration. Because of Defendant PGA TOUR's breach, it has unlawfully obtained millions of dollars that equity demands be paid to Plaintiffs.

**IV. UNJUST ENRICHMENT, QUANTUM MERUIT, AND MONEY HAD AND RECEIVED**

99.    Plaintiffs incorporate the allegations in paragraphs 1 - 98 in this section for all purposes as if fully restated.

100.    By wearing the bibs, Plaintiffs conferred a benefit on Defendant PGA TOUR under circumstances that would make it inequitable for Defendant to retain the benefit without paying for its value.

101.    Under the Endorsement Policy, Plaintiffs are entitled to payment for endorsing products and services by wearing corporate logos on their attire.  However, Plaintiffs never have been paid for endorsement services they provided by donning the bibs.  When Defendant PGA TOUR received and retained money paid by bib sponsors, it received and retained money rightfully belonging to Plaintiffs.

102.    Further, Defendant knew that Plaintiffs expected compensation for donning corporate logos during professional golf tournaments.  Defendant's Endorsement Policy permits Plaintiffs to endorse products and services for pay by displaying sponsor logos on their attire. Defendant pays Plaintiffs to wear caps bearing the logo of Defendant's hat sponsor during professional golf tournaments.  Plaintiffs have informed Defendant that Plaintiffs oppose wearing the bibs without compensation, and Plaintiffs have informed Defendant that they want the opportunity to endorse their own sponsors in the space occupied by the bibs.  Further, Defendant PGA TOUR had to coerce Plaintiffs into wearing the bibs.  Defendant PGA TOUR knew that the basis of Plaintiffs' resistance to wearing the bibs was Plaintiffs' desire to be paid for endorsing products and services.  Defendant PGA TOUR voluntarily and knowingly accepted and retained payment for the endorsements effectuated by the bibs despite knowing that Plaintiffs expected payment for endorsing bib sponsors' products and services.  At Plaintiffs' expense and by virtue of Plaintiffs' effort, Defendant PGA TOUR was unjustly enriched in an amount equal to the sums collected from bib sponsors.

103.    For these reasons, it would be inequitable for Defendant PGA TOUR to retain the benefits obtained from Plaintiffs' endorsement of Defendant's sponsors without paying fair value for the service.  The Court should therefore place a constructive trust on the money that Defendant

PGA TOUR has accepted by virtue of the bibs, disgorge the money from Defendant, and award it to Plaintiffs.

## V. LANHAM ACT VIOLATIONS

104.    Plaintiffs incorporate the allegations in paragraphs 1-103 in this section for all purposes as if fully restated.

105.    Defendant PGA TOUR's conduct violates § 43 of the Lanham Act, codified at 15 U.S.C. § 1125.   Specifically, by forcing Plaintiffs to wear the bibs without their consent, Defendant has employed a marketing device that is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of Defendant with Plaintiffs, or as to the origin, sponsorship, or approval of Defendant's and bib sponsors' goods, services, or commercial activities.   Through the same conduct, Defendant has misrepresented the nature, characteristics, and qualities of Defendant's own marketing services.

106.    As detailed above, Plaintiffs were forced to wear the bibs before live and broadcast audiences viewing professional golf tournaments.   Defendant knew that these audiences are generally comprised of golf fans who readily identify professional golfers and their caddies. Motivated by that knowledge, Defendant used the likenesses and images of Plaintiffs to endorse the products and services of bib sponsors by forcing Plaintiffs to wear bibs at professional golf tournaments.

107.    By forcing Plaintiffs to wear the bibs before live and broadcast audiences, Defendant intentionally and knowingly (1) misled those audiences into believing that Plaintiffs voluntarily endorse or approve of the bib sponsors' products and services; (2) caused confusion among members of those audiences as to whether Plaintiffs endorse or approve bib sponsors' products and services; (3) misled or confused Endorsement consumers regarding Plaintiffs' association with Defendant and involvement in Defendant's advertising activities; (4) misled those audiences and Endorsement Consumers into believing that Plaintiffs voluntarily endorse or approve Defendant PGA TOUR's use of Plaintiffs'  likenesses and images in Defendant's marketing activities; and (5) created a false belief that Defendant PGA TOUR and Plaintiffs are

1 connected, associated, or otherwise affiliated with respect to the advertising achieved by the bibs

2 and with respect to the companies advertised on the bibs.

3     108.    As a result of Defendant PGA TOUR's violations of the Lanham Act, Plaintiffs

4 have sustained damages in the amount that they would have earned had Defendant or the bib

5 sponsors been required to pay Plaintiffs for the use of their likenesses and images.

6     109.    By virtue of its Lanham Act violations, Defendant has been enriched by all sums

7 paid for bib advertising. Plaintiffs seek an order disgorging those sums and awarding them to

8 Plaintiffs.

9 **VI. DURESS/BUSINESS COMPULSION**

10     110.    Plaintiffs incorporate the allegations in paragraphs 1 – 109 in this part for all

11 purposes as if fully restated.

12     111.    Plaintiffs unwillingly wore the bibs at issue in this lawsuit. To compel Plaintiffs to

13 wear the bibs, Defendant PGA TOUR threatened to and attempted to interfere with Plaintiffs'

14 business relationships with their respective players and individual sponsors. That interference

15 would preclude Plaintiffs from providing caddie services to professional golf players at

16 professional golf tournaments. Such interference also would have reduced or eliminated

17 Plaintiffs' ability to enter new endorsement agreements and to perform under existing

18 endorsement agreements. There is no other context in the United States in which Plaintiffs can

19 provide caddie services to professional golf players or sell endorsements. Thus, Defendant PGA

20 TOUR gave Plaintiffs no reasonable alternative but to wear the bibs without remuneration.

21     112.    As a result of Defendant PGA TOUR's coercion, Plaintiffs have lost opportunities

22 to endorse products and services for pay in the space occupied by Defendant's bibs. Additionally,

23 Plaintiffs have provided valuable endorsement services for Defendant PGA TOUR without

24 compensation.

25     113.    Plaintiffs have suffered damages in the amount of money they would have earned

26 through endorsement deals they would have entered into had they been able to use the space

27 occupied by the bibs in accordance with the Endorsement Policy. Alternatively, Plaintiffs seek to

28

1    recover the amount of money and other benefits Defendant PGA TOUR has received in

2    connection with the bibs.

3    **VII. VIOLATIONS OF CALIFORNIA'S UNFAIR COMPETITION LAW**

4         114.    Plaintiffs incorporate the allegations in paragraphs 1 – 113 in this section for all

5    purposes as if fully restated.

6         115.    In perpetuating the conduct alleged herein, Defendant PGA TOUR violated

7    California Business & Professions Code § 17200 *et seq.* ("**UCL**").    Specifically, by coercing

8    Plaintiffs to wear the bibs during professional golf tournaments, Defendant has engaged in

9    business practices or acts that are unfair, unlawful, fraudulent, or a combination thereof.

10        116.    As noted above, there is a lucrative market for advertising opportunities during

11   professional golf tournaments and in broadcasts of those tournaments.    Defendant and Plaintiffs

12   are competitors in that market.    The consumers in the market are companies seeking to purchase

13   marketing space.    Bib sponsors are one example of these consumers.

14        117.    As alleged throughout this Complaint, Plaintiffs' have employed threats of

15   interference with Plaintiffs' endorsement opportunities and with Plaintiffs' employment by

16   professional golfers to coerce Plaintiffs into providing advertising services for Defendant without

17   compensation.    As a result, Defendant has unfairly decreased competition by reducing Plaintiffs'

18   capacity to sell endorsements.    Further, Defendant's conduct is unlawful under the UCL because

19   Defendant has violated federal antitrust law, misappropriated Plaintiffs' likenesses and images,

20   violated the Lanham Act, and breached its contracts with Plaintiffs.    Additionally, on information

21   and belief, Defendant PGA TOUR has intentionally misled bib sponsors into believing that

22   Plaintiffs voluntarily consented to wearing the bibs without compensation.    Alternatively,

23   Defendant intentionally misled bib sponsors into believing that Defendant had a legal right to

24   force Plaintiffs to wear the bibs without compensation.    In the further alternative, Defendant

25   intentionally misled bib sponsors into believing that Plaintiffs were being compensated for

26   wearing the bibs.    Defendant PGA TOUR's conduct provides no valid benefit to consumers or to

27   competition.

28

118.    As a result of Defendant's unfair competition, Plaintiffs have suffered significant pecuniary losses in the amount they would have earned had Defendant not coerced Plaintiffs into wearing the bibs without compensation and had Defendant allowed Plaintiffs to exercise their rights under the Endorsement Policy.  As a result of Defendant's unfair competition, consumers of advertising, such as bib sponsors, have suffered significant injury by paying above market value for bib advertising, by being denied access to a valuable marketing medium, or being priced out of the market altogether.  Further, Defendant PGA TOUR has benefitted from its unfair competition by netting millions of dollars each year from bib advertising.

119.    Neither Plaintiffs nor consumers could have reasonably avoided the harm caused by Defendant PGA TOUR's unfair competitive practices.  Plaintiffs were given a "choice": wear the bibs and preserve their employment relationship with professional golfers, or refuse to wear the bibs and Defendant would work to terminate Plaintiffs' employment with professional golfers and interfere with Plaintiffs' individual sponsorship agreements.  Plaintiffs could not have reasonably chosen the latter.  Consumers of advertising services are on similar footing.  On information and belief, at least some consumers are unaware of Defendant PGA TOUR's coercion and have no reason to believe that Plaintiffs were entitled to the benefits under the Endorsement Policy.  These consumers' lack of understanding is attributable to Defendant's misrepresentations.  And regardless of advertising consumers' awareness of the Endorsement Policy, they had no reasonable response to Defendant PGA TOUR's conduct.  Advertising consumers could disregard Defendant's conduct and enter endorsement agreements with Plaintiffs under which Plaintiffs would wear logos in the space occupied by the bibs.  However, Defendant would simply continue to force Plaintiffs to wear the bibs.

120.    Plaintiffs and advertising consumers have suffered actual damages in the amount they would have earned had they been permitted to endorse sponsors in the space occupied by the bibs.  Further, because of its unlawful conduct, Defendant PGA TOUR has received tens of millions of dollars annually.  The Court should order disgorgement the benefits obtained by Defendant as a result of its wrongful conduct.

**CLASS ALLEGATIONS**

121.     Plaintiffs incorporate the allegations in paragraphs 1 - 120 in this part for all purposes as if fully restated.

122.     Class certification is appropriate under Federal Rules of Civil Procedure 23(b)(2) ("**Rule 23(b)(2)**") and 23(b)(3) ("**Rule 23(b)(3)**").  Class certification is appropriate under Rule 23(b)(2) because Defendant PGA TOUR's wrongful conduct was generally directed to the entire proposed class, and Plaintiffs' requested injunctive relief is appropriate respecting the proposed class as a whole.  Class certification is also appropriate under Rule 23(b)(3) because questions of law or fact common to all proposed class members predominate over any questions affecting only individual members, and the class action procedure is superior to other available methods for fairly and efficiently adjudicating Plaintiffs' claims.

## I. PROPOSED CLASS DEFINITION

123.     Plaintiffs propose the following class definition: All caddies residing in the United States who, without remuneration, wear or have worn bibs bearing the logos of Defendant PGA TOUR's sponsors or those of Defendant's partners or affiliates, while providing caddie services to a golfer participating in a tournament on one of Defendant PGA TOUR's Three Tours pursuant to an agreement between such golfer and such caddie.

124.     Proposed class representative Mike Hicks and alternate proposed class representative Kenny Harms are members of this proposed class.

## II. THRESHOLD REQUIREMENTS UNDER FEDERAL RULE OF CIVIL PROCEDURE 23(a).

125.     The proposed class satisfies the numerosity, commonality, typicality, and adequacy requirements under Federal Rule of Civil Procedure 23(a).  First, Plaintiffs' proposed class satisfies the numerosity requirement.  On information and belief, more than 1,000 caddies comprise the proposed class, and they reside across the United States.  Given the number of proposed class members and their various domiciles, it would be impracticable to join all caddies individually in this action.

126.     Plaintiffs' proposed class also satisfies the commonality requirement.  The claims of each member of the proposed class stand and fall on the allegation that Defendant coerced

1   Plaintiffs to wear the bibs without compensation and, in doing so, violated federal antitrust law,

2   violated the Lanham Act, breached its contracts with Plaintiffs, misappropriated Plaintiffs' images

3   and likenesses, and retained money owed to Plaintiffs.  The questions common to each and every

4   member of the proposed class include (1) whether Defendant PGA TOUR violated the Sherman

5   Act by unlawfully restraining the proposed class members' ability to compete in the Endorsement

6   Market; (2) whether Defendant PGA TOUR breached its contracts with members of the proposed

7   class by prohibiting them from endorsing products and services as provided by the Endorsement

8   Policy; (3) whether Defendant PGA TOUR misappropriated the likenesses and images of the

9   members of the proposed class when it coerced each member to wear the bibs at professional golf

10  tournaments, which were broadcast via television, Internet, and video-on-demand platforms; and

11  (4) whether Defendant PGA TOUR wrongfully profited from each member of the proposed class

12  at each member's expense, or by the employment of duress or unlawful compulsion.

13      127.     Plaintiffs' proposed class representative Mike Hicks and alternate proposed class

14  representative, Kenny Harms (collectively "**Proposed Class Representatives**") satisfy the

15  typicality requirement.  The harm suffered by all members of the proposed class is identical in

16  character to the harm suffered by the Proposed Class Representatives.  The Proposed Class

17  Representatives and each proposed class member had an agreement with the PGA TOUR under

18  which they could endorse products as permitted under the Endorsement Policy, and the proposed

19  class members, including the Proposed Class Representatives, were prohibited by the PGA TOUR

20  from exercising their rights under the Endorsement Policy.  Each proposed class member and the

21  Proposed Class Representatives were prohibited from selling endorsements in the market defined

22  above.  Each proposed class member and the Proposed Class Representatives wore Defendant

23  PGA TOUR's bibs and therefore conferred a benefit on Defendant without remuneration.  Finally,

24  nothing alleged in this Complaint is unique to the Proposed Class Representatives.

25      128.     The Proposed Class Representatives will fairly and adequately protect the interests

26  of the proposed class.  They have historically worked for the betterment of the caddie profession

27  and caddie working conditions.  For instance, Mr. Hicks has been a PGA Tour caddie for thirty-

28  three years.  Mr. Hicks has contributed to sixteen victories by four different players in Defendant's

events.  Mr. Harms serves as a board member for the APTC, an organization devoted to the improvement of caddie working conditions and benefits.  Mr. Harms has been a professional caddie since 1991 and has caddied for professional golfers Kevin Na, Hale Irwin, Aaron Baddeley, Hubert Green, Ray Floyd, Gary Player, Lee Trevino, David Eger, Jan Stephenson, Emilee Klein, Lynn Connelly, and Michelle Wie.

129.    Approximately eighty members of the proposed class are named plaintiffs in this action and have hired the undersigned counsel to represent their interests in this case.  There are no reasons why the undersigned counsel cannot adequately protect the proposed class's interests.

130.    Neither the Proposed Class Representatives nor their counsel have any conflicts of interest with other members of the proposed class.  In fact, several members of the proposed class, named above, *supra* paragraphs 14 – 35, have agreed to join in this lawsuit and to be represented by the same counsel.  Further, the Proposed Class Representatives and the proposed class members will share the same benefits from this action should Plaintiffs prevail.

**III.  CLASS CERTIFICATION IS PROPER UNDER RULE 23(b)(2)**

131.    Defendant PGA TOUR has acted or refused to act on grounds that apply generally to all the members of the proposed class, so that final injunctive relief is appropriate with respect to the proposed class as a whole.

132.    The conduct of Defendant PGA TOUR alleged in this Complaint has been directed at all caddies working for professional golfers on one or more of the Three Tours.  Defendant has compelled all caddies to wear the bibs against their will.  Defendant has unlawfully decreased all caddies' capacity to compete in the market defined above.  Defendant has interfered with all caddies' rights under the Endorsement Policy.  Defendant has unlawfully profited from all caddies' wearing the bib.

133.    Should Plaintiffs prevail on one or more of their causes of action, Plaintiffs seek an order from this Court enjoining Defendant PGA TOUR from continuing its unlawful conduct in the future.    The injunctive relief sought and bases for such relief are stated below, *infra* paragraphs 142 - 154.

134.   Although Plaintiffs also seek damages for Defendant PGA TOUR's unlawful conduct, those damages will constitute a hollow victory in the absence of prospective injunctive relief, especially for those class members who are in the beginning stages of their career as a professional caddie.  Without injunctive relief in place, Defendant PGA TOUR may determine that it is in its economic interest to continue the conduct at issue in this lawsuit or to take new measures that unlawfully interferes with the relevant market, coerces the Plaintiffs, or uses the Plaintiffs' likenesses for commercial purposes without Plaintiffs' consent.   Additionally, injunctive relief will provide Plaintiffs and their potential sponsors the freedom and security to negotiate and enter endorsement agreements without the fear of interference by Defendant PGA TOUR.  Should Defendant PGA TOUR continue the same conduct that establishes liability in this case, Plaintiffs should not have to begin further litigation to re-establish liability for such conduct.

135.   Finally, damages alone are inadequate.  Damages do not protect Plaintiffs from Defendant's future attempts to force Plaintiffs to endorse products and services without compensation.  And with respect to Plaintiffs who recently entered the profession, their damages will be nominal, and injunctive relief will protect their pecuniary interests by securing their right to compensation for endorsements.

## IV.  CLASS CERTIFICATION IS PROPER UNDER RULE 23(b)(3)

136.   Class certification under Rule 23(b)(3) is appropriate because the questions of law or fact common to proposed class members predominate over any questions affecting only individual members, and a class action is superior to other available methods for fairly and efficiently adjudicating Plaintiffs' claims.

137.   The proposed class satisfies the predominance element because the central issues can be resolved for all members of the proposed class in a single adjudication.  These central questions are (1) whether Defendant PGA TOUR violated the Sherman Act by unlawfully restraining the proposed class members' ability to compete in the Endorsement Market; (2) whether Defendant PGA TOUR breached its contracts with members of the proposed class by prohibiting them from endorsing products and services as provided by the Endorsement Policy; (3) whether Defendant PGA TOUR misappropriated the likenesses and images of the members of the

1  proposed class when it coerced each member to wear the bibs at professional golf tournaments,

2  which were broadcast via television, Internet, and video-on-demand platforms; and (4) whether

3  Defendant PGA TOUR wrongfully profited from each member of the proposed class at each

4  member's expense, or by the employment of duress or unlawful compulsion. Given the

5  homogenous nature of Defendant PGA TOUR's conduct toward the proposed class members,

6  these issues may be determined in this litigation in a single stroke.

7       138.    The superiority element is likewise satisfied. First, on information and belief, no

8  caddies are involved in litigation that involves or relates to the allegations made in this Complaint.

9       139.    Second, there are many reasons why members of the proposed class would not

10  have an interest in individually controlling the prosecution of their claims in separate actions. For

11  example, all members of the proposed class will benefit equally from the prospective relief

12  requested by Plaintiffs, assuring that each of them will be treated in the same manner and there is

13  no risk of inconsistency of result. Additionally, several members of the proposed class are

14  hesitant to prosecute claims on their own behalf out of fear of retaliation by Defendant PGA

15  TOUR. Other members of the proposed class are hesitant to prosecute their claims individually

16  out of fear that the player for whom they caddie will terminate their employment out of the

17  player's own fear of retaliation by Defendant PGA TOUR, or to avoid any publicity created by

18  litigation. Others will lack financial incentive given the cost of litigation versus the amount they

19  could reasonably expect to recover.

20       140.    It is highly desirable to focus this litigation in this forum. Defendant PGA TOUR

21  has a permanent office in San Francisco, California, which makes much of the evidence easily

22  accessible and provides a convenient venue for Defendant's representatives to attend hearings or

23  other court proceedings as necessary. The Northern District of California is extremely

24  experienced in adjudicating claims similar to those alleged in this Complaint. Additionally,

25  prosecution of Plaintiffs' nearly-identical claims in several different courts will amount to a waste

26  of judicial resources, and individual prosecution will result in costly and wasteful duplication of

27  discovery, motion practice, and trial.

28

141.     There is little foreseeable difficulty in managing the proposed class action.  In fact, a class action would streamline discovery and avoid the need for separate, repetitive trials and duplicate discovery.  Instead of Defendant PGA TOUR's representatives being deposed numerous times in separate suits and forums, its representatives only would be subject to depositions in this class action.  The proposed class action would eliminate other repetitive, duplicate discovery, such as depositions of individual plaintiffs which merely produce the same testimony over and over again.  To the extent that the amount of actual damages or losses suffered by each member of the proposed class militates against class certification, Plaintiffs aver that the evidence in this case will reveal a method of determining actual loss—or actual benefit conferred on Defendant PGA—that minimizes the need for individual evidence by each proposed class member.  Plaintiffs anticipate that such a formula may be created by considering factors such as (1) the number of tournament rounds during which each proposed class member wore a bib; (2) the proportion of each such tournament round that was televised or otherwise broadcast, taking into consideration the mode of broadcast; (3) the number of such rounds taking place after the "cut" occurred in a particular tournament; and (4) on which of Defendant PGA Tour's Three Tours  the bib was worn.

## REQUESTED RELIEF

### I. INJUNCTIVE RELIEF PURSUANT TO 15 U.S.C. § 4 AND 15 U.S.C. § 1116

142.     Plaintiffs incorporate the allegations in paragraphs 1 – 141 in this section for all purposes as if fully restated.

143.     Upon determination that Defendant PGA TOUR's conduct violates the Sherman Act, Plaintiffs request a permanent injunction that will prohibit Defendant  PGA TOUR from continuing such conduct.

144.     Upon determination that Defendant PGA TOUR's conduct constituted a violation of the Lanham Act, 15 U.S.C. § 1125(a), Plaintiffs request an order permanently enjoining Defendant PGA TOUR from continuing such conduct.

145.     Additionally, Plaintiffs request a permanent injunction (1) prohibiting Defendant PGA TOUR from revising its rules, regulations, or policies in any way that would unreasonably

restrain trade as alleged herein; (2) prohibiting Defendant PGA TOUR from taking any retaliatory action against Plaintiffs or members of the proposed class; and (3) prohibiting Defendant PGA TOUR from imposing any limits on the endorsement of products and services by Plaintiffs and members of the proposed class beyond those that apply to professional golfers participating in PGA TOUR events.

## II. PERMANENT INJUNCTIVE RELIEF GENERALLY

146.    Plaintiffs incorporate paragraphs 1 – 145 in this section for all purposes as if fully restated.

147.    Plaintiffs seek a permanent injunction prohibiting Defendant PGA TOUR from engaging in any conduct upon which liability is based in this lawsuit.

148.    Plaintiffs ask the Court to enjoin Defendant from broadcasting images of Plaintiffs wearing the bibs except with consent of caddies.  Alternatively, Plaintiffs request an order that requires Defendant PGA TOUR to compensate Plaintiffs appearing in such broadcasts.

149.    Plaintiffs anticipate that Defendant PGA TOUR will interfere with Plaintiffs' contracts with their respective players in retaliation or in an attempt to compel the players to prohibit Plaintiffs from engaging in their own endorsement activities.  Plaintiffs therefore seek an order enjoining Defendant PGA TOUR from taking such actions.

150.    The conduct that Plaintiffs seek to enjoin will cause irreparable harm to Plaintiffs. For instance, should Plaintiffs enter individual endorsement deals as a result of prevailing in this litigation, the conduct sought to be enjoined will force Plaintiffs to choose between fulfilling their endorsement responsibilities and engaging in their profession as a caddie.  Plaintiffs request injunctive relief that will prevent such harm.

151.    The balance of equities and public interest tip in favor of permanent injunctive relief.  A permanent injunction will provide Plaintiffs and Defendant PGA TOUR with consistent expectations regarding future endorsement deals between Plaintiffs and sponsors.  Thus, Plaintiffs and Defendant PGA TOUR, relying on the Court's injunction order, will have reliable expectations and can proceed with certainty as to the parties' respective rights.  Additionally, with a permanent injunction in place governing aspects of the parties' prospective conduct, the sponsors

- 34 -

with whom Plaintiffs and Defendant PGA TOUR enter endorsement agreements will have some security based on the terms of the injunctive order. If the future is unsettled, Plaintiffs, Defendant PGA, and potential sponsors are all susceptible to entering endorsement deals that guarantee litigation. Further, upon prevailing in this case, neither Plaintiffs nor this Court should have to relitigate the same issues disposed in this lawsuit when the threat of such relitigation could be quelled by injunctive relief.

152. The public's interest will be served by a future permanent injunction. Public interest is always served by actions that reduce consumer confusion and misleading advertising. An order that precludes Defendant PGA TOUR from compelling Plaintiffs to wear the bibs will produce these benefits. The public's interest always will be served by guarding against certain litigation in exchange for limits on parties' unlawful conduct. An order enjoining prospective conduct identical to the conduct at issue in this lawsuit will reduce the chances that these issues are relitigated.

**III. S**TATUTORY **I**NJUNCTIONS **U**NDER **S**TATE **L**AW

153. Pursuant to California's unfair competition law, Plaintiffs request an order enjoining Defendant PGA TOUR from engaging in any practice which constitutes unfair competition and restoring to Plaintiffs all money and property which Defendant acquired or will acquire by virtue of its unfair competition.

154. To that end, Plaintiffs request that a receiver be appointed to oversee Defendant's compliance with such order. Alternatively, the court should maintain supervisory jurisdiction.

**IV. P**RELIMINARY **I**NJUNCTION

155. Plaintiffs seek preliminary injunctive relief that will maintain the status quo among the parties pending the outcome of this case. The specific relief requested and grounds for such relief are set forth in Plaintiffs' motion and memorandum in support filed contemporaneously with this Complaint.

**V. A**CTUAL AND **S**TATUTORY **D**AMAGES

156. Plaintiffs incorporate the allegations in paragraphs 1 - 155 in this section for all purposes as if fully restated.

1     157.    Plaintiffs seek to recover all statutory damages to which they are entitled. Under

2  California's right to publicity statute, CAL. CIV. CODE § 3344, Plaintiffs are entitled to $750 for

3  each violation.

4     158.    Plaintiffs also seek actual damages in the amount of money they would have earned

5  based on the market value of the bib endorsements.

6     159.    Plaintiffs seek actual damages in the amount of the gross income attributable to

7  Defendant PGA TOUR's use of Plaintiffs' likenesses and images in commercial activities.

8     160.    Plaintiffs' seek actual damages in the amount of royalties to which Plaintiffs would

9  have been entitled had Plaintiffs been properly paid for the use of their likenesses and images in

10  the endorsement of the products and services of the companies whose logos appeared on the bibs.

11     161.    Plaintiffs seek damages in the amount that Plaintiffs could have reasonably

12  expected to earn had they been afforded the right under the Endorsement Policy to endorse

13  products and services in the space occupied by the bibs.

14  **VI. DISGORGEMENT/CONSTRUCTIVE TRUST**

15     162.    Plaintiffs incorporate the allegations in paragraphs 1 - 161 in this section for all

16  purposes as if fully restated.

17     163.    Plaintiffs seek recovery of all money and benefits received by Defendant PGA

18  TOUR and its partners and affiliates by virtue of Plaintiffs' wearing the bibs during Defendant

19  PGA TOUR's events.

20     164.    On information and belief, Defendant PGA TOUR has accepted and retained over

21  $50 million annually from bib sponsors.

22  **VII. TREBLE AND PUNITIVE DAMAGES**

23     165.    Plaintiffs seek treble damages under 15 U.S.C. § 15 and 15 U.S.C. § 1117.

24     166.    Additionally, Defendant PGA's conduct was intentional, reckless, and malicious.

25  Thus, to the extent permitted by law, Plaintiffs' seek punitive damages.

26  **VIII. PRE-JUDGMENT AND POST-JUDGMENT INTEREST**

27     167.    Plaintiffs request pre-judgment post-judgment interest on any money judgment.

28

1

2                                    **<u>PRAYER</u>**

3          Plaintiffs respectfully ask that the Court grant the relief requested above and all other relief

4   to which Plaintiffs are entitled, whether by law or equity.

5

6

7   *[Signature Blocks on Next Page]*

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1  Dated: February 3, 2015                **THE LANIER LAW FIRM, P.C.**

2                                         By:      */s/ Lee Cirsch*_____
3                                                     Lee Cirsch

4                                         Lee Cirsch (CA State Bar No. 227668)
                                          10866 Wilshire Blvd., Suite 400
5                                         Los Angeles, CA  90024
                                          Telephone:  310-277-5100
6                                         Facsimile:  310-277-5103
7                                         lee.cirsch@lanierlawfirm.com

8                                         THE LANIER LAW FIRM, P.C.
                                          W. Mark Lanier *Pending Pro Hac Vice*
9                                         wml@lanierlawfirm.com
                                          Eugene R. Egdorf  *Pending Pro Hac Vice*
10                                        gene.egdorf@lanierlawfirm.com
                                          Benjamin T. Major  *Pending Pro Hac Vice*
11                                        ben.major@lanierlawfirm.com
                                          Ryan D. Ellis  *Pending Pro Hac Vice*
12                                        ryan.ellis@lanierlawfirm.com
13                                        6810 FM 1960 West
                                          Houston, TX 77069
14                                        Telephone:   713-659-5200
                                          Facsimile:   713-659-2204
15

16                                        Arthur R. Miller *Pending Pro Hac Vice*
                                          Arthur.miller@lanierlawfirm.com
17                                        THE LANIER LAW FIRM, PLLC
                                          126 East 56th Street, 6th Floor
18                                        Tower 56
                                          New York, New York 10022
19                                        Telephone:  212-421-2800
20                                        Facsimile:  212-421-2878
                                          ***Attorneys for Class Representative Plaintiffs, William***
21                                        ***Michael Hicks, Kenneth Harms, et. al.***

22

23

24

25

26

27

28

1

## <u>DEMAND FOR JURY</u>

2

Plaintiffs hereby demand a trial by jury on all issues as provided by Rule 38(b) of the

3

Federal Rules of Civil Procedure.

4

Dated: February 3, 2015                   THE LANIER LAW FIRM, P.C.

5

By:        */s/ Lee  Cirsch*

6

Lee Cirsch

7

THE LANIER LAW FIRM, P.C.

8

Lee Cirsch (CA227668)
10866 Wilshire Blvd., Suite 400

9

Los Angeles, CA  90024
Telephone:  310-277-5100

10

Facsimile:  310-277-5103
lee.cirsch@lanierlawfirm.com

11

12

THE LANIER LAW FIRM, P.C.
W. Mark Lanier *Pending Pro Hac Vice*

13

wml@lanierlawfirm.com
Eugene R. Egdorf  *Pending Pro Hac Vice*

14

gene.egdorf@lanierlawfirm.com
Benjamin T. Major  *Pending Pro Hac Vice*

15

ben.major@lanierlawfirm.com
Ryan D. Ellis  *Pending Pro Hac Vice*

16

ryan.ellis@lanierlawfirm.com
6810 FM 1960 West

17

Houston, TX 77069

18

Telephone:   713-659-5200
Facsimile:   713-659-2204

19

20

Arthur R. Miller *Pending Pro Hac Vice*
Arthur.miller@lanierlawfirm.com

21

THE LANIER LAW FIRM, PLLC
126 East 56th Street, 6th Floor

22

Tower 56
New York, New York 10022

23

Telephone:  212-421-2800
Facsimile:  212-421-2878

24

***Attorneys for Class Representative Plaintiffs, William***

25

***Michael Hicks, Kenneth Harms, et. al.***

26

27

28