**Lee Cirsch (CA State Bar No. 227668)**
THE LANIER LAW FIRM, P.C.
10866 Wilshire Blvd., Suite 400
Los Angeles, California   90024
Telephone:  310-277-5100
Facsimile:  310-277-5103
lee.cirsch@lanierlawfirm.com

W. Mark Lanier *Admitted Pro Hac Vice*
wml@lanierlawfirm.com
Eugene R. Egdorf  *Admitted Pro Hac Vice*
gene.egdorf@lanierlawfirm.com
Benjamin T. Major  *Admitted Pro Hac Vice*
ben.major@lanierlawfirm.com
Ryan D. Ellis  *Admitted Pro Hac Vice*
ryan.ellis@lanierlawfirm.com
THE LANIER LAW FIRM, P.C.
6810 FM 1960 West
Houston, Texas 77069
Telephone:   713-659-5200
Facsimile:   713-659-2204

Arthur R. Miller *Admitted Pro Hac Vice*
Arthur.miller@lanierlawfirm.com
THE LANIER LAW FIRM, PLLC
126 East 56th Street, 6th Floor
Tower 56
New York, New York 10022
Telephone:  212-421-2800
Facsimile:  212-421-2878

***Attorneys for Class Representative
Plaintiffs, William Michael Hicks and
Kenneth Harms, and Individual Plaintiffs,
Matthew Achatz, Brandon Antus, Chad
Antus, Andrew Barnes, Chris Berry,
Michael Bestor, Duane Bock, David
Brooker, Mark Carens, Steve Catlin, Bruce
Clendenen, Graeme Courts, Michael
Darby, Henry Diana, Don Donatello,
Michael Doran, James Edmondson, Dean
Elliott, Joseph Etter, Brent Everson, Micah
Fugitt, Damon Green, Jay Haas, Jr.,
Steven Hale, Matthew Hauser, Adam
Hayes, William Heim, Christian Heath
Holt, Jonathan Jakovac, Tom Janis,
Jimmy Johnson, Chris Jones, Nick Jones,
Steve Kay, Anthony Knight, Shay Knight,
Mitch Knox, Kurtis Kowaluk, Ronald
Levin, John Limanti, Brennen Little,***

1  *Damian Lopez, Scott Martin, Rich Mayo,*
*Jr., Daniel McQuilken, Eric Meller,*
2  *Matthew Minister, Charles Mohr, Todd*
*Montoya, Tony Navarro, Donald Nelson,*
3  *Travis Perkins, Joseph Pyland, Brian*
*Reed, Chad Reynolds, Miguel Rivera,*
4  *David Robinson, Scott Sajtinac, Andrew*
*Sanders, Fred Sanders, Corby Segal,*
5  *Shawn Segars, Brian Smith, Russell Stark,*
*Brad Swearingen, Paul Tesori, Robert*
6  *Thompson, Scott Tway, Steve Underwood,*
*Mark Urbanek, Rusty Uresti, Brett*
7  *Waldman, Neil Wallace, Aaron Wark,*
*Jeffery Willett, Barry Williams, Michael*
8  *Mazzeo, Jon Yarbrough, Justin York*
*Pete Jordan, Brent Henley, Calvin Henley,*
9  *John R. Adcox, Peter Ambrosetti, George*
*Assante, Matthew Bednarski, Norman R.*
10  *Blount, Jr., Alan Bond, Harry Brown,*
*John M. Buchna, Bob Burns, Colin*
11  *Byrne, Kenny Butler, Michael Carrick,*
*Ladden Cline, Martin Courtois, Russell*
12  *Craver, Mark Crunden, Jon Custer,*
*Andrew Davidson, Joshua E. Dickinson,*
13  *Robert Dickerson, Jeff Dolf, Joseph*
*Duplantis, John Egan, Terry R. Engleman,*
14  *Patrick V. Esway, Jr., Christopher S.*
*Fiedler, Thomas Fletcher, Tim Goodell,*
15  *Steve Greenwood, Matthew Hall, Mark*
*Hamilton, Mark Huber, David A. Kerr,*
16  *Kyle Kolenda, Marcel LaBas, David*
*Lawson. Philip Lowe, Michael Maroney,*
17  *Greg W. Martin, Andrew Martinez, Ronald*
*McCann, Kevin McArthur, Robert J.*
18  *McFadden, Allan Mellan, Michael*
*Middlemo, Mark E. Miller, Richard J.*
19  *Motacki, Todd Newcomb, David B.*
*Parsons, David Patterson, William Poore,*
20  *Lewis B. Puller III, David H. Rawls, Chad*
*Rosenak, Richard M. Schlaack, Daniel*
21  *Schlimm, Eric Schwarz, Spencer Seifert,*
*James Smith, John L. Smith, William*
22  *Spencer, James Springer, Linn Strickler,*
*Brian H. Sullivan, Timothy J. Thalmueller,*
23  *Jim Thomas, Kenneth A. Tolles, Terry*
*Travis, Matthew Tritton, Dennis Turning,*
24  *Robert Vail, Peter Vanderriet, John Venn,*
*Weston Scott Watts, Michael J. Waite,*
25  *James Walters, Bradley Whittle, Anthony*
*Wilds, Stephen Williams, Thomas G.*
26  *Williams, Edward E. Willis, David*
*Woosley, Walter Worthen, Jr., Noah Zelnik*
27
28

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| William Michael Hicks and Kenneth Harms, as ) Class Representative Plaintiffs and Individual ) Plaintiffs, Matthew Achatz, Brandon Antus, ) Chad Antus, Andrew Barnes, Chris Berry, ) Michael Bestor, Duane Bock, David Brooker, ) Mark Carens, Steve Catlin, Graeme Courts ) Bruce Clendenen, Michael Darby, Henry ) Diana, Don Donatello, Michael Doran, James ) Edmondson, Dean Elliott, Joseph Etter, Brent ) Everson, Micah Fugitt, Damon Green, Jay ) Haas, Jr., Steven Hale, Matthew Hauser, Adam ) Hayes, William Heim, Christian Heath Holt, ) Jonathan Jakovac, Tom Janis, Jimmy Johnson, ) Chris Jones, Nick Jones, Steve Kay, Anthony ) Knight, Shay Knight, Mitch Knox, Kurtis ) Kowaluk, Ronald Levin, John Limanti, ) Brennen Little, Damian Lopez, Scott Martin, ) Rich Mayo, Jr., Daniel McQuilken, Eric ) Meller, Matthew Minister, Charles Mohr, Todd ) Montoya, Tony Navarro, Donald Nelson, ) Travis Perkins, Joseph Pyland, Brian Reed, ) Chad Reynolds, Miguel Rivera, David ) Robinson, Scott Sajtinac, Andrew Sanders, ) Fred Sanders, Corby Segal, Shawn Segars, ) Brian Smith, Russell Stark, Brad Swearingen, ) Paul Tesori, Robert Thompson, Scott Tway, ) Steve Underwood, Mark Urbanek, Rusty ) Uresti, Brett Waldman, Neil Wallace, Aaron ) Wark, Jeffery Willett, Barry Williams, Michael ) Mazzeo, Jon Yarbrough, Justin York, Peter ) Jordan, Brent Henley, Calvin Henley, John R. ) Adcox, Peter Ambrosetti, George Assante, ) Matthew Bednarski, Norman R. Blount, Jr., ) Alan Bond, Harry Brown, John M. Buchna, ) Bob Burns, Colin Byrne, Kenny Butler, ) Michael Carrick, Ladden Cline, Martin ) Courtois, Russell Craver, Mark Crunden, Jon ) Custer, Andrew Davidson, Joshua E. ) Dickinson, Robert Dickerson, Jeff Dolf, Joseph ) Duplantis, John Egan, Terry R. Engleman, ) Patrick V. Esway, Jr., Christopher J. Fiedler, ) Thomas Fletcher, Tim Goodell, Steve ) Greenwood, Matthew Hall, Mark Hamilton, ) Mark Huber, David A. Kerr, Kyle Kolenda, ) Marcel LaBas, David Lawson, Philip Lowe, ) Michael Maroney, Greg W. Martin, Andrew ) Martinez, Ronald McCann, Kevin McArthur, ) Robert J. McFadden, Allan Mellan, Michael ) Middlemo, Mark E. Miller, Richard J. | Case No. 3:15-cv-00489-VC

**PLAINTIFFS' SECOND AMENDED CLASS ACTION COMPLAINT FOR DAMAGES**

**DEMAND FOR JURY TRIAL** |

1  Motacki, Todd Newcomb, David B. Parsons,
   David Patterson, William Poore, Lewis B.
2  Puller III, David H. Rawls, Chad Rosenak,
   Richard M. Schlaack, Daniel Schlimm, Eric
3  Schwarz, Spencer Seifert, James Smith, John
   L. Smith, William Spencer, James Springer,
4  Linn Strickler, Brian H. Sullivan, Timothy J.
   Thalmueller, Jim Thomas, Kenneth A. Tolles,
5  Terry Travis, Matthew Tritton, Dennis
   Turning, Robert Vail, Peter Vanderriet, John
6  Venn, Weston Scott Watts, Michael J. Waite,
   James Walters, Bradley Whittle, Anthony
7  Wilds, Stephen Williams, Thomas G.
   Williams, Edward E. Willis, David Woosley,
8  Walter Worthen, Jr., Noah Zelnik

9
   and all others similarly situated,
10
                    Plaintiffs,
11
           vs.
12
   PGA TOUR, Inc.,
13
                    Defendant.
14  _____

15

16
   **PLAINTIFFS' SECOND AMENDED CLASS COMPLAINT AND JURY DEMAND**
17

18
                    **INTRODUCTION**
19
           1.      This is a class action lawsuit brought by professional golf caddies employed by
20
   professional golfers who compete on one or more of Defendant's golf tours.  The purposes of this
21
   lawsuit are to compensate caddies who have been forced to wear the logos of Defendant's
22
   corporate sponsors without remuneration, and to preclude Defendant, individually and in concert
23
   with its Local Hosts, from forcing caddies to provide these endorsement services gratuitously in
24
   the future. [1]  The main issue in this lawsuit is whether Defendant, alone or in concert Local Hosts,
25

26
   _____
27          [1] Local Hosts co-sponsor PGA TOUR events with Defendant.  Local Hosts have a strong
28  financial interest in the sale of advertising space on the bibs.  Further, Local Hosts compete with

may lawfully compel caddies to wear "bibs" (examples pictured below) during professional golf tournaments and then retain for Defendant and/or the Local Hosts the tens of millions of dollars in advertising revenue generated by those bibs annually.



## I.  A BRIEF HISTORY

2.     Golf has not always attracted fanfare or produced wealth.   Early professional golfers were generally poor and survived on meager wages earned by making golf clubs and balls, managing the course shop, giving golf lessons, or working as a caddie.   Early professional golfers merely served golf club members.   They were not permitted in the clubhouse and commanded a low social status.   Even the most proficient professional golfers could hardly be deemed "affluent" until the 1950s.

3.     Similar to professional golfers, professional caddies had very humble beginnings. Caddies were originally golf club servants chosen by a club member to carry his bag and to locate errant balls.   Given the rudimentary grooming of early golf courses, the first caddies were often called upon to locate each ball driven down the fairway.

professional golfers, Defendant, and Plaintiffs in one of the relevant antitrust markets defined below.

4.      As time passed, caddies became experts in course geometry and topography and provided players an advantage over competitors who lacked such a resource.   Given the knowledge and skill that good caddies possess, it is no surprise that golfing greats such as Ben Hogan, Byron Nelson, and Sam Snead caddied at local clubs in their youth.

5.      Since the 1950s, enthusiasm for professional golf, by spectators and sponsors alike, has provided vast opportunities for wealth to the sport's participants.   Defendant, with gross annual revenue of approximately $1 billion, has benefitted immensely from that enthusiasm, initially stirred by famous players such as Arnold Palmer and by celebrities like Bob Hope.

6.      As professional golf has become more popular and competitive, caddies have become an integral part of the sport.  Employed by their respective golfer—not by Defendant— caddies are expected to have considerable expertise in course topography and geometry.  Caddies must know the correct yardage for every lie on every hole, and they must be skilled in reading greens. Caddies also serve as coaches, strategists, general assistants, cheerleaders, counselors, and friends.   One esteemed sports journalist has described caddies as "traffic cops, psychiatrists[,] meteorologists[,] chauffeurs, butlers, and bodyguards, buddies, sidekicks and frequent dinner companions."   Another journalist likens good caddies to "accomplished sports psychologists, like corner men in boxing."   Caddies help their player maintain confidence in aspects of play such as club selection and reading greens.   Although it is axiomatic that success in professional golf comes down to making good shots, caddies are undeniably instrumental in supporting the level of competition that contributes to Defendant's success.

7.      The job market for caddies highlights their importance to professional golf.   For example, it is quite common and acceptable for a struggling golfer to terminate his caddie because of poor tournament results.  If caddies merely carried bags, certainly they would not be terminated as a result of poor play.   Additionally, the market for skilled caddies can become quite competitive.  It is not uncommon for players to recruit other players' caddies using the attraction of better tournament finishes and, therefore, greater income potential for the caddie.

## II. DEFENDANT'S TREATMENT OF CADDIES GENERALLY

8.      Despite the caddies' contribution to professional golf, Defendant has treated caddies as second-class participants of the game.  The Barclays tournament in 2013 provides a microcosm of Defendant's treatment of caddies.   During a rain delay, caddies and members of some of the caddies' families retreated to a shelter designated for caddies.  Although the shelter was not crowded, security officials entered the shelter, demanded identification, and began to shout and berate caddies and their families.  While caddies who produced credentials were permitted to remain in the shelter, caddies' wives and children were put out into the rain by security personnel.

9.      Additionally, Defendant has denied caddies basic health care coverage and access to pension plans.  During tournament play, Defendant forces caddies to use portable lavatories that lack running water and denies caddies access to areas of tournament venues necessary for caddies to perform their duties fully.   The list goes on.

## III. THE CONDUCT AT ISSUE IN THIS LAWSUIT

10.      This suit arises from Defendant's and Local Hosts' practice of unlawfully forcing Plaintiffs to wear the bibs, pictured above in paragraph 1.  The bibs bear the logos of Defendant's sponsors and enjoy significant exposure to live tournament audiences, television audiences, and webcast audiences.  The value of the bibs is approximately $50 million annually.  Caddies receive none of that revenue and never have consented to Defendant's commercial use of their likenesses and images for commercial purposes.  Instead, the money generated by these bib advertisements is paid to Defendant and Local Hosts pursuant to express and implied written and oral agreements, patterns of practice, understandings, or some combination thereof.

11.      As noted throughout this Complaint, Plaintiffs have raised their grievances regarding the bib on multiple occasions, and Defendant has sometimes obstinately refused to change its practice, relying on mere custom as its justification.  For instance, during the 2014 Farmers Insurance Open, Defendant represented that "the bib is off the table" while conceding it may not be "right" but nonetheless justifying the practice because "that is the way it has been."

12.     Other times Defendant suggested that caddies are not actually required to wear the bibs.  Despite such representations, Defendant has fined Plaintiff Steve Williams numerous times for removing bibs that covered up his own sponsors' logos.  Defendant's representations regarding the caddies' duty to wear the bibs have been consistently inconsistent.  Local Hosts have similarly forced caddies to wear the bibs, which are designed by Local Hosts, by threatening to report caddies to Defendant for discipline, by not permitting a caddie to participate in a tournament and carry out his duties for his professional golfer, and by threatening to prohibit the caddie from participating in a tournament unless the caddie wears the bib.  Defendant has previously testified in this case as to Local Hosts' role in designing the bib and bib logos, and Local Hosts' forcing caddies to wear the bibs.  .

13.     The plain text of Defendant's "regulations" permits caddies to endorse their own sponsors' products and services in the space occupied by the bibs, and Defendant does not employ the caddies.   Nevertheless, Plaintiffs have continued to wear the bibs in acquiescence to Defendant's threats to interfere with the caddie-player relationship—which would cause the caddie to suffer financial ruin—and to further limit Plaintiffs' endorsement opportunities.

14.     In this lawsuit the class of caddies defined below seeks injunctive relief that will prohibit Defendant and its Local Hosts from continuing the wrongful conduct that gives rise to this lawsuit.   The caddies also seek actual damages and disgorgement of the monies Defendant unlawfully acquired and/or appropriated as a result of appropriating the caddies' endorsement services.

## IV.   DEFENDANT'S CONDUCT SINCE THE FILING OF PLAINTIFFS' ORIGINAL COMPLAINT

15.     Plaintiffs filed their original complaint on February 3, 2015.  Shortly thereafter, Tim Finchem, Defendant's commissioner, appeared at a press conference, and though he did not address the lawsuit directly, conceded that "there's obviously things [Defendant] can do better."

16.     However, since Plaintiffs filed their original complaint, Defendant has demonstrated its intent to dispose of this lawsuit through non-judicial means, including the use of retaliation and propaganda.  For instance, in a letter to the players, Defendant represented (albeit through implication and innuendo) that this lawsuit will detrimentally affect tournament purses

1   and by extension, player income.   Specifically, Defendant informed PGA players that the money

2   received from the bibs is used to fund player purses.  Against that backdrop, Defendant ensured

3   players that it "does not participate in a player's decision to hire or fire a caddie."  Defendant has

4   also implied that this lawsuit will harm player pensions.  However, Defendant has not commented

5   on how this lawsuit may affect its commissioner's $5.3 million salary or the seven-digit salaries of

6   other executives.  Nor has it commented on why money received from the bibs could not be used

7   to fully fund caddie healthcare, which would cost approximately $4 million, a small fraction of

8   total bib revenue and at least $1.3 million less than Commissioner Finchem's salary alone.

9        17.    On February 28, 2015, during the third round of the Honda Classic, a thunderstorm

10   with 55 mile-per-hour winds caused a delay in play.  While Defendant and its local tournament

11   host permitted others to seek refuge indoors, the caddies were left to seek refuge under an open

12   metal shed or in their own vehicles.  This prompted long-time ESPN analyst and talk-show host

13   Scott Van Pelt to opine that Defendant "treats its caddies like outside dogs" and should "do better

14   than this."

15        18.    Further, Defendant recently canceled an annual caddie dinner where, historically,

16   Defendant would address the caddies on the state of the tours and operations, and take questions

17   from the caddies regarding tour concerns.  Defendant has also indefinitely suspended its quarterly

18   meetings with the Caddie Advisory Committee.  Simply stated, Defendant is retaliating against the

19   caddies for filing this lawsuit while attempting to maintain some appearance of innocence and an

20   element of deniability.  Plaintiffs anticipate this conduct will continue and reserve the right to file

21   a motion for interim injunctive relief.

22

23

24

25

26

27

28

**PARTIES**

19.     Defendant PGA TOUR, Inc. ("**PGA TOUR**"), is a Maryland corporation with a permanent place of business in San Francisco, California.

20.     Plaintiffs[2] allege that this case is suitable as a class action under Federal Rule of Civil Procedure 23.  Alternatively, Plaintiffs aver that the class proposed below should be certified as to certain causes of action if it is not certified for all claims and requests for relief.  In the further alternative, in the event the class is not certified for this action or any portion thereof, the named Plaintiffs bring this action in their individual capacities as set forth below.

21.     Named plaintiff William Michael "Mike" Hicks is the proposed class representative.  Mr. Hicks has caddied at Defendant PGA TOUR events for approximately thirty-three years.  Among others, Mr. Hicks has caddied for professional golfers Payne Stewart, Greg Norman, Steve Stricker, Justin Leonard and Josh Teater.  Mr. Hicks resides in North Carolina.

22.     Named plaintiff Kenneth "Kenny" Harms is the alternate proposed class representative.  Mr. Harms has been a professional tour caddy since 1991.  Mr. Harms has caddied for professional golfers Kevin Na, Hale Irwin, Aaron Baddeley, Hubert Green, Ray Floyd, Gary Player, Lee Trevino, David Eger, Jan Stephenson, Emilee Klein, Lynn Connelly and Michelle Wie.  Mr. Harms resides in Florida.

23.     Plaintiffs Bruce Clendenen, Nick Jones, Anthony Knight, Corby Segal, Terry R. Engleman, Tim Goodell, David A. Kerr, Michael Maroney, Andrew Martinez, Todd Newcomb, Eric Schwarz, Spencer Seifert, Matthew Tritton and Dennis Turning have served as caddies on one or more of Defendant's golf tours and reside in the State of California.

24.     Plaintiffs Chad Antus, Steve Catlin, Graeme Courts, Don Donatello, Michael Doran, Dean Elliott, Brent Everson, Damon Green, Tom Janis, Steve Kay, Kurtis Kowaluk, John Limanti, Eric Meller, Matthew Minister, Charles Mohr, Travis Perkins, Joseph Pyland, Brian

---

[2] Note that in this Complaint, unless otherwise noted or demanded by context, "Plaintiffs" refers to the proposed class representatives, the proposed class, and the named plaintiffs disjunctively and collectively.

1   Reed, Chad Reynolds, Miguel Rivera, Andrew Sanders, Brian Smith, Paul Tesori, Scott Tway,

2   Steve Underwood, Mark Urbanek, Aaron Wark, Harry Brown, John M. Buchna, Bob Burns,

3   Michael Carrick, Martin Courtois, Mark Crunden, Andrew Davidson, Robert Dickerson, Marcl

4   LaBas, David Lawson, Greg W. Martin, Ronald McCann, David Patterson, William Poore, Linn

5   Strickler, Timothy J. Thalmueller, Jim Thomas, Kenneth A. Tolles, John Venn, James Walters,

6   Anthony Wilds and Noah Zelnik have served as caddies on one or more of Defendant's golf tours

7   and reside in the State of Florida.

8       25.     Plaintiffs James Edmondson, Micah Fugitt, Matthew Hauser, Bill Heim, James

9   Johnson, Brennan Little, Damian Lopez, Scott Martin, Richard Mayo, Jr., Donald Nelson, Scott

10  Sajtinac, Russell Stark, Rusty Uresti, Brett Waldman, Jon Yarbrough, Alan Bond, Russell Craver,

11  Christopher S. Fiedler, Robert J. McFadden, David H. Rawls, William Spencer, and Robert Vail

12  have served as caddies on one or more of Defendant's golf tours and reside in the State of Texas.

13      26.     Plaintiffs Henry Diana, Joseph Etter, David Robinson, Thomas Fletcher, Michael

14  Middlemo, James Smith, John L. Smith, Peter Vanderriet, and Bradley Whittle have served as

15  caddies on one or more of Defendant's golf tours and reside in the State of Georgia.

16      27.     Plaintiffs Michael Bestor, Steven Hale, Ronald Levin and Fred Sanders have served

17  as caddies on one or more of Defendant's golf tours and reside in the State of Colorado.

18      28.     Plaintiffs Duane Bock, Mark Carens, Adam Hayes, Barry Williams, Matthew Hall,

19  Philip Lowe, Mark E.Miller, Richard J. Motacki, James Springer and David Woosley have served

20  as caddies on one or more of Defendant's golf tours and reside in the State of North Carolina.

21      29.     Plaintiffs Andrew Barnes, Pete Jordan, Neil Wallace, Justin York, Joseph Duplantis

22  and Kyle Kolenda have served as caddies on one or more of Defendant's golf tours and reside in

23  the State of Arizona.

24      30.     Plaintiffs Chris Berry, Jonathan Jakovac, Chris Jones and Patrick V. Esway, Jr.

25  have served as a caddies on one or more of Defendant's golf tours and reside in the State of

26  Nevada.

27

28

1    31.     Plaintiffs Jay Haas, Jr., Shay Knight, Shawn Segars, Robert Thompson, Brad

2 Swearingen, Jeff Dolf and Steve Greenwood have served as caddies on one or more of

3 Defendant's golf tours and reside in the State of South Carolina.

4    32.     Plaintiff Jeffery Willett has served as a caddy on one or more of Defendant's golf

5 tours and resides in the State of Maine.

6    33.     Plaintiff Brent Henley, Calvin Henley, Mitchell Knox, Peter Ambrosetti and Kenny

7 Butler have served as a caddies on one or more of Defendant's golf tours and resides in the State

8 of Tennessee.

9    34.     Plaintiff Matthew Achatz and Walter Worthen, Jr.  have served as a caddies on one

10 or more of Defendant's golf tours and reside in the State of Michigan.

11    35.     Plaintiff David Brooker has served as a caddy on one or more of Defendant's golf

12 tours and resides in the State of Connecticut.

13    36.     Plaintiff Michael Darby has served as a caddy on one or more of Defendant's golf

14 tours and resides in Richmond, British Columbia, Canada.

15    37.     Plaintiff Christian Heath Holt and Mark Hamilton have served as a caddies on one

16 or more of Defendant's golf tours and reside in the State of Missouri.

17    38.     Plaintiff Todd Montoya has served as a caddy on one or more of Defendant's golf

18 tours and resides in Belen, New Mexico.

19    39.     Plaintiff Tony Navarro and Terry Travis have served as a caddies on one or more of

20 Defendant's golf tours and reside in the State of Illinois.

21    40.     Plaintiffs Brad Antus, Michael Mazzeo and Matthew Bednarski have served as

22 caddies on one or more of Defendant's golf tours and reside in the State of Pennsylvania.

23    41.     Plaintiff Daniel McQuilken and George Assante have served as a caddies on one or

24 more of Defendant's golf tours and reside in the State of New Jersey.

25    42.     Plaintiff John R. Adcox, Allan Mellan, Richard Schlaack and Daniel Schlimm have

26 served as caddies on one or more of Defendant's golf tours and reside in the State of Ohio.

27    43.     Plaintiff Mark Huber and Weston Scott Watts have served as caddies on one or

28 more of Defendant's golf tours and reside in the State of Wisconsin.

1       44.     Plaintiff Norman R. Blount, Jr. and Lewis B. Puller III have served as a caddies on

2  one or more of Defendant's golf tours and reside in the State of Virginia.

3       45.     Plaintiff David B. Parsons has served as a caddy on one or more of Defendant's

4  golf tours and resides in the State of Kentucky.

5       46.     Plaintiff Ladden Cline and Kevin McArthur have served as caddies on one or more

6  of Defendant's golf tours and reside in the State of Louisiana.

7       47.     Plaintiff Thomas G. Williams has served as a caddy on one or more of Defendant's

8  golf tours and resides in the State of Rhode Island.

9       48.     Plaintiff Jon Custer has served as a caddy on one or more of Defendant's golf tours

10  and resides in the State of Oklahoma.

11       49.     Plaintiff Edward E. Willis has served as a caddy on one or more of Defendant's

12  golf tours and resides in the State of Alabama.

13       50.     Plaintiff John Egan has served as a caddy on one or more of Defendant's golf tours

14  and resides in the State of Indiana.

15       51.     Plaintiff Brian H. Sullivan has served as a caddy on one or more of Defendant's

16  golf tours and resides in the State of Washington.

17       52.     Plaintiff Chad Rosenak has served as a caddy on one or more of Defendant's golf

18  tours and resides in the State of Minnesota.

19       53.     Plaintiff Joshua E. Dickinson has served as a caddy on one or more of Defendant's

20  golf tours and resides in the State of Arkansas.

21       54.     Plaintiff Michael J. Waite has served as a caddy on one or more of Defendant's golf

22  tours and resides in Queensland, Australia.

23       55.     Plaintiff Colin Byrne has served as a caddy on one or more of Defendant's golf

24  tours and resides in Howth Dublin, Ireland.

25       56.     Plaintiff Stephen Williams has served as a caddy on one or more of Defendant's

26  golf tours and resides in Auckland, New Zealand.

27

28

**JURISDICTION AND VENUE**

**I. SUBJECT MATTER JURISDICTION**

57.     This Court has subject matter jurisdiction because this is a civil action arising under the laws of the United States.  *See* 28 U.S.C. § 1331.  Specifically, Plaintiffs seek to prosecute civil claims under the Sherman Act, 15 U.S.C. § 1 *et seq.*, the Clayton Act, 15 U.S.C. § 12 *et seq.*, and the Lanham Act, 15 U.S.C. § 1050 *et seq.*

58.     This Court also may exercise jurisdiction under 28 U.S.C. § 1337(a) because this is a civil action arising under an act of Congress regulating commerce or protecting trade and commerce against restraints on trades and monopolies.

59.     This Court may exercise jurisdiction under 28 U.S.C. § 1332(d) because this is a class action involving damages exceeding $5,000,000 exclusive of costs  and interest, and one or more members of the proposed class is a citizen of a state other than Maryland and Florida. The proposed class consists of more than 100 members.

60.     This Court has supplemental subject matter jurisdiction over Plaintiffs' state law claims under 28 U.S.C. § 1367.  The Court has original jurisdiction over Plaintiffs' Sherman Act and Lanham Act claims, and Plaintiffs' state law claims are so related to Plaintiffs' federal law claims that they form part of the same case or controversy.

**II. PERSONAL JURISDICTION**

61.     This Court may exercise personal jurisdiction over Defendant PGA TOUR under 15 U.S.C. § 22 based on Defendant's national contacts.  Defendant PGA TOUR is a Maryland Corporation with a permanent place of business in San Francisco, California.  Further, PGA TOUR advertises its "headquarters" as Ponte Vedra Beach, Florida.  Defendant PGA TOUR has designated registered agents within the United States.  Defendant PGA TOUR organizes, manages, and promotes numerous professional golf tournaments throughout the United States each year, and Defendant PGA TOUR's gross revenue is approximately $1 billion annually. Finally, Defendant owns and operates approximately thirty-five golf courses in the United States.

62.     This Court also may exercise personal jurisdiction over Defendant PGA TOUR under California's long-arm statute, which is coextensive with constitutional due process limits.

1  *See* Cal. Civ. Proc. Code § 410.10.  Defendant PGA TOUR maintains a permanent office in San

2  Francisco, California, and owns and manages several golf courses throughout the state of

3  California.  Additionally, Defendant organizes and promotes numerous golf tournaments

4  throughout the state of California, and those tournaments give rise to Plaintiffs' claims.

5  63.  Given Defendant's systematic and continuous contacts with California and the

6  substantial connection between Plaintiffs' claims and those contacts, this Court may exercise

7  specific and general personal jurisdiction over Defendant PGA TOUR.

8  **III.  VENUE**

9  64.  Venue is proper in the Northern District of California under Sections 4 and 12 of

10  the Clayton Act, codified at 15 U.S.C. §§ 15, 22.  Defendant PGA TOUR may be found in this

11  district and transacts business in this district.  Additionally, a substantial part of Defendant's

12  misconduct and the damages caused by that misconduct occurred in this district.

13  65.  Venue is also proper in this district because Defendant resides here.  *See* 28 U.S.C.

14  § 1391(b)(1), (c)(2), and (d). Defendant PGA TOUR has organized and promoted numerous

15  tournaments within the Northern District of California, and those tournaments provide a primary

16  basis for Plaintiffs' claims and damages.  Defendant PGA TOUR maintains a permanent office

17  within the Northern District of California.  Defendant owns and manages two golf courses located

18  on real property owned by Defendant within the Northern District of California.

19  66.  Venue is proper in the Northern District of California because a substantial part of

20  the events or omissions giving rise to the claim occurred in the Northern District of California.

21  Plaintiffs' claims arise from harm and conduct occurring at Defendant's golf tournaments, and

22  several of those tournaments are organized and promoted in this district.

23  67.  This action should be assigned in accordance with Rule 3-2(c) and 3-2(d) of the

24  Northern District of California Civil Local Rules ("**Local Rules**").  This case should be assigned

25  to the San Francisco or Oakland division because Defendant resides in the division for venue

26  purposes and a substantial part of the events or omissions which give rise to the claim occurred in

27  one or more of the counties identified in Local Rule 3-2(d).  Additionally, these divisions have

28  vast experience in adjudicating similar cases, such as *Samuel Michael Keller v. Electronic Arts*

1  *Inc. et al.*, 4:09-cv-01967-CW (Wilken, J., Oakland division); *Edward C. O'Bannon, Jr. v.*

2  *National Collegiate Athletic Association et al.*, 4:09-cv-03329-CW (Wilken, J., Oakland division);

3  and *Cohen v. Facebook, Inc*., No. C 10–5282 RS (N.D. Cal. 2011) (Seebork, J., San Francisco

4  division).

5

6  **FACTUAL BACKGROUND**

7  **I.  PLAINTIFFS' RELATIONSHIP WITH DEFENDANT AND LOCAL HOSTS**

8      68.    Defendant PGA TOUR organizes and promotes three tours of professional golf

9  tournaments held across the United States.  Generally, each tournament has a local sponsor—

10 usually a nonprofit entity—that helps organize the tournament.  These Local Hosts work together

11 with Defendant to obtain and retain sponsors represented by the bibs at issue in this lawsuit.  Local

12 Hosts and Defendant all profit directly from bib sponsorships.  To retain bib sponsors and to lock

13 out competition for advertising opportunities during tournament play, Local Hosts and Defendant

14 work together to design the bibs according to those goals and to coerce caddies into wearing the

15 bibs with threats of fines or other modes of discipline that will leave caddies unemployed.  Local

16 Hosts and Defendant operate pursuant to implied and express written and oral agreements, patterns

17 of practice, and understandings that grow from their mutual desire to and financial interest in

18 monopolizing the markets at issue here and restraining competition in those markets.  One

19 example of their involves the Defendant each refraining from competing in certain subdivisions of

20 the markets at issue so that the other can operate without competition.  Although the PGA TOUR

21 is the most prominent and profitable, Defendant (with the assistance of various Local Hosts) also

22 organizes, co-sponsors, and promotes tournaments on the Champions Tour and Web.com Tour.

23 These tours are collectively referred to as the "**Three Tours.**"

24     69.    Plaintiffs are caddies employed by players competing on one or more of the Three

25 Tours.  While Defendant requires professional golfers to employ caddies for all practice, Pro-Am

26 and tournament rounds, no agency relationship exists between Plaintiffs and Defendant, its

27 affiliates, or its partners.  Instead, Plaintiffs are independent contractors for professional golfers

28 who compete in professional golf tournaments organized and promoted by Defendant.

70.     Plaintiffs and Defendant are parties to numerous contracts.   These contracts are described in detail below and provide a basis for Plaintiffs' claims.

## II.   THE ENDORSEMENT POLICY

71.     Defendant's Player Handbook & Tournament Regulations ("**Handbook**") includes a provision titled, "Player Endorsement Policy" ("**Endorsement Policy"**).   The Endorsement Policy generally requires endorsements to be "tasteful and in accordance with standards of decorum expected of professional golfers."   The Endorsement Policy's chief concern is preserving the image and reputation of the PGA TOUR and, thus, the Endorsement Policy limits endorsements of tobacco, alcohol,[3] and gaming.   In the interest of "taste," the Endorsement Policy limits placement and size of sponsor logos.   Otherwise, the Endorsement Policy does not limit endorsements.   Plaintiffs do not acknowledge Defendant's right to limit endorsements under the Endorsement Policy and expressly reserve the right to challenge those limitations.

72.     Pursuant to Defendant's Endorsement Policy, professional golfers playing in tournaments organized and promoted by Defendant often wear various sponsor logos on their attire, including their shirts.   Because players may choose to wear various sponsors' logos, some sponsors negotiate exclusive endorsement deals with players under which a player will wear only the sponsor's logo.

73.     Under Defendant's rules and contractual provisions drafted by Defendant, caddies are permitted to endorse products under the Endorsement Policy to the same extent as players.   Defendant's Handbook provides, "Caddies' clothing must conform to the Player Endorsement Policy."   As set forth in detail below, Plaintiffs have entered numerous contracts with Defendant that include the same or similar language.   Thus, Defendant expressly permits caddies to wear various sponsor logos on their attire—including shirts.   However, as set forth below, Defendant, individually and in concert with Local Hosts, constricts Plaintiffs' endorsement potential and usurps Plaintiffs' endorsement opportunities.

---

[3]   Although Players and caddies are prohibited from endorsing companies selling alcohol, Defendant endorses Grey Goose vodka as the "official spirit" of the PGA Tour.

III. **DEFENDANT PGA TOUR, INDIVIDUALLY, AND IN CONCERT WITH ITS LOCAL HOSTS FORCES PLAINTIFFS TO ENDORSE THE PRODUCTS AND SERVICES OF SPONSORS WHO PAY ONLY DEFENDANT AND ITS LOCAL SPONSORS FOR THE CADDIES' ENDORSEMENT SERVICES.**

74.    Notwithstanding the language in the Handbook, Endorsement Policy, and relevant contracts, Defendant, individually and in concert with Local Hosts, has forced Plaintiffs to endorse the products and services of Defendant PGA TOUR's sponsors without remuneration.   The specific mechanism through which Defendant and Local Hosts perpetuate this misconduct is known as the "bib," pictured in paragraph 1 above.

75.    As the photographs show, the bibs bear sponsor logos—and integrate sponsors' logos—in the tournament logo which appears on the bibs.  Defendant's Local Hosts design the bibs and the logos appearing on the bibs. The sponsors represented by those logos pay Defendant and Local Hosts for the bib space.   No one, however, pays Plaintiffs to wear these bibs. Defendant PGA TOUR and Local Host officials have threatened to prohibit Plaintiffs from providing caddie services at tournaments organized and promoted by Defendant PGA TOUR if Plaintiffs refuse to wear the bibs.  And of course, players' participation in each tournament is conditioned on players employing a caddie for that particular tournament.   Additionally, Defendant PGA TOUR has contacted tour players to determine whether players would be willing to terminate their agreements with caddies who refuse to wear the bibs.  Defendant PGA TOUR and its Local Hosts have demonstrated that if Plaintiffs do not supply the marketing medium for Defendant's and Local Hosts' sponsors by wearing bibs, from which both Defendant and Local Hosts profit, Defendant will interfere with the relationships between Plaintiffs and the players for whom they work.

76.    Defendant PGA TOUR's coercive conduct has recently reached new heights.   In 2013, many Plaintiffs joined the Association of Professional Tour Caddies ("**APTC**"), a trade association of professional golf caddies who work with some of the top professional golfers in the world.  Many Plaintiffs joined the APTC to improve the Plaintiffs' profession in general and to represent Plaintiffs' collective professional interests.

77.     In retaliation for many Plaintiffs' membership in the APTC, and in a further effort to compel Plaintiffs to don the bibs during tournaments, Defendant PGA TOUR has threatened to prohibit caddies from receiving endorsement money from any sponsor that competes with Defendant's sponsors or from any of Defendant's sponsors who reduce their investment in Defendant because of an endorsement agreement with one or more of the Plaintiffs.  Believing they have no reasonable choice but to comply with Defendant PGA TOUR's demands, Plaintiffs have continued to wear the bibs without compensation.[4]

78.     With respect to marketing activities stemming from actual tournament play, the bib provides the greatest source of marketing exposure.  Thus, the bib provides the most valuable marketing medium between commercials during tournament broadcasts.  On information and belief, the annual value of the bib exceeds $50 million, and that sum is paid to Defendant and Local Hosts by "title sponsors" and other companies whose logos appear on the bibs or are integrated in the bib design.  However, Plaintiffs are paid nothing to wear bibs and, therefore, endorse the products and services of bib sponsors without compensation.  Plaintiffs are made to serve as billboards to advertise, at the direction of the PGA Tour and the Local Hosts, for some of the most profitable companies in the world without compensation. Instead of compensating Plaintiffs for wearing the bib, Defendant PGA TOUR "incentivizes" Plaintiffs by refraining from following through on its threats to interfere with Plaintiffs' relationships with their respective players and by refraining from interfering with Plaintiffs' other endorsement opportunities.

79.     Defendant PGA TOUR and its Local Hosts have always known that Plaintiffs expect payment for wearing corporate logos.  For instance, Plaintiffs have the option to wear caps bearing the logo of Nature Valley, one of Defendant's corporate sponsors.  Defendant PGA TOUR has fashioned a formula for compensating caddies who choose to wear the Nature Valley caps

---

[4] In a meeting with several caddies, one of Defendant's top executives indicated Defendant would not discuss compensation for the bib by saying "the bib is off the table."  Defendant's executive went on to say "it may not be right, but that is how it has been and how it will be" when referring to Defendant's refusal to compensate Plaintiffs for serving as glorified billboards.

during tournament play.  Given that Defendant knows that Plaintiffs expect payment for their endorsement of Defendant's sponsors on Plaintiffs' headwear, Defendant cannot reasonably deny knowing that Plaintiffs expect to be paid to endorse sponsors on their other attire, including bibs.[5] Nor can the Local Hosts, who have been fully aware of the Nature Valley cap program since its inception.

80.    Plaintiffs' expectation of payment is evident in other ways.  Defendant has entered enforceable agreements under which the Endorsement Policy applies to Plaintiffs, and the Endorsement Policy permits Plaintiffs to endorse products for pay—even though Defendant unlawfully limits that right in practice.  Thus, Defendant PGA TOUR cannot reasonably deny knowing that Plaintiffs expect payment for endorsing sponsors' products and services.  Nor can the Local Hosts, who have been aware of the Endorsement Policy and its application to Plaintiffs for at least as long as each respective Local Host has co-sponsored a PGA TOUR golf event.

81.    Defendant, individually and in concert with Local Hosts, made a calculated decision to use Plaintiffs, their likenesses, and their images to endorse Defendant's sponsors. Plaintiffs are readily recognizable to the audience targeted by the bibs.  By forcing Plaintiffs to wear the bibs, Defendant PGA TOUR and the Local Hosts benefit from their commercial use of Plaintiffs' likenesses and images and their status as professional caddies.  Plaintiffs never have consented to the commercial use of their likeness by Defendant PGA TOUR, its affiliates and partners, or its Local Hosts.  Because of their interest or claim to bib-generated advertisement revenue, Local Hosts have actively worked to ensure that Defendant and Local Hosts—and not the Plaintiffs—profit from the use of Plaintiffs' likenesses and images during tournament play.

---

[5] Defendant has recently threatened to force all caddies to wear the Nature Valley hat pursuant to an alleged exclusivity provision in the contract between Nature Valley and Defendant. While Defendant has proudly proclaimed that Plaintiffs are not a party to that contract, Defendant seems intent on enforcing its provisions against Plaintiffs.

**IV.  THE MARKETS AT ISSUE AND THE HARM CAUSED TO THOSE MARKETS**

82.     There are two relevant markets for the purpose of Plaintiffs' antitrust claims: the "Endorsement Market" and the "Live Action Advertising Market" (collectively "**Relevant Markets**").

83.     In addition to the definitions below, Plaintiffs note that the direct evidence of anticompetitive effects caused by Defendant's misconduct obviates the need to define the relevant markets or to demonstrate Defendant's market power in those markets.  As alleged elsewhere in this Complaint, Defendant's and Local Hosts' misconduct has caused numerous, substantial anticompetitive effects.  Because direct evidence plainly connects Defendant's misconduct to anticompetitive effects, the Court may infer that Defendant possesses monopoly power and that the markets in which those anticompetitive effects occur are the relevant markets.

### A.  The Endorsement Market Definition

84.     One market affected by Defendant's conduct and its concerted efforts with Local Hosts is the national market for the endorsement of products and services by participants in professional golf tournaments ("**Endorsement Market**").  Alternatively, the geographic scope of the Endorsement Market is North America.

85.     Defendant PGA TOUR's tournaments take place in various states across the country and are organized in part by a Local Host, which generally is a nonprofit entity. Spectators in attendance view the tournament live, and the tournaments generally are televised, broadcast on the Internet, and viewable on video-on-demand platforms.  Professional golfers and caddies are highly visible to both live spectators and to viewers of broadcasted tournaments. Professional golfers and caddies are the only people who are consistently visible to both live and broadcast audiences.  They are also the only people readily recognizable by the audience.  Thus, professional golfers and caddies, but for Defendant's unlawful conduct and concerted action with Local Hosts, would be the only competitors in the Endorsement Market.  While player and caddie endorsements may be *supplemented* by other forms of advertising, such as Internet, television, and print advertising, they are not interchangeable for a variety of reasons: (A) endorsements by players is an advertising vehicle that is not easily avoided by flipping the page, clicking out of an

ad, or fast-fast forwarding with DVR; a viewer of the golf tournament will see the logo worn by a tournament participant; (B) endorsements made by the endorser during competition provides a unique, exponentially more effective opportunity to improve brand recognition and validity when compared to endorsements made in print or in television commercials; (C) endorsements by caddies and professional golfers add an element of price flexibility not offered by these other forms of advertising because a company can effectively set his own price by hiring a prominent player or caddie versus a lesser-known one, and by hiring multiple players and caddies versus hiring one.

86.     The Endorsement Market includes the smallest group of products in which Defendant, or a hypothetical monopolist, can profitably impose a small but significant and non-transitory increase in price. On information and belief, if Defendant or a hypothetical monopolist increased the price of bib space and its other products in this market in the range of five percent to ten percent for an extended period of time, the purchasers of that bib space and other products would not, as a result of that increase, pursue marketing opportunities in other markets to such a degree that the price increase would not be profitable for Defendant or the hypothetical monopolist.  On information and belief, Defendant has implemented such price increases in the past, and purchasers in this market did not switch to products in other markets to such a degree that the price increase was not profitable.  Further, econometric studies, which consider relevant information such as pricing and number of competitors, controlled for unrelated forces affecting pricing and demand, will demonstrate that purchasers in the Endorsement Market will not switch to products outside of that market in response to a small but significant and non-transitory price increase by Defendant or a hypothetical monopolist—with respect to bib space its other products in this market—to such a degree that the price increase is unprofitable.  On information and belief, surveys of bib sponsors and other consumers in this market would support the same conclusion.

87.     The consumers in the Endorsement Market are companies who employ professional golf tournament participants to endorse products and services during professional golf tournaments ("**Endorsement Consumers**").  By employing tournament participants to endorse

1   products and services at professional golf events, Endorsement Consumers target a unique, narrow

2   audience. *Infra* ¶¶ 93-97.

3         **B.  The Live Action Advertising Market**

4         88.    The Live Action Advertising Market refers to the national (or, alternatively North

5   American) market for in-play or in-action commercial advertising at professional golf events

6   between commercial breaks.  In this market, advertisements opportunities are sold to sponsors,

7   and the sponsor's logos are inserted subtly but effectively in the field of play where they can be

8   viewed by the live golf tournament audience and by the broadcast audiences between commercial

9   breaks (*i.e.* during play).

10        89.    The suppliers in this market include professional golfers, caddies, Defendant, and

11  Local Hosts.  The advertising supplied by golfers and caddies has been described above in the

12  Endorsement Market description.  Defendant and Local Hosts provide the remainder of the

13  advertising supply on signage around the golf course at each tournament that is recorded by

14  television camera, included in television broadcasts of the tournament, and is seen by live

15  spectators during play and by broadcast audiences between commercial breaks.

16        90.    The Live Action Advertising Market is distinct from the market for traditional

17  commercials for several reasons.  For example, with the advancement of television playback

18  technology—digital video recorder devices or "DVRs"—broadcast viewers can simply fast

19  forward through commercial breaks; thus, the advertisement does not and cannot reach the

20  viewer.[6]  Further, broadcast viewers are far less likely to leave the room when play is going on

21

22

23  [6] The movie industry has used this concept for decades.  By their very nature, movies do not have

24  commercials.  So, the movie production companies who wish to generate advertising revenue

25  integrate those ads into the movie itself.  For example, a character may hold a soft drink can in a

26  manner permitting the audience to easily see the "Coca-Cola" logo, or child characters may eat

27  cereal and position the box in a manner that permits the audience to easily see the "Cheerios" logo.

28  The makers of Coca-Cola and Cheerios pay money in exchange for these in-movie advertising

than during a commercial break; thus, a broadcast viewer is far more likely to actually see the Ping logo on Bubba Watson's visor, or the Buick logos and automobiles placed throughout the course during the Buick Open than he would if those things were merely in traditional commercials. Additionally, while some of the larger corporations spend exorbitant amounts on live action advertising, the vast majority of companies purchasing live action advertisements are smaller companies who cannot or do not want to pay for advertising *via* television commercials. Thus, the vast majority of consumers in the Live Action Advertising Market do not have a viable option to advertise *via* television commercials or in other broadcast commercial locations.

91.     The Live Action Advertising Market includes the smallest group of products in which Defendant or a hypothetical monopolist can profitably impose a small but significant and non-transitory increase in price. On information and belief, if Defendant or a hypothetical monopolist increased the price of bib space and its other products in this market in the range of five percent to ten percent for an extended period of time, the purchasers of that bib space and other products in this market would not, as a result of that increase, pursue marketing opportunities in other markets to such a degree that the price increase would not be profitable for Defendant or a hypothetical monopolist. On information and belief, Defendant has implemented such price increases in the past, and purchasers in the Live Action Advertising Market did not switch to products in other markets to such a degree that the price increase was not profitable. Further, econometric studies, which consider relevant information such as pricing and number of competitors, controlled for unrelated forces affecting pricing and demand, will demonstrate that purchasers in the Live Action Advertising Market will not switch to products outside of that market in response to a small but significant and non-transitory price increase by Defendant or a hypothetical monopolist—with respect to bib space and other products in this market—to such a degree that the price increase is unprofitable. On information and belief, surveys of bib sponsors and other consumers in this market would support the same conclusion.

opportunities. Defendant, Local Hosts, players, and caddies perform very similar functions by offering in-play advertising opportunities for companies in the Live Action Advertising Market.

92.     The consumers in the Live Action Advertising Market are companies who seek specifically to advertise products and services during play at professional golf tournaments ("**Live Action Advertising Consumers**").  These consumers seek to advertise to broadcast viewers only between commercials during live play and to live spectators.  As seen below, the audience for professional golf tournaments is uniquely attractive to these consumers. *Infra* ¶¶ 93-97.

### C. The PGA Audience is a Unique Target for Advertising Consumers in Both Markets

93.     The average audience for PGA golf tournaments is unique in that it is primarily comprised of golf fans who are generally much more affluent than audiences for other American professional sports.  Approximately 90% of professional golf fans are Caucasian.  The percentage of professional golf fans 55 years old and older by far exceeds the percentage of that demographic segment in other major televised sports.  The percentage of teenage professional golf fans is by far exceeded by other major televised sports. Professional golf also has the lowest share of fans in their 20s and 30s when compared to other major televised sports.  Fans of professional golf have vastly different purchasing interests than fans of other professional sports.  For example, the most prevalent purchasing plans for golf fans include golf equipment, financial planning, banking, and vacationing.  Nearly all professional golf fans travel for business *via* air travel on a regular basis and take vacations using airlines on an annual basis, marking a much greater propensity than the propensity of other major sports' fans.  On information and belief, nearly half of golf fans vacation at a golf resort each year.  The percentage of fans of other major televised sports who do the same is negligible.

94.     The unique characteristics of a professional golf tournament audience are further highlighted by the fact that Defendant schedules the most important rounds of golf—including the final round—at the same time as college football games and NFL games.  Thus, the audience—*i.e.* the target of advertising—for football games is largely exclusive of that of professional golf. Defendant schedules tournaments that overlap with the Major League Baseball World Series and with the NHL and NBA Playoffs and Finals.  Thus, Defendant recognizes it is not competing with professional baseball, hockey, or basketball for an audience.  The same goes for all other major professional sports.

95.     Simply put, professional golf fans are unique. Because of their demographics and purchasing habits, professional golf fans are primarily targeted with advertisements for (1) golf-specific athletic gear like golf bags, golf shirts and golf-specific apparel, golf shoes with spikes, golf clubs, golf training equipment, golf gloves, and the like; (2) asset and wealth protection and management planning such as life insurance, 401(k) planning, IRAs, and legal services that protect assets; (3) luxury automobiles; (4) top-shelf alcohol; (5) travel services—including golf resorts—and products like luxury resorts, rental car services, and airlines; (6) luxury electronic equipment; and (7) luxury timepieces such as Rolex and Tag Heuer watches.  These are just examples.  The unique audience for professional golf explains why professional golfers primarily wear logos that advertise golf-specific equipment and apparel made by companies like Nike, Titleist, Ping, Callaway, Hopkins, Slazenger, and others.  The unique audience for professional golf explains why title sponsors for major PGA TOUR events include the likes of Charles Schwab & Co., The PNC Financial Services Group, Inc., Dick's Sporting Goods, and Regions Financial Corporation. It explains why the name of the Defendant's very popular Match Play Championship is called the "*Cadillac* Match Play Championship" and does not refer to an entry-level brand of car manufactured by GM.

96.     For these reasons, changes in the cost of in-play advertising at Defendant's golf events versus the cost of in-play advertising during other sporting events will not affect the demand for player and caddie endorsements in the Endorsement Market or the demand for in-play advertising in the Live Action Advertising Market.  While companies may supplement their advertising in other markets, suppliers in these other markets simply do not compete with suppliers in the Relevant Markets.

97.     For purposes of the Endorsement Market, having non-golfing professionals endorse the products and services sought by professional golf fans is distinct from having golfing professionals endorse those products.  Each audience member is viewing because of his connection with or desire to watch one or more of the golfing professionals—which includes players and caddies—participate in the tournament.  Because the audience is comprised of fans of

1  the golfing professionals endorsing the products, the marketing effect on the audience is much

2  greater, more effective, and much more valuable than the endorsement of a non-golf professional.

3      **D. Defendant's Individual and Concerted Misconduct Has Harmed the Relevant**

4          **Markets.**

5      98.    As noted above, the supply of endorsers in the Endorsement Market is naturally

6  limited to professional golfers and to Plaintiffs and other caddies participating in professional golf

7  tournaments because they are the only consistently-visible and recognizable people during

8  professional golf tournaments. As noted above suppliers in the Live Action Advertising Market

9  are limited to golfers, caddies, Defendant, and Local Hosts.  Thus, the supply chains in the

10 Relevant Markets are susceptible to these natural limits or barriers, and no other suppliers could

11 break into the markets even if it would be profitable for them to do so.

12     99.    Defendant and the Local Hosts engaged in concerted action proscribed by Section

13 1.  Local Hosts are third parties who co-sponsor professional golf events across the country.  In

14 general, each Local Host co-sponsors a single professional golf tournament with Defendant.

15 These Local Hosts include without limitation entities such as American Institute of Mathematics

16 in Palo Alto, California; PGA of America in Palm Beach Gardens Florida; Tiger Woods Charity

17 Event Corporation in Irvine, California; and Monterey Peninsula Foundation, Inc. in Monterey,

18 California.

19     100.   Defendant and the Local Hosts know that supply in the Relevant Markets is

20 limited.  Defendant's unlawful manipulation of the markets through its unilateral acts and through

21 its concerted acts with Local Hosts demonstrates this awareness.  By employing coercive measures

22 to force Plaintiffs to wear bibs, Defendant and the Local Hosts have hijacked a chain of supply of

23 endorsement opportunities and foreclosed competition and/or unreasonably restrained competition

24 in the Relevant Markets.

25     101.   Defendant also engages in concerted action with unwilling participants such as the

26 Plaintiffs and consumers in the Relevant Markets.  As noted throughout this Complaint, Plaintiffs

27 are coerced by Defendant and Local Hosts to wear the bibs, thus limiting supply and competition

28 in the Relevant Markets.  Consumers in the Relevant Markets are likewise given little choice: buy

1   the advertising product for an inflated value from a limited selection and quantity, or leave the

2   market.  Thus, consumers help perpetuate Defendant's antitrust violations by buying bib space at a

3   large profit and in spite of its limits on competition.

4         102.    The harm to the Relevant Markets is pronounced.  For instance, the bib effectively

5   reduces the number of advertising opportunities Plaintiffs may provide individually, thus reducing

6   the total output of supply in each of the Relevant Markets.  For instance, Plaintiffs' shirts provide

7   a valuable marketing medium.  However, the bib occupies so much of the Plaintiffs' shirts that no

8   room is left for Plaintiffs to place logos of their own sponsors.   Thus, not only are Defendant PGA

9   TOUR and Local Hosts using Plaintiffs as human billboards without compensating them, they are

10  drastically abridging Plaintiffs' capacity to wear the logos for companies who are consumers in the

11  Relevant Markets and whose products and services Plaintiffs wish to endorse.

12        103.    Absent Defendant PGA TOUR's unlawful combination with Local Hosts and

13  Defendant's other unlawful conduct, the Relevant markets could provide advertising and

14  endorsement opportunities to a much broader scope of companies and products.  Specifically, the

15  bibs that Defendant and Local Hosts force Plaintiffs to wear generally bear the logo of only one to

16  three sponsors.  And all Plaintiffs are forced to wear identical bibs during a given tournament.

17  Thus, the same one, two, or three logos appear on every caddie's bib during tournament play. This

18  practice limits potential consumers' ability to enter the Relevant Markets because many consumers

19  who might pay a single caddie to endorse products in the bib space find that it is cost prohibitive

20  to purchase bib space under the current practice.  And even if it is not cost prohibitive, many

21  consumers are shut out of the Relevant Markets simply because no supply is available.  Without

22  Defendant's illegal restraint on the Relevant Markets, both by its own conduct and in concert with

23  others, Plaintiffs would separately enter their own endorsement agreements, resulting in greater

24  supply and variety of endorsement and advertising opportunities in the Relevant Markets.  Absent

25  Defendant's restraint on trade, supply would increase, and prices in the Relevant Markets would

26  be governed by competition—not coercion.

27        104.    The bib also prevents Plaintiffs from entering exclusive endorsement deals with

28  sponsors.  In some instances, a sponsor will want a player or caddie to wear only that sponsor's

1 logos during tournaments.  Because an exclusive endorsement deal prohibits or limits a player or

2 caddie from endorsing other products during golf tournaments, the exclusive sponsor is willing to

3 pay a premium to the player or caddie.  Although players are free to enter these exclusive

4 endorsement deals, the bibs preclude Plaintiffs from entering exclusive endorsement deals because

5 Plaintiffs have no control over which sponsors' logos are placed on the bibs by Defendant and

6 Local Hosts.  In other words, so long as Plaintiffs must wear the bibs, no endorsement deal with a

7 caddie can truly be "exclusive."

8      105.    Although Local Hosts and Defendant would be natural competitors in the Live

9 Action Advertising Market, they refrain from competing head-to-head in that market by refraining

10 from competing in subdivisions of the market dominated by the other.  They share the bib

11 advertising revenue while precluding consumers from competing for bib space and restraining

12 caddies from competing in the market.  Defendant and Local Hosts have artificially reduced the

13 value of Plaintiffs' non-bib endorsements by making the bib prominent in size and color, and by

14 placing logos on the bibs that vastly exceed the size that Defendant and Local Hosts "approve" for

15 non-bib endorsements.  The brightly-colored bibs and large logos command greater attention than

16 the other logos in the Relevant Markets, thereby depressing the value that Plaintiffs can obtain for

17 wearing the logos of non-bib sponsors.  While Local Hosts design the bibs and the logos on the

18 bibs, on information and belief, Defendant is also involved in the bibs' designs.

19

20                              **CAUSES OF ACTION**

21 **I. SHERMAN ACT**

22      106.    Plaintiffs incorporate the allegations in paragraphs 1 – 105 in this section for all

23 purposes as if fully restated.

24      *A.    **Defendant Unreasonably Restrained Trade Through Its Concerted Action With***

25           ***Local Hosts and Unwilling Participants.***

26      107.    Defendant's conduct violates section 1 of the Sherman Act, which prohibits

27 "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade

28 or commerce among the several States, or with foreign nations."  Defendant has engaged in

1  multiple unlawful combinations, contracts, or conspiracies in its efforts to restrain trade

2  unreasonably.

3        108.    Defendant and its Local Hosts, through a contract—whether implied, express,

4  written, or oral, combination and/or conspiracy, have cooperated in an effort to limit competition

5  unlawfully.  On information and belief, Local Hosts were aware of Defendant's efforts to coerce

6  Plaintiffs into endorsing the products and services of bib sponsors without remuneration.  Due to

7  Local Hosts' financial interest in the bib sponsorship revenue, Local Hosts unilaterally made the

8  conscious decision to join in and support Defendant's coercive conduct.  Local Hosts are natural

9  competitors with Defendant in the Live Action Advertising Market, but Local Hosts and

10 Defendant have worked together to maximize their profits in the market by limiting supply and by

11 commandeering supply.  Local Hosts also knew that their own employment of coercion—and in

12 tandem with Defendant's coercion—would limit supply in the Relevant Markets and would

13 unreasonably hinder Plaintiffs' ability to compete in the markets.  However, because Local Hosts

14 stood to profit from the unlawful restraint on trade imposed by their concerted action with

15 Defendant, the Local Hosts consciously participated in the scheme of forcing Plaintiffs to wear the

16 bibs and prohibiting Plaintiffs from exercising their rights under the Endorsement Policy and from

17 competing in the Relevant Markets.  The combination between Defendant PGA TOUR and its

18 Local Hosts artificially reduces supply and boosts the price paid for advertising and endorsements

19 in the Relevant Markets, and both parties to the combination derive a profit from their common

20 scheme.  Local Hosts and Defendant share a common interest in obtaining "title sponsorships" and

21 other sponsorships from companies who pay to have their logo appear on the bibs.  Local Hosts

22 and Defendants—to the exclusion of caddies—profit from revenue generated by bib sponsorships.

23 The bibs and the logos themselves (if sponsors' logos are integrated with the tournament logo) are

24 designed by Local Hosts.  Pursuant to their shared desire to reduce competition in the Relevant

25 Markets, Local Hosts intentionally design the bibs in a way to cover the caddies' shirts—the

26 caddies most valuable ad space—and to reduce and eliminate any attention the caddies' other

27 logos garner.  Finally, on information and belief, Local Hosts and Defendant refrain from

28

1 competing with one another in certain segments of the Live Action Advertising Market in order to

2 retain their control of the market, suppress supply, and inflate pricing.

3       109.   Defendant and Local Hosts also have coerced Plaintiffs and consumers into a

4 combination with Defendant that unreasonably restrains trade.  First, Defendant and Local Hosts

5 have threatened to interfere with Plaintiffs' relationship with their respective players and with

6 Plaintiffs' individual sponsors if Plaintiffs do not wear the bibs and endorse Defendant's and

7 Local Hosts' sponsors without compensation.  Fearing unemployment and the resulting financial

8 ruin, Plaintiffs have unwillingly acquiesced to Defendant's demands and threats by wearing the

9 bibs without compensation, thereby unwillingly contributing to Defendant's unreasonable restraint

10 on trade.  In other words, Defendant has forced Plaintiffs to work with Defendant to unreasonably

11 restrain trade.  And through this combination, forged in coercion and involuntary acquiescence,

12 Plaintiffs, the Relevant Markets, and the relevant consumers in those markets have suffered harm.

13 Second, consumers in the Relevant Markets are likewise given little choice: buy the advertising

14 product for an inflated value from a limited selection and quantity, or leave the market.  Thus,

15 consumers help perpetuate Defendant's antitrust violations by buying bib space at a large profit

16 and in spite of its limits on competition.

17       110.   The intended and actual product of Defendant's and Local Hosts' restraints on trade

18 was to raise, fix, peg, or stabilize the price paid for endorsements and advertising at professional

19 golf tournaments by unlawfully limiting, commandeering, or eliminating channels of supply.  By

20 forcing Plaintiffs to wear the bibs, Defendant, both individually and in concert with Local Hosts,

21 has unlawfully gained control of supply in the Relevant Markets, and accordingly, exerts unlawful

22 control over the prices paid for endorsements and advertising in those markets.  Through its

23 combination, contract, and/or conspiracy with Local Hosts, a competitor of Defendant's in the

24 Live Action Advertising Market, Defendant has placed a horizontal restraint on trade in that

25 market.  Defendant's restraints on trade should receive *per se* scrutiny.  Accordingly, Defendant

26 should be required to proffer evidence that its conduct does not constitute an unreasonable

27 restraint on trade.

28

111.    Defendant, individually and in concert with Local Hosts, artificially reduced output in the Relevant Markets by nearly eliminating Plaintiffs as a channel of supply for endorsement and advertising services.   Defendant's restraint on trade should receive *per se* scrutiny.   Accordingly, Defendant should be required to proffer evidence that its conduct does not constitute an unreasonable restraint on trade.

112.    Defendant cannot demonstrate that its conduct serves procompetitive purposes. Even if Defendant could identify a procompetitive purpose, a less restrictive restraint would achieve the same procompetitive purpose.

113.    Consumers in the Relevant Markets, and consequently Plaintiffs, have suffered numerous harms, including (1) having access to fewer and less diverse sources of supply in the Relevant Markets; (2) paying above market value for endorsements and advertisements; and (3) being priced out of the Relevant Markets altogether.   Further, given the prominence of the bib's size and color, consumers who employ Plaintiffs to endorse products and services receive less value than they bargained for because their logos are covered or overshadowed by the bibs.

114.    Plaintiffs have suffered damages.   Specifically, Plaintiffs have suffered a loss equivalent to the amount of money they could have earned had they been permitted to endorse products and services in the space occupied by the bibs.

115.    Defendant and Local Hosts unlawfully profited by their anticompetitive conduct. On information and belief, the value of the bib is believed to be in excess of $50 million for the past tournament season alone and similar sums in other seasons.   These sums were paid to and appropriated by Defendant and Local Hosts.

### B. Defendant Is Liable Under the Sherman Act for Its Illegal Tying Arrangement

116.    Defendant has monopoly power over the market for professional golf tournaments ("**Golf Tournament Market**").   While that monopoly is not directly in dispute here, Defendant has employed its monopoly in the Golf Tournament Market to gain monopoly power and leverage control in the Relevant Markets.

117.    Defendant in essence sells access to professional golf tournaments (the "tying product"), conditioned on Defendant's coerced purchase of bib advertising (the "tied product").

Defendant does this in multiple ways.  One way that Defendant accomplishes this is by requiring professional golfers to employ a caddie during tournament rounds.  As a condition to players' participation in a given tournament, players must hire a caddie *and* permit Defendant to use the caddie to endorse Defendant's sponsors *via* the bib.  Alternatively, players must accept a caddie "provided by" Defendant whom Defendant will likewise force to endorse its sponsors by forcing them to wear the bib.  Thus, Defendant is employing its monopoly in the Golf Tournament Market to leverage control of the separate, unrelated Relevant Markets.

118.    A second manner in which Defendant engages in illegal tying involves caddies' "purchase" of access to tournaments ("tying product") to Defendant's coerced "purchase" of Plaintiffs' endorsement services. While the caddies do not wish to sell their endorsement services to Defendant, Defendant uses its monopoly power in the Golf Tournament Market to leverage control in the Relevant Markets and to coerce Plaintiffs into effectively granting Defendant monopoly power in the Relevant Markets.

119.    Third, while there is no agency relationship between Defendant and Plaintiffs, Defendant in essence "purchases" caddie services from Plaintiffs. Defendant co-sponsors the tournaments in the Professional Golf Tournament Market, and as each tournament's co-sponsor, Defendant recognizes that professional golfers—and therefore the golf tournament product— benefit from the use of caddies.  Indeed, Defendant requires players to have them.  In consideration of access to the tournament, Plaintiffs agree to provide caddie services at each tournament in a manner that improves the value of Defendant's tournament product.  Thus, while there is no employment relationship or any agency relationship for that matter, Defendant in essence buys caddie services through barter.  But Defendant ties that purchase to its coerced purchase of Plaintiffs' endorsement services.  Thus, Defendant purchases caddie services in the Golf Tournament Market contingent upon its coerced "purchase" of endorsement services in the Relevant Markets.

120.    The two products—caddie services and endorsement services—were not originally bundled in practice because they do not appear in the same market.  These services' presence in

1   the same transactions here is directly attributable to Defendant's control over the Golf Tournament

2   Market, its control over the players, and its coercion of the caddies.

3          121.    As a result of Defendant's tying arrangement, the Relevant Markets and Plaintiffs

4   are injured as a result as described elsewhere in this Complaint.

5          ***C. Defendant Has Maintained a Monopoly Through Unlawful Means or, Alternatively,***

6          ***Attempted to Establish a Monopoly Through Unlawful Means.***

7          122.    Defendant PGA TOUR's conduct violates Section 2 of the Sherman Act, codified

8   at 15 U.S.C. § 2, which makes it unlawful to monopolize, or attempt to monopolize, or combine or

9   conspire with any other person or persons, to monopolize any part of the trade or commerce

10  among the several states.

11         123.    As demonstrated above, Defendant PGA TOUR has monopoly power in the

12  Relevant Markets or, alternatively, there is a dangerous probability that Defendant may be able to

13  achieve monopoly power.  Professional golfers and their caddies are the only sources of supply in

14  the Endorsement Market and are the primary sources of supply in the Live Action Advertising

15  Market.  Defendant knows that entry into the markets by others is closed because there are a finite

16  number of professional golfers and caddies who can participate in each tournament.  This is one

17  built-in barrier to competition.

18         124.    Further, Defendant has successfully exercised control over the caddies' capacity to

19  endorse their sponsors' products and services.  Through coercion, Defendant has forced Plaintiffs

20  to wear bibs bearing sponsors' logos that far exceed the size and prominence of those that

21  Plaintiffs and players are permitted to wear.  Defendant forces Plaintiffs to wear the bibs without

22  compensation.   As a result of Defendant's monopolistic conduct, Defendant has drastically

23  reduced supply in the Relevant Markets and has forced consumers to pay higher prices, leave the

24  markets, or not enter the markets in the first place.   On information and belief, Defendant's

25  coercion has also led to Defendant's controlling at least 80% of the market share in the Relevant

26  Markets.  Further, through its coercion of Plaintiffs and other caddies, Defendant has erected an

27  artificial barrier to competition in the Relevant Markets.

28

125.   Further, other than this lawsuit, there appears to be no impediment to Defendant's ability to take over another source of supply in the Relevant Markets—the players.  For instance, Defendant has attempted to justify forcing Plaintiffs to wear the bibs by suggesting it is part of Defendant's "uniform" requirement.  If Defendant's justification survives scrutiny in this lawsuit, Defendant could similarly apply a "uniform" requirement to professional golfers competing on the Three Tours.  If both players and caddies are compelled by Defendant to endorse the products and services of Defendant's sponsors without payment, Defendant will have absolute control over the Relevant Markets, their supply, and the prices paid in those markets for player and caddie endorsements during tournament play and other in-play advertising.

126.   Defendant has demonstrated an intent to control prices, destroy competition, or some combination thereof in the Relevant Markets.  On information and belief, discovery will reveal direct evidence in the form of correspondence that proves Defendant's intent.  Additionally, Defendant and Local Hosts refrain from competing against one another in the Relevant Markets even though they are natural competitors.   Local Hosts refrain from advertising in a way that detracts from the effectiveness of bib advertisements, Defendant agrees refrains from advertising in certain subdivisions of the Live Action Advertising Market so that Local Hosts may retain control there. Finally, Defendant's use of threats and coercion, along with the revenue Defendant receives as a result of its conduct reveals that Defendant specifically intends to reduce or eliminate competition in the Relevant Markets at the cost of consumers in those markets and Plaintiffs.

127.   Endorsement Consumers and Live Action Advertising Consumers in general have suffered numerous harms because of Defendant's monopolistic conduct, including (1) having access to fewer and less diverse sources of supply in the Relevant Markets; (2) paying above market value for endorsements; and (3) being priced out of the Relevant Markets altogether. Further, given the prominence of the bib's size and color, consumers who employ Plaintiffs to endorse products and services receive less value than they bargained for because their logos are covered or overshadowed by the bibs.

128.    Plaintiffs have suffered damages due to Defendant's monopolistic conduct. Specifically, Plaintiffs have suffered a loss equivalent to the amount of money they could have earned had they been permitted to endorse products and services in the space occupied by the bibs.

129.    Defendant has unlawfully profited by its monopolistic conduct.  On information and belief, the value of the bib is believed to be in excess of $50 million for the past tournament season alone and similar sums in other seasons.

## II. RIGHT OF PUBLICITY/MISAPPROPRIATION OF LIKENESS

130.    Plaintiffs incorporate the allegations in paragraphs 1 – 129 in this section for all purposes as if fully restated.

131.    By forcing Plaintiffs to wear the bibs, Defendant knowingly and intentionally used the images and likenesses of Plaintiffs for marketing purposes without Plaintiffs' consent. Specifically, Defendant used Plaintiffs' likenesses and images at professional golf tournaments and in broadcasts of those tournaments to endorse the products and services of bib sponsors. Defendant also used Plaintiffs' likenesses and images to market bib space to potential Endorsement Consumers and Live Action Advertising Consumers.

132.    Plaintiffs never consented to Defendant's use of their likenesses and images for commercial purposes. To any extent Defendant claims that Plaintiffs consented contractually or by other means, Defendant used coercion to secure that alleged consent as described elsewhere in this Complaint.  Defendant PGA TOUR forced Plaintiffs to wear the bibs by threatening to interfere with Plaintiffs' relationships with their respective players and individual sponsors.  Defendant threatened to impose further limits on Plaintiffs' right to endorse their individual sponsors if Plaintiffs refused to wear the bibs.  Reasonably prudent people in Plaintiffs' position would have succumbed to Defendant PGA TOUR's threats just as Plaintiffs did.   Given the vulnerable position that Plaintiffs were in and Defendant's knowledge of Plaintiffs' vulnerability, Defendant successfully coerced Plaintiffs into wearing the bibs.

133.    Defendant used Plaintiffs' likenesses and images to serve a commercial purpose— to endorse the products and services of Defendant's sponsors. In return, Defendant's sponsors paid

1   Defendant various sums of money.  Defendant also used Plaintiffs' likenesses and images to

2   market the bibs in order to lure new bib sponsors to purchase bib space from Defendant.

3        134.    Had Plaintiffs been paid for the use of their likenesses and images, Plaintiffs could

4   have collectively earned over $50 million during the 2013-2014 golf season and similar sums

5   during other seasons at issue in this lawsuit.  Plaintiffs seek to recover the sums they would have

6   earned had they been paid for the use of their likenesses and images in promoting the goods and

7   services advertised on the bibs.

8        135.    Further, as a result of Defendant's misappropriation of Plaintiffs' likenesses and

9   images, and violation of their right to publicity, Defendant PGA TOUR received millions of

10   dollars.  Plaintiffs seek an order disgorging monies received by Defendant as a result of its

11   misappropriation of Plaintiffs' likenesses and images, and awarding those monies to Plaintiffs.

12   **III. BREACH OF CONTRACT**

13        136.    Plaintiffs incorporate paragraphs 1 – 136 in this section for all purposes as if fully

14   restated.

15        137.    Plaintiffs and Defendant entered one or more written contracts.  Defendant

16   breached those contracts, and Plaintiffs suffered injury as a result of Defendant's breaches.

17        138.    Defendant PGA TOUR is a lawfully-formed corporation with the capacity to enter

18   enforceable agreements, including those at issue here.  Among the essential terms of the contracts

19   at issue is Defendant PGA TOUR's agreement to permit Plaintiffs to exercise the same rights as

20   players under the Endorsement Policy.  In exchange for this right and others, Plaintiffs agreed to,

21   among other things, carry out their duties as caddies in accordance with Defendant PGA TOUR's

22   guidelines.  For instance, Plaintiffs agreed to wear the types of shoes designated by Defendant, to

23   refrain from entering the locker rooms at any time, to assist in maintaining the golf course by

24   replacing divots, and to release Defendant PGA TOUR from liability for certain physical injuries

25   that Plaintiffs might sustain during the course of a tournament.

26        139.    Plaintiffs and Defendant PGA TOUR mutually assented to all relevant terms in the

27   subject contracts.  Their respective assent to the essential terms of the contracts is evidenced by

28   their signatures on written contracts.  Mutual assent is also evidenced by the parties' conduct.

Specifically, Plaintiffs performed their caddie services in compliance with the terms of those contracts, and Defendant permitted Plaintiffs to caddie on the Three Tours without objection and issued Plaintiffs credentials for those tournaments.

140.    Plaintiffs performed under the contracts by complying with their various duties under the terms, including those duties set forth above.  Defendant PGA TOUR breached the contract by prohibiting Plaintiffs from exercising their rights under the Endorsement Policy.  As set forth above, Defendant coerced Plaintiffs into wearing bibs that cover a significant part of the Plaintiffs' attire.  Plaintiffs received no payment for wearing the bibs, which bore the logos of sponsors who paid Defendant PGA TOUR for endorsing their products and services.  Additionally, because of the coverage of the bibs, Plaintiffs were unable to place logos at prime locations on their attire and, thus, could not sell endorsements as provided by the Endorsement Policy.

141.    As a result of Defendant PGA TOUR's breaches of contracts, Plaintiffs have sustained damages in the amount that they would have earned had they been permitted to endorse products in accordance with the Endorsement Policy.

142.    Defendant PGA TOUR unjustly profited from its breach of contract.  Notwithstanding the contract terms, Defendant coerced Plaintiffs into wearing the logos of Defendant's sponsors without remuneration.  Because of Defendant PGA TOUR's breach, it has unlawfully obtained millions of dollars that equity demands be paid to Plaintiffs.

**IV.  UNJUST ENRICHMENT, QUANTUM MERUIT, AND MONEY HAD AND RECEIVED**

143.    Plaintiffs incorporate the allegations in paragraphs 1 - 142 in this section for all purposes as if fully restated.

144.    By wearing the bibs, Plaintiffs conferred a benefit on Defendant PGA TOUR under circumstances that would make it inequitable for Defendant to retain the benefit without paying for its value.

145.    Under the Endorsement Policy, Plaintiffs are entitled to payment for endorsing products and services by wearing corporate logos on their attire.  However, Plaintiffs never have been paid for endorsement services they provided by donning the bibs.  When Defendant PGA

1  TOUR received and retained money paid by bib sponsors, it received and retained money

2  rightfully belonging to Plaintiffs.

3      146.    Further, Defendant knew that Plaintiffs expected compensation for donning

4  corporate logos during professional golf tournaments.  Defendant's Endorsement Policy permits

5  Plaintiffs to endorse products and services for pay by displaying sponsor logos on their attire.

6  Defendant pays Plaintiffs to wear caps bearing the logo of Defendant's hat sponsor during

7  professional golf tournaments.  Plaintiffs have informed Defendant that Plaintiffs oppose wearing

8  the bibs without compensation, and Plaintiffs have informed Defendant that they want the

9  opportunity to endorse their own sponsors in the space occupied by the bibs.  Further, Defendant

10 PGA TOUR had to coerce Plaintiffs into wearing the bibs.  Defendant PGA TOUR knew that the

11 basis of Plaintiffs' resistance to wearing the bibs was Plaintiffs' desire to be paid for endorsing

12 products and services.  Defendant PGA TOUR voluntarily and knowingly accepted and retained

13 payment for the endorsements effectuated by the bibs despite knowing that Plaintiffs expected

14 payment for endorsing bib sponsors' products and services.  At Plaintiffs' expense and by virtue

15 of Plaintiffs' effort, Defendant PGA TOUR was unjustly enriched in an amount equal to the sums

16 collected from bib sponsors.

17     147.    For these reasons, it would be inequitable for Defendant PGA TOUR to retain the

18 benefits obtained from Plaintiffs' endorsement of Defendant's sponsors without paying fair value

19 for the service.  The Court should therefore place a constructive trust on the money that Defendant

20 PGA TOUR has accepted by virtue of the bibs, disgorge the money from Defendant, and award it

21 to Plaintiffs.

22 **V. LANHAM ACT VIOLATIONS**

23     148.    Plaintiffs incorporate the allegations in paragraphs 1-147 in this section for all

24 purposes as if fully restated.

25     149.    Defendant PGA TOUR's conduct violates § 43 of the Lanham Act, codified at 15

26 U.S.C. § 1125.   Specifically, by forcing Plaintiffs to wear the bibs without their consent,

27 Defendant has employed a marketing device that is likely to cause confusion, or to cause mistake,

28 or to deceive as to the affiliation, connection, or association of Defendant with Plaintiffs, or as to

the origin, sponsorship, or approval of Defendant's and bib sponsors' goods, services, or commercial activities.  Through the same conduct, Defendant has misrepresented the nature, characteristics, and qualities of Defendant's own marketing services.

150.   As detailed above, Plaintiffs were forced to wear the bibs before live and broadcast audiences viewing professional golf tournaments.  To any extent Defendant alleges that Plaintiffs consented contractually or by other means, such alleged consent was secured through Defendant's use of coercion as described elsewhere in this Complaint.  Defendant knew that these audiences are generally comprised of golf fans who readily identify professional golfers and their caddies. Motivated by that knowledge, Defendant used the likenesses and images of Plaintiffs to endorse the products and services of bib sponsors by forcing Plaintiffs to wear bibs at professional golf tournaments.

151.   By forcing Plaintiffs to wear the bibs before live and broadcast audiences, Defendant intentionally and knowingly (1) misled those audiences into believing that Plaintiffs voluntarily endorse or approve of the bib sponsors' products and services; (2) caused confusion among members of those audiences as to whether Plaintiffs endorse or approve bib sponsors' products and services; (3) misled or confused Endorsement and Live Action Advertising Consumers regarding Plaintiffs' association with Defendant and involvement in Defendant's advertising activities; (4) misled those audiences and consumers into believing that Plaintiffs voluntarily endorse or approve Defendant PGA TOUR's use of Plaintiffs' likenesses and images in Defendant's marketing activities; and (5) created a false belief that Defendant PGA TOUR and Plaintiffs are connected, associated, or otherwise affiliated with respect to the advertising achieved by the bibs and with respect to the companies advertised on the bibs.

152.   As a result of Defendant PGA TOUR's violations of the Lanham Act, Plaintiffs have sustained damages in the amount that they would have earned had Defendant or the bib sponsors been required to pay Plaintiffs for the use of their likenesses and images.

153.   By virtue of its Lanham Act violations, Defendant has been enriched by all sums paid for bib advertising.  Plaintiffs seek an order disgorging those sums and awarding them to Plaintiffs.

## VI. DURESS/BUSINESS COMPULSION

154.   Plaintiffs incorporate the allegations in paragraphs 1 – 153 in this part for all purposes as if fully restated.

155.   Plaintiffs unwillingly wore the bibs at issue in this lawsuit.   To any extent Defendant claims that Plaintiffs "agreed" to provide free advertising services—a notion which appears untenable and nonsensical considering the lack of employment relationship between Defendant and Plaintiffs—Defendant acquired the alleged agreement through the employment of duress and business compulsion.   To compel Plaintiffs to wear the bibs—and, alternatively, to acquire Plaintiffs' "agreement" to provide Defendant free advertising services—Defendant PGA TOUR threatened to and attempted to interfere with Plaintiffs' business relationships with their respective players and individual sponsors.   Defendant and its Local Hosts fined and "disciplined" or threatened to "discipline" caddies who refused to wear the bib and threatened to or did in fact preclude caddies from working for their golfer if they refused to provide Defendant free advertising services.   Thus, if caddies refused to provide Defendant free advertising services, they would lose their job with their respective players.   Plaintiffs, who lack viable alternative employment, would therefore become unemployed, default on financial commitments, be at risk for imminent bankruptcy, and generally fall into financial ruin.

156.   Such interference also would have reduced or eliminated Plaintiffs' ability to enter new endorsement agreements and to perform under existing endorsement agreements. There is no other context in the United States in which Plaintiffs can provide caddie services to professional golf players or sell endorsements.   Thus, Defendant PGA TOUR gave Plaintiffs no reasonable alternative but to wear the bibs without remuneration.

157.   As a result of Defendant PGA TOUR's coercion, Plaintiffs have lost opportunities to endorse products and services for pay in the space occupied by Defendant's bibs.   Additionally, Plaintiffs have provided valuable endorsement services for Defendant PGA TOUR without compensation.

158.   Plaintiffs have suffered damages in the amount of money they would have earned through endorsement deals they would have entered into had they been able to use the space

1  occupied by the bibs in accordance with the Endorsement Policy.  Alternatively, Plaintiffs seek to

2  recover the amount of money and other benefits Defendant PGA TOUR has received in

3  connection with the bibs.

4  **VII.  VIOLATIONS OF CALIFORNIA'S UNFAIR COMPETITION LAW**

5  159.  Plaintiffs incorporate the allegations in paragraphs 1 – 158 in this section for all

6  purposes as if fully restated.

7  160.  In perpetuating the conduct alleged herein, Defendant PGA TOUR violated

8  California Business & Professions Code § 17200 *et seq.* ("**UCL**").  Specifically, by coercing

9  Plaintiffs to wear the bibs during professional golf tournaments, Defendant has engaged in

10  business practices or acts that are unfair, unlawful, fraudulent, or a combination thereof.

11  161.  As noted above, there is a lucrative market for advertising opportunities during

12  professional golf tournaments and in broadcasts of those tournaments.  Defendant and Plaintiffs

13  are competitors in that market.  The consumers in the markets are companies seeking to purchase

14  marketing space.  Bib sponsors are one example of these consumers.

15  162.  As alleged throughout this Complaint, Plaintiffs' have employed threats of

16  interference with Plaintiffs' endorsement opportunities and with Plaintiffs' employment by

17  professional golfers to coerce Plaintiffs into providing advertising services for Defendant without

18  compensation.  As a result, Defendant has unfairly and illegally decreased competition by

19  reducing Plaintiffs' capacity to sell endorsements.

20  163.  Further, Defendant's conduct is unlawful under the UCL because Defendant has

21  violated federal antitrust law, misappropriated Plaintiffs' likenesses and images, violated the

22  Lanham Act, and breached its contracts with Plaintiffs.

23  164.  Additionally, on information and belief, Defendant PGA TOUR has intentionally

24  misled bib sponsors into believing that Plaintiffs voluntarily consented to wearing the bibs without

25  compensation.  On information and belief, Defendant expressly represented to bib sponsors that

26  Plaintiffs voluntarily wore the bibs, and bib sponsors purchased bib advertising space because they

27  believed that Plaintiffs wore the bibs on their own volition.  Otherwise, bib sponsors would not

28

1   want to expose themselves to liability or to have their brand tarnished by being involved with

2   Defendant's conduct at issue in this case.

3       165.   Alternatively, Defendant intentionally misled bib sponsors into believing that

4   Defendant had a legal right to force Plaintiffs to wear the bibs without compensation. Again, Bib

5   sponsors purchased advertising space on the bib because they believed Defendant's

6   misrepresentations regarding its "right" to compel caddies to wear the bib. Bib sponsors would

7   not want to expose themselves to liability arising from the failure to pay endorsers (*i.e.* the

8   caddies) for their advertising services.

9       166.   In the further alternative, Defendant intentionally misled bib sponsors into

10   believing that Plaintiffs were being compensated for wearing the bibs. Bib sponsors purchased

11   advertising space on the bib because they believed Defendant's misrepresentations regarding the

12   caddies receipt of payment or other agreed-upon consideration for their advertising services, such

13   as the payment caddies receive for wearing the Nature Valley caps described above. Bib sponsors

14   would not want to expose themselves to liability arising from the failure to pay endorsers (*i.e.* the

15   caddies) for their advertising services. Likewise, bib sponsors would not want to have their brand

16   tarnished by being involved with Defendant's conduct at issue in this case

17       167.   As a result of Defendant's unlawful acts, the public at large, including golf fans and

18   bib sponsors, has been misled. By forcing Plaintiffs to wear the logos before live tournament

19   audiences and on broadcasts of each tournament, Defendant effectively represented that Plaintiffs

20   and other caddies endorsed the companies, goods, and services represented on the bibs—whether

21   their logos were "incorporated" in the tournament logo or placed on the bib independently. A

22   reasonable consumer would have been misled, especially considering that players and caddies also

23   wear other logos on their attire because they actually do endorse the companies, products, and

24   services represented by those logos. A reasonable consumer will not know or discern that

25   Plaintiffs are not employed by Defendant, the Local Host, or the bib sponsors. A reasonable

26   consumer will not know or discern that Plaintiffs do not, in fact, endorse the companies, goods, or

27   services represented by the logos on the bibs. Consumers did in fact rely on the appearance of

28   endorsement by caddies when deciding whether to purchase the goods and services represented by

1   the bib logos.  Consumers in the Relevant Markets who decided to buy bib advertising space from

2   Defendant and Local Hosts relied on the misleading appearance that caddies voluntarily endorsed

3   the products on the bibs.  Those consumers would not have purchased bib advertising space had

4   they known that Defendant compelled Plaintiffs to wear the bibs.    Defendant knew that

5   representing to the public that caddies endorse the companies and products represented by the

6   logos was false because, in fact, the caddies had expressed their utter lack of desire to endorse

7   those companies and were unlawfully compelled to do so by Defendant and its Local Hosts.

8       168.    Defendant PGA TOUR's conduct provides no valid benefit to consumers or to

9   competition.  As a result of Defendant's unfair, unlawful competition, Plaintiffs have suffered

10  significant pecuniary losses in the amount they would have earned had Defendant not coerced

11  Plaintiffs into wearing the bibs without compensation and had Defendant allowed Plaintiffs to

12  exercise their rights under the Endorsement Policy.  As a result of Defendant's unfair, unlawful

13  competition, consumers of advertising, such as bib sponsors, have suffered significant injury by

14  paying above market value for bib advertising, by being denied access to a valuable marketing

15  medium, or being priced out of the market altogether.  Further, Defendant PGA TOUR has

16  benefitted from its unlawful competition by netting millions of dollars each year from bib

17  advertising.

18      169.    Neither Plaintiffs nor consumers could have reasonably avoided the harm caused

19  by Defendant PGA TOUR's unfair competitive practices.  Plaintiffs were given a "choice": wear

20  the bibs and preserve their employment relationship with professional golfers, or refuse to wear

21  the bibs and Defendant would work to terminate Plaintiffs' employment with professional golfers

22  and interfere with Plaintiffs' individual sponsorship agreements.  Plaintiffs could not have

23  reasonably chosen the latter.  Consumers of advertising services are on similar footing.  On

24  information and belief, at least some consumers are unaware of Defendant PGA TOUR's coercion

25  and have no reason to believe that Plaintiffs were entitled to the benefits under the Endorsement

26  Policy.  These consumers' lack of understanding is attributable to Defendant's misrepresentations.

27  And regardless of advertising consumers' awareness of the Endorsement Policy, they had no

28  reasonable response to Defendant PGA TOUR's conduct.  Advertising consumers could disregard

1  Defendant's conduct and enter endorsement agreements with Plaintiffs under which Plaintiffs

2  would wear logos in the space occupied by the bibs.  However, Defendant would simply continue

3  to force Plaintiffs to wear the bibs.

4       170.    Plaintiffs and advertising consumers have suffered actual damages in the amount

5  they would have earned had they been permitted to endorse sponsors in the space occupied by the

6  bibs.  Further, because of its unlawful conduct, Defendant PGA TOUR has received tens of

7  millions of dollars annually.  The Court should order disgorgement of all benefits obtained by

8  Defendant as a result of its wrongful conduct.

9

10                                          **CLASS ALLEGATIONS**

11       171.    Plaintiffs incorporate the allegations in paragraphs 1 - 170 in this part for all

12  purposes as if fully restated.

13       172.    Class certification is appropriate under Federal Rules of Civil Procedure 23(b)(2)

14  ("**Rule 23(b)(2)**") and 23(b)(3) ("**Rule 23(b)(3)**").  Class certification is appropriate under Rule

15  23(b)(2) because Defendant PGA TOUR's wrongful conduct was generally directed to the entire

16  proposed class, and Plaintiffs' requested injunctive relief is appropriate respecting the proposed

17  class as a whole.  Class certification is also appropriate under Rule 23(b)(3) because questions of

18  law or fact common to all proposed class members predominate over any questions affecting only

19  individual members, and the class action procedure is superior to other available methods for

20  fairly and efficiently adjudicating Plaintiffs' claims.

21  **I.  PROPOSED CLASS DEFINITION**

22       173.    Plaintiffs propose the following class definition: All caddies residing in the United

23  States who, without remuneration, wear or have worn bibs bearing the logos of Defendant PGA

24  TOUR's sponsors or those of Defendant's partners or affiliates, while providing caddie services to

25  a golfer participating in a tournament on one of Defendant PGA TOUR's Three Tours pursuant to

26  an agreement between such golfer and such caddie.

27       174.    Proposed class representative Mike Hicks and alternate proposed class

28  representative Kenny Harms are members of this proposed class.

II. <u>T</u>HRESHOLD <u>R</u>EQUIREMENTS <u>U</u>NDER <u>F</u>EDERAL <u>R</u>ULE OF <u>C</u>IVIL <u>P</u>ROCEDURE 23(a).

175.      The proposed class satisfies the numerosity, commonality, typicality, and adequacy requirements under Federal Rule of Civil Procedure 23(a).   First, Plaintiffs' proposed class satisfies the numerosity requirement.   On information and belief, more than 1,000 caddies comprise the proposed class, and they reside across the United States.   Given the number of proposed class members and their various domiciles, it would be impracticable to join all caddies individually in this action.

176.      Plaintiffs' proposed class also satisfies the commonality requirement.   The claims of each member of the proposed class stand and fall on the allegation that Defendant coerced Plaintiffs to wear the bibs without compensation and, in doing so, violated federal antitrust law, violated the Lanham Act, breached its contracts with Plaintiffs, misappropriated Plaintiffs' images and likenesses, and retained money owed to Plaintiffs.   The questions common to each and every member of the proposed class include (1) whether Defendant PGA TOUR violated the Sherman Act by unlawfully restraining the proposed class members' ability to compete in the Relevant Markets; (2) whether Defendant PGA TOUR breached its contracts with members of the proposed class by prohibiting them from endorsing products and services as provided by the Endorsement Policy; (3) whether Defendant PGA TOUR misappropriated the likenesses and images of the members of the proposed class when it coerced each member to wear the bibs at professional golf tournaments, which were broadcast via television, Internet, and video-on-demand platforms; and (4) whether Defendant PGA TOUR wrongfully profited from each member of the proposed class at each member's expense, or by the employment of duress or unlawful compulsion.

177.      Plaintiffs' proposed class representative Mike Hicks and alternate proposed class representative, Kenny Harms (collectively "**Proposed Class Representatives**") satisfy the typicality requirement.   The harm suffered by all members of the proposed class is identical in character to the harm suffered by the Proposed Class Representatives.   The Proposed Class Representatives and each proposed class member had an agreement with the PGA TOUR under which they could endorse products as permitted under the Endorsement Policy, and the proposed class members, including the Proposed Class Representatives, were prohibited by the PGA TOUR

from exercising their rights under the Endorsement Policy. Each proposed class member and the Proposed Class Representatives were prohibited from selling endorsements in the markets defined above. Each proposed class member and the Proposed Class Representatives wore Defendant PGA TOUR's bibs and therefore conferred a benefit on Defendant without remuneration. Finally, nothing alleged in this Complaint is unique to the Proposed Class Representatives.

178. The Proposed Class Representatives will fairly and adequately protect the interests of the proposed class. They have historically worked for the betterment of the caddie profession and caddie working conditions. For instance, Mr. Hicks has been a PGA Tour caddie for thirty-three years. Mr. Hicks has contributed to sixteen victories by four different players in Defendant's events. Mr. Harms serves as a board member for the APTC, an organization devoted to the improvement of caddie working conditions and benefits. Mr. Harms has been a professional caddie since 1991 and has caddied for professional golfers Kevin Na, Hale Irwin, Aaron Baddeley, Hubert Green, Ray Floyd, Gary Player, Lee Trevino, David Eger, Jan Stephenson, Emilee Klein, Lynn Connelly, and Michelle Wie.

179. Over 160 members of the proposed class are named plaintiffs in this action and have hired the undersigned counsel to represent their interests in this case. There are no reasons why the undersigned counsel cannot adequately protect the proposed class's interests.

180. Neither the Proposed Class Representatives nor their counsel have any conflicts of interest with other members of the proposed class. In fact, several members of the proposed class, named above, *supra* paragraphs 19 – 56, have agreed to join in this lawsuit and to be represented by the same counsel. Further, the Proposed Class Representatives and the proposed class members will share the same benefits from this action should Plaintiffs prevail.

### III. CLASS CERTIFICATION IS PROPER UNDER RULE 23(b)(2)

181. Defendant PGA TOUR has acted or refused to act on grounds that apply generally to all the members of the proposed class, so that final injunctive relief is appropriate with respect to the proposed class as a whole.

182. The conduct of Defendant PGA TOUR alleged in this Complaint has been directed at all caddies working for professional golfers on one or more of the Three Tours. Defendant has

1   compelled all caddies to wear the bibs against their will.  Defendant has unlawfully decreased all

2   caddies' capacity to compete in the markets defined above.  Defendant has interfered with all

3   caddies' rights under the Endorsement Policy.  Defendant has unlawfully profited from all

4   caddies' wearing the bib.

5   183.   Should Plaintiffs prevail on one or more of their causes of action, Plaintiffs seek an

6   order from this Court enjoining Defendant PGA TOUR from continuing its unlawful conduct in

7   the future.   The injunctive relief sought and bases for such relief are stated below, *infra*

8   paragraphs 192-204.

9   184.   Although Plaintiffs also seek damages for Defendant PGA TOUR's unlawful

10  conduct, those damages will constitute a hollow victory in the absence of prospective injunctive

11  relief, especially for those class members who are in the beginning stages of their career as a

12  professional caddie.  Without injunctive relief in place, Defendant PGA TOUR may determine

13  that it is in its economic interest to continue the conduct at issue in this lawsuit or to take new

14  measures that unlawfully interferes with the relevant market, coerces the Plaintiffs, or uses the

15  Plaintiffs' likenesses for commercial purposes without Plaintiffs' consent.   Additionally,

16  injunctive relief will provide Plaintiffs and their potential sponsors the freedom and security to

17  negotiate and enter endorsement agreements without the fear of interference by Defendant PGA

18  TOUR.  Should Defendant PGA TOUR continue the same conduct that establishes liability in this

19  case, Plaintiffs should not have to begin further litigation to re-establish liability for such conduct.

20  185.   Finally, damages alone are inadequate.  Damages do not protect Plaintiffs from

21  Defendant's future attempts to force Plaintiffs to endorse products and services without

22  compensation.  And with respect to Plaintiffs who recently entered the profession, their damages

23  will be nominal, and injunctive relief will protect their pecuniary interests by securing their right

24  to compensation for endorsements.

25  **IV.  CLASS CERTIFICATION IS PROPER UNDER RULE 23(b)(3)**

26  186.   Class certification under Rule 23(b)(3) is appropriate because the questions of law

27  or fact common to proposed class members predominate over any questions affecting only

28

1   individual members, and a class action is superior to other available methods for fairly and

2   efficiently adjudicating Plaintiffs' claims.

3       187.   The proposed class satisfies the predominance element because the central issues

4   can be resolved for all members of the proposed class in a single adjudication.   These central

5   questions are (1) whether Defendant PGA TOUR violated the Sherman Act by unlawfully

6   restraining the proposed class members' ability to compete in the Relevant Markets; (2) whether

7   Defendant PGA TOUR breached its contracts with members of the proposed class by prohibiting

8   them from endorsing products and services as provided by the Endorsement Policy; (3) whether

9   Defendant PGA TOUR misappropriated the likenesses and images of the members of the

10  proposed class when it coerced each member to wear the bibs at professional golf tournaments,

11  which were broadcast via television, Internet, and video-on-demand platforms; and (4) whether

12  Defendant PGA TOUR wrongfully profited from each member of the proposed class at each

13  member's expense, or by the employment of duress or unlawful compulsion.   Given the

14  homogenous nature of Defendant PGA TOUR's conduct toward the proposed class members,

15  these issues may be determined in this litigation in a single stroke.

16      188.   The superiority element is likewise satisfied.   First, on information and belief, no

17  caddies are involved in litigation that involves or relates to the allegations made in this Complaint.

18      189.   Second, there are many reasons why members of the proposed class would not

19  have an interest in individually controlling the prosecution of their claims in separate actions. For

20  example, all members of the proposed class will benefit equally from the prospective relief

21  requested by Plaintiffs, assuring that each of them will be treated in the same manner and there is

22  no risk of inconsistency of result.   Additionally, several members of the proposed class are

23  hesitant to prosecute claims on their own behalf out of fear of retaliation by Defendant PGA

24  TOUR.   Other members of the proposed class are hesitant to prosecute their claims individually

25  out of fear that the player for whom they caddie will terminate their employment out of the

26  player's own fear of retaliation by Defendant PGA TOUR, or to avoid any publicity created by

27  litigation.   Others will lack financial incentive given the cost of litigation versus the amount they

28  could reasonably expect to recover.

1    190.    It is highly desirable to focus this litigation in this forum.  Defendant PGA TOUR

2   has a permanent office in San Francisco, California, which makes much of the evidence easily

3   accessible and provides a convenient venue for Defendant's representatives to attend hearings or

4   other court proceedings as necessary.   The Northern District of California is extremely

5   experienced in adjudicating claims similar to those alleged in this Complaint.   Additionally,

6   prosecution of Plaintiffs' nearly-identical claims in several different courts will amount to a waste

7   of judicial resources, and individual prosecution will result in costly and wasteful duplication of

8   discovery, motion practice, and trial.

9    191.    There is little foreseeable difficulty in managing the proposed class action.  In fact,

10   a class action would streamline discovery and avoid the need for separate, repetitive trials and

11   duplicate discovery.  Instead of Defendant PGA TOUR's representatives being deposed numerous

12   times in separate suits and forums, its representatives only would be subject to depositions in this

13   class action.  The proposed class action would eliminate other repetitive, duplicate discovery, such

14   as depositions of individual plaintiffs which merely produce the same testimony over and over

15   again.  To the extent that the amount of actual damages or losses suffered by each member of the

16   proposed class militates against class certification, Plaintiffs aver that the evidence in this case will

17   reveal a method of determining actual loss—or actual benefit conferred on Defendant PGA—that

18   minimizes the need for individual evidence by each proposed class member.  Plaintiffs anticipate

19   that such a formula may be created by considering factors such as (1) the number of tournament

20   rounds during which each proposed class member wore a bib; (2) the proportion of each such

21   tournament round that was televised or otherwise broadcast, taking into consideration the mode of

22   broadcast; (3) the number of such rounds taking place after the "cut" occurred in a particular

23   tournament; and (4) on which of Defendant PGA Tour's Three Tours  the bib was worn.

24

25

26

27

28

**REQUESTED RELIEF**

**I.** **INJUNCTIVE RELIEF PURSUANT TO 15 U.S.C. § 4 AND 15 U.S.C. § 1116**

192.    Plaintiffs incorporate the allegations in paragraphs 1 – 191 in this section for all purposes as if fully restated.

193.    Upon determination that Defendant PGA TOUR's conduct violates the Sherman Act, Plaintiffs request a permanent injunction that will prohibit Defendant  PGA TOUR from continuing such conduct.

194.    Upon determination that Defendant PGA TOUR's conduct constituted a violation of the Lanham Act, 15 U.S.C. § 1125(a), Plaintiffs request an order permanently enjoining Defendant PGA TOUR from continuing such conduct.

195.    Additionally, Plaintiffs request a permanent injunction (1) prohibiting Defendant PGA TOUR from revising its rules, regulations, or policies in any way that would unreasonably restrain trade as alleged herein; (2) prohibiting Defendant PGA TOUR from taking any retaliatory action against Plaintiffs or members of the proposed class; and (3) prohibiting Defendant PGA TOUR from imposing any limits on the endorsement of products and services by Plaintiffs and members of the proposed class beyond those that apply to professional golfers participating in PGA TOUR events.

**II.** **PERMANENT INJUNCTIVE RELIEF GENERALLY**

196.    Plaintiffs incorporate paragraphs 1 – 195 in this section for all purposes as if fully restated.

197.    Plaintiffs seek a permanent injunction prohibiting Defendant PGA TOUR from engaging in any conduct upon which liability is based in this lawsuit.

198.    Plaintiffs ask the Court to enjoin Defendant from broadcasting images of Plaintiffs wearing the bibs except with consent of caddies.  Alternatively, Plaintiffs request an order that requires Defendant PGA TOUR to compensate Plaintiffs appearing in such broadcasts.

199.    Plaintiffs anticipate that Defendant PGA TOUR will interfere with Plaintiffs' contracts with their respective players in retaliation or in an attempt to compel the players to

1    prohibit Plaintiffs from engaging in their own endorsement activities.  Plaintiffs therefore seek an

2    order enjoining Defendant PGA TOUR from taking such actions.

3         200.   The conduct that Plaintiffs seek to enjoin will cause irreparable harm to Plaintiffs.

4    For instance, should Plaintiffs enter individual endorsement deals as a result of prevailing in this

5    litigation, the conduct sought to be enjoined will force Plaintiffs to choose between fulfilling their

6    endorsement responsibilities and engaging in their profession as a caddie.  Plaintiffs request

7    injunctive relief that will prevent such harm.

8         201.   The balance of equities and public interest tip in favor of permanent injunctive

9    relief.  A permanent injunction will provide Plaintiffs and Defendant PGA TOUR with consistent

10   expectations regarding future endorsement deals between Plaintiffs and sponsors.  Thus, Plaintiffs

11   and Defendant PGA TOUR, relying on the Court's injunction order, will have reliable

12   expectations and can proceed with certainty as to the parties' respective rights.  Additionally, with

13   a permanent injunction in place governing aspects of the parties' prospective conduct, the sponsors

14   with whom Plaintiffs and Defendant PGA TOUR enter endorsement agreements will have some

15   security based on the terms of the injunctive order.  If the future is unsettled, Plaintiffs, Defendant

16   PGA, and potential sponsors are all susceptible to entering endorsement deals that guarantee

17   litigation.  Further, upon prevailing in this case, neither Plaintiffs nor this Court should have to

18   relitigate the same issues disposed in this lawsuit when the threat of such relitigation could be

19   quelled by injunctive relief.

20        202.   The public's interest will be served by a future permanent injunction.  Public

21   interest is always served by actions that reduce consumer confusion and misleading advertising.

22   An order that precludes Defendant PGA TOUR from compelling Plaintiffs to wear the bibs will

23   produce these benefits.  The public's interest always will be served by guarding against certain

24   litigation in exchange for limits on parties' unlawful conduct.  An order enjoining prospective

25   conduct identical to the conduct at issue in this lawsuit will reduce the chances that these issues

26   are relitigated.

27

28

**III. STATUTORY INJUNCTIONS UNDER STATE LAW**

203.   Pursuant to California's unfair competition law, Plaintiffs request an order enjoining Defendant PGA TOUR from engaging in any practice which constitutes unfair competition and restoring to Plaintiffs all money and property which Defendant acquired or will acquire by virtue of its unfair competition.

204.   To that end, Plaintiffs request that a receiver be appointed to oversee Defendant's compliance with such order.  Alternatively, the court should maintain supervisory jurisdiction.

**IV. PRELIMINARY INJUNCTION**

205.   Plaintiffs reserve the right to request preliminary injunctive relief that will maintain the status quo among the parties pending the outcome of this case.

**V. ACTUAL AND STATUTORY DAMAGES**

206.   Plaintiffs incorporate the allegations in paragraphs 1 - 205 in this section for all purposes as if fully restated.

207.   Plaintiffs seek to recover all statutory damages to which they are entitled.  Under California's right to publicity statute, CAL. CIV. CODE § 3344, Plaintiffs are entitled to $750 for each violation.

208.   Plaintiffs also seek actual damages in the amount of money they would have earned based on the market value of the bib endorsements.

209.   Plaintiffs seek actual damages in the amount of the gross income attributable to Defendant PGA TOUR's use of Plaintiffs' likenesses and images in commercial activities.

210.   Plaintiffs' seek actual damages in the amount of royalties to which Plaintiffs would have been entitled had Plaintiffs been properly paid for the use of their likenesses and images in the endorsement of the products and services of the companies whose logos appeared on the bibs.

211.   Plaintiffs seek damages in the amount that Plaintiffs could have reasonably expected to earn had they been afforded the right under the Endorsement Policy to endorse products and services in the space occupied by the bibs.

## VI. DISGORGEMENT/CONSTRUCTIVE TRUST

212.    Plaintiffs incorporate the allegations in paragraphs 1 - 211 in this section for all purposes as if fully restated.

213.    Plaintiffs seek recovery of all money and benefits received by Defendant PGA TOUR and its partners and affiliates by virtue of Plaintiffs' wearing the bibs during Defendant PGA TOUR's events.

214.    On information and belief, Defendant PGA TOUR has accepted and retained over $50 million annually from bib sponsors.

## VII. TREBLE AND PUNITIVE DAMAGES

215.    Plaintiffs seek treble damages under 15 U.S.C. § 15 and 15 U.S.C. § 1117.

216.    Additionally, Defendant PGA's conduct was intentional, reckless, and malicious. Thus, to the extent permitted by law, Plaintiffs' seek punitive damages.

## VIII. PRE-JUDGMENT AND POST-JUDGMENT INTEREST

217.    Plaintiffs request pre-judgment post-judgment interest on any money judgment.

## PRAYER

Plaintiffs respectfully ask that the Court grant the relief requested above and all other relief to which Plaintiffs are entitled, whether by law or equity.

*[Signature Blocks on Next Page]*

1   Dated: September 4, 2015          **THE LANIER LAW FIRM, P.C.**

2                                     By:    */s/ Eugene R. Egdorf*

3                                            Eugene R. Egdorf

4                                     Lee Cirsch (CA State Bar No. 227668)
                                      10866 Wilshire Blvd., Suite 400
5                                     Los Angeles, CA  90024
                                      Telephone:  310-277-5100
6                                     Facsimile:  310-277-5103
                                      lee.cirsch@lanierlawfirm.com
7

8                                     THE LANIER LAW FIRM, P.C.
                                      W. Mark Lanier *Admitted Pro Hac Vice*
9                                     wml@lanierlawfirm.com
                                      Eugene R. Egdorf  *Admitted Pro Hac Vice*
10                                    gene.egdorf@lanierlawfirm.com
                                      Benjamin T. Major  *Admitted Pro Hac Vice*
11                                    ben.major@lanierlawfirm.com
                                      Ryan D. Ellis  *Admitted Pro Hac Vice*
12                                    ryan.ellis@lanierlawfirm.com
                                      6810 FM 1960 West
13                                    Houston, TX 77069
                                      Telephone:   713-659-5200
14                                    Facsimile:   713-659-2204
15

16                                    Arthur R. Miller *Admitted Pro Hac Vice*
                                      Arthur.miller@lanierlawfirm.com
17                                    THE LANIER LAW FIRM, PLLC
                                      126 East 56th Street, 6th Floor
18                                    Tower 56
                                      New York, New York 10022
19                                    Telephone:  212-421-2800
                                      Facsimile:  212-421-2878
20                                    ***Attorneys for Class Representative Plaintiffs, William***
21                                    ***Michael Hicks, Kenneth Harms, et. al.***

22

23

24

25

26

27

28

1

## **ECF CERTIFICATION**

2        I hereby certify that a true and correct copy of the foregoing document was filed

3   electronically on this 4th day of September, 2015. As of this date, all counsel of record have

4   consented to electronic service and are being served with a copy of this document through the

5   Court's CM/ECF System.

6

7

8                                          By:    _____*/s/ Eugene R. Egdorf*_____

9                                                  Eugene R. Egdorf

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

2

3     **<u>DEMAND FOR JURY</u>**

4          Plaintiffs hereby demand a trial by jury on all issues as provided by Rule 38(b) of the

5     Federal Rules of Civil Procedure.

6     Dated: September 4, 2015          THE LANIER LAW FIRM, P.C.

7                                       By:     _/s/ Eugene R. Egdorf_____

8                                               Eugene R. Egdorf

9                                       THE LANIER LAW FIRM, P.C.
                                        Lee Cirsch (CA227668)
10                                      10866 Wilshire Blvd., Suite 400
                                        Los Angeles, CA  90024
11                                      Telephone:  310-277-5100
                                        Facsimile:   310-277-5103
12                                      lee.cirsch@lanierlawfirm.com

13
                                        THE LANIER LAW FIRM, P.C.
14                                      W. Mark Lanier *Admitted Pro Hac Vice*
                                        wml@lanierlawfirm.com
15                                      Eugene R. Egdorf  *Admitted Pro Hac Vice*
                                        gene.egdorf@lanierlawfirm.com
16                                      Benjamin T. Major  *Admitted Pro Hac Vice*
                                        ben.major@lanierlawfirm.com
17                                      Ryan D. Ellis  *Admitted Pro Hac Vice*
                                        ryan.ellis@lanierlawfirm.com
18                                      6810 FM 1960 West
                                        Houston, TX 77069
19                                      Telephone:  713-659-5200
                                        Facsimile:    713-659-2204
20

21
                                        Arthur R. Miller *Admitted Pro Hac Vice*
22                                      Arthur.miller@lanierlawfirm.com
                                        THE LANIER LAW FIRM, PLLC
23                                      126 East 56th Street, 6th Floor
                                        Tower 56
24                                      New York, New York 10022
                                        Telephone:  212-421-2800
25                                      Facsimile: 212-421-2878
                                        ***Attorneys for Class Representative Plaintiffs, William***
26                                      ***Michael Hicks, Kenneth Harms, et. al.***

27

28