JEFFREY A. MISHKIN (admitted *pro hac vice*)
ANTHONY J. DREYER (admitted *pro hac vice*)
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, NY 10036
Telephone: (212) 735-3000
Facsimile:  (917) 777-2000
Email: jeffrey.mishkin@skadden.com
Email: anthony.dreyer@skadden.com

RAOUL D. KENNEDY (SB No. 40892)
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
525 University Avenue
Palo Alto, CA 94301
Telephone: (650) 470-4500
Facsimile:  (650) 470-4570
Email: raoul.kennedy@skadden.com

Attorneys for Defendant
PGA TOUR, INC.

# IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| WILLIAM MICHAEL HICKS and KENNETH HARMS, as Class Representative Plaintiffs, *et al.* | Case No. 3:15-cv-00489-VC |
| Plaintiffs, | **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS PLAINTIFFS' SECOND AMENDED CLASS ACTION COMPLAINT** |
| v. | |
| PGA TOUR, INC. | Hearing Date:        October 29, 2015 |
| Defendants. | Time:                    10:00 a.m. |
| | Courtroom:           Courtroom 4 |
| | Before:                 Hon. Vince Chhabria |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................. ii

ARGUMENT ......................................................................... 2

I.      PLAINTIFFS' SHERMAN ACT CLAIMS SHOULD BE DISMISSED. ........................ 2

    A.      Plaintiffs Have Not Pleaded A Plausible Relevant Market. ................................. 2

    B.      Plaintiffs Have Not Pleaded A Plausible Section 2 Monopolization Claim. .......... 5

    C.      Plaintiffs Have Not Pleaded A Plausible Section 1 Conspiracy Claim. ................. 8

    D.      Plaintiffs Have Not Pleaded A Plausible Section 1 Tying Claim. ......................... 9

II.     PLAINTIFFS' RIGHT OF PUBLICITY CLAIM SHOULD BE DISMISSED. ...............10

III.    PLAINTIFFS' BREACH OF CONTRACT CLAIM SHOULD BE DISMISSED. .........11

IV.     PLAINTIFFS' UNJUST ENRICHMENT CLAIM SHOULD BE DISMISSED. ............12

V.      PLAINTIFFS' LANHAM ACT CLAIM SHOULD BE DISMISSED. ..........................12

VI.     PLAINTIFFS' DURESS CLAIM SHOULD BE DISMISSED. .....................................13

VII.    PLAINTIFFS' UCL CLAIM SHOULD BE DISMISSED. .............................................15

CONCLUSION .....................................................................................15

1

**TABLE OF AUTHORITIES**

2

3

**CASES**

4

*Adidas America, Inc. v. NCAA*, 64 F. Supp. 2d 1097 (D. Kan. 1999) ........................................... 3

5

*America Online, Inc. v. GreatDeals.Net*, 49 F. Supp. 2d 851 (E.D. Va. 1999)........................... 5

6

*American Airlines v. Christensen*, 967 F.2d 410 (10th Cir. 1992) ............................................... 8

7

*Apple, Inc. v. Psystar Corp.*, 586 F. Supp. 2d 1190 (N.D. Cal. 2008) .......................................4, 6

8

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009).....................................................................................2, 9

9

*B&O Mfg., Inc. v. Home Depot U.S.A., Inc.*, No. C07-02864 JSW, 2007 WL 3232276 (N.D. Cal. Nov. 1, 2007)........................................................................................................................14

10

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) .......................................................2, 9, 13

11

*Beutler Sheetmetal Works v. McMorgan & Co.*, 616 F. Supp. 453 (N.D. Cal. 1985) ................... 8

12

*Bloom v. Martin*, 77 F.3d 318 (9th Cir. 1996) ............................................................................15

13

*Brantley v. NBC Universal, Inc.*, 675 F.3d 1192 (9th Cir. 2012) ...............................................10

14

*Burke v. TV Guide Magazine Grp., Inc.*, 442 F. App'x 356 (9th Cir. 2011)................................11

15

*Cairns v. Franklin Mint Co.*, 107 F. Supp. 2d 1212 (C.D. Cal. 2000)........................................12

16

*Chavez v. Whirlpool Corp.*, 93 Cal. App. 4th 363 (2001) ...........................................................15

17

*Colonial Med. Grp., Inc. v. Catholic Health Care W.*, 444 F. App'x 937 (9th Cir. 2011) ............ 2

18

*Condit v. Star Editorial, Inc.*, 259 F. Supp. 2d 1046 (E.D. Cal. 2003) ........................................13

19

*DocMagic, Inc. v. Ellie Mae, Inc.*, 745 F. Supp. 2d 1119 (N.D. Cal. 2010) ...............................15

20

*Dryer v. NFL*, 55 F. Supp. 3d 1181 (D. Minn. 2014).............................................................12, 13

21

*Facebook, Inc. v. Power Ventures, Inc.*, No. C08-05780 JW, 2010 WL 3291750 (N.D. Cal. July 20, 2010) ............................................................................................................................ 7

22

*Groth-Hill Land Co. v. General Motors LLC*, No. C 13-1362 TEH, 2013 WL 3853160 (N.D. Cal. July 23, 2013) ............................................................................................................14

23

24

*Hart v. World Wrestling Entm't, Inc.*, No. 3:10-cv-0975 (SRU), 2012 WL 1233022 (D. Conn. Apr. 10, 2012) ................................................................................................................12

25

*Hedging Concepts, Inc. v. First Alliance Mortgage Co.*, 41 Cal. App. 4th 1410 (1996)..............12

26

*IMO Dev. Corp. v. Dow Corning Corp.*, 135 Cal. App. 3d 451 (Cal. App. 1982) ......................14

27

28

---

**MEMORANDUM OF POINTS AND AUTHORITIES IN
SUPPORT OF DEFENDANT'S MOTION TO DISMISS**

**Case No. 3:15-cv-00489-VC**

*Ketab Corp. v. Mesriani Law Grp.*, No. 2:14-cv-7241-RSWL (MRW), 2015 WL 2084469 (C.D. Cal. May 5, 2015)................................................................................................13

*LiveUniverse, Inc. v. MySpace, Inc.*, No. CV 06-6994 AHM (RZx), 2007 WL 6865852 (C.D. Cal. June 4, 2007), *aff'd*, 304 F. App'x 554 (9th Cir. 2008) ................................. 6

*LiveUniverse, Inc. v. MySpace, Inc.*, 304 F. App'x 554 (9th Cir. 2008)........................................15

*Logan v. Union Sec. Ins. Co.*, No. 14-1174 DMG (Ex), 2015 WL 3745047 (C.D. Cal. Mar. 31, 2015) ................................................................................................................11

*Madama v. Genesis Rehab Servs.*, No. 12-1451 (MLC), 2014 WL 3695976 (D.N.J. July 24, 2014) ..............................................................................................................12, 13

*Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290 (2d Cir. 2008) ...................... 4

*Marshall v. ESPN Inc.*, No. 3:14-1945, 2015 WL 3606645 (M.D. Tenn. June 8, 2015)..............13

*Marshall v. Packard-Bell Co.*, 106 Cal. App. 2d 770 (1951) ......................................................14

*McCollum v. Blue Shield of Cal. Life & Health Ins. Co.*, No. 12-01650-PSG, 2012 WL 5389711 (N.D. Cal. Nov. 2, 2012) ..................................................................................15

*Mendes v. FedEx Ground Package Sys., Inc.*, No. 14-cv-03826-SI, 2015 WL 217920 (N.D. Cal. Jan. 15, 2015) ...................................................................................................... 2

*Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752 (1984)..........................................6, 8, 9

*Morris Communications Corp. v. PGA TOUR, Inc.*, 364 F.3d 1288 (11th Cir. 2004) ................. 7

*Newton v. Thomason*, 22 F.3d 1455 (9th Cir. 1994) ....................................................................11

*O'Connor v. Uber Techs., Inc.*, 58 F. Supp. 3d 989 (N.D. Cal. 2014).........................................15

*Person v. Google, Inc.*, No. C 06-7297 JF (RS), 2007 WL 1831111 (N.D. Cal. June 25, 2007), *aff'd*, 346 F. App'x 230 (9th Cir. 2009)................................................................ 3

*Randhawa v. Skylux Inc.*, No. CIV. 2:09-02304 WBS DAD, 2013 WL 178182 (E.D. Cal. Jan. 16, 2013) ...................................................................................................................15

*Right Field Rooftops, LLC v. Chicago Baseball Holdings, LLC*, No. 15 C 551, 2015 WL 1497821 (N.D. Ill. Apr. 2, 2015) .................................................................................... 4

*Rio Grande Royalty Co. v. Energy Transfer Partners, L.P.*, 786 F. Supp. 2d 1190 (S.D. Tex. 2009) .................................................................................................................... 8

*Sambreel Holdings LLC v. Facebook, Inc.*, 906 F. Supp. 2d 1070 (S.D. Cal. 2012) ................... 6

*Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447 (1993) ........................................................... 6

*Spinelli v. NFL*, No. 13 Civ. 7398 (RWS), 2015 WL 1433370 (S.D.N.Y. Mar. 27, 2015) .......... 4

*Tanaka v. Univ. of S. Cal.*, 252 F.3d 1059 (9th Cir. 2001).......................................................... 3

*Toscano v. Professional Golfers' Ass'n*, 258 F.3d 978 (9th Cir. 2001) ....................................... 8

*Troyer v. Shrider*, No. CV 08-5042 PSG (JWJx), 2008 WL 4291450 (C.D. Cal. Sept. 15, 2008) ................................................................................................................12

*United States v. Grinnell Corp.*, 384 U.S. 563 (1966) ................................................ 6

*U.S. Capital Partners, LLC v. AHMSA Int'l, Inc.*, No. 12-6520 (JSC), 2013 WL 594285 (N.D. Cal. Feb. 14, 2013) ......................................................................................12

*Universal Grading Serv., LLC v. eBay, Inc.*, 563 F. App'x 571 (9th Cir. 2014).........................10

*Verizon Communications, Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398 (2004)..... 6

## STATUTES

15 U.S.C. § 1 ................................................................................................................ 2

15 U.S.C. § 2 ................................................................................................................ 2

15 U.S.C. § 1125(a)(1) ...............................................................................................13

Cal. Bus. & Prof. Code § 17200 ................................................................................15

Cal. Civ. Code § 3344(a) ...........................................................................................11

Fed. R. Civ. P. 9(b)....................................................................................................15

Fed. R. Civ. P. 12(b)(6) ............................................................................................. 2

## OTHER AUTHORITIES

Restatement (Third) of Unfair Competition § 46 (Am. Law Inst. 1995) ....................................11

**NOTICE OF MOTION AND MOTION**

TO ALL PARTIES AND THEIR COUNSEL OF RECORD:

PLEASE TAKE NOTICE, that on October 29, 2015, at 10:00 a.m., or as soon thereafter as the matter may be heard, in the United States District Court, Northern District of California, Courtroom 4, 17th Floor, at 450 Golden Gate Avenue, San Francisco, California 94102, before the Honorable Vince Chhabria, Defendant PGA TOUR, Inc. (the "TOUR") will and hereby does move the Court for an order dismissing Plaintiffs' Second Amended Class Action Complaint for Damages ("SAC") in its entirety with prejudice pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.

This motion is based on the Notice of Motion, the accompanying Memorandum of Points and Authorities, the accompanying Request for Judicial Notice ("RJN"), all other papers submitted in support of the motion, the record on file in this action, and such other written and oral argument as may be presented to the Court.

## MEMORANDUM OF POINTS AND AUTHORITIES

Plaintiffs have now made three attempts to find a legal theory on which to challenge the TOUR's lawful and legitimate right to regulate and control the advertising that occurs at the TOUR's own professional golf tournaments and, for the third time, plaintiffs have failed to state a cognizable claim. The fundamental facts underlying plaintiffs' claims are not in dispute. The TOUR has established and operates, manages and promotes three domestic professional golf tours: the PGA TOUR, the Champions Tour and the Web.com Tour. (SAC ¶¶ 61, 68.) The TOUR has organized the tournaments in each of those tours and has exercised its legal right unilaterally to establish the terms and conditions under which any person wishing to attend or participate in a TOUR event may do so. No one—not a professional golfer, not a spectator, not a local host organization, not a tournament title sponsor, not a member of the media, and not a caddie—is granted access to a TOUR event unless he or she agrees to abide by the TOUR's terms.

Among those terms, and in furtherance of its effort to organize and manage the advertising at each TOUR event, the TOUR has adopted its Player Endorsement Policy. As the complaint alleges, one of the concerns of the endorsement policy "is preserving the image and reputation of the PGA TOUR." (*Id.* ¶ 71.) The TOUR "limits endorsements of tobacco, alcohol, and gaming," as well as the "placement and size of sponsor logos." (*Id.*)[1] By managing all advertising at each TOUR event, the TOUR can also maximize the value of its events, both as entertainment products for its golf fans and as advertising opportunities for its sponsors. The TOUR has permitted golfers and, by extension, their caddies to utilize the TOUR-arranged telecasts to give exposure to their sponsors, but only to the extent that golfers and caddies do not interfere with the TOUR's exercise of its legal right to realize the value of its own efforts in creating, organizing, managing and promoting its product.

As part of its effort to organize, manage and promote its professional golf tournament product, the TOUR has adopted a policy requiring caddies at TOUR events to wear a caddie bib identi-

---

[1] The Player Endorsement Policy, which was extended to caddies as a convenience to players with endorsement deals that require displaying the sponsor's logos on the caddie's clothing, expressly provides that "[a]ll sponsorships, endorsements and promotional activities . . . *are subject to the approval of the PGA TOUR.*" (RJN Ex. R, at 76-77 (emphasis added).)

fying the player who has employed the caddie and the name of the tournament.  Plaintiffs—168 professional caddies—challenge that policy, alleging that, by adopting and enforcing the policy, the TOUR violated the Sherman Act and the Lanham Act, misappropriated the caddies' images and likenesses, breached its contracts with the caddies, was unjustly enriched, engaged in acts of duress and business compulsion, and violated California's unfair competition law.  As demonstrated below, plaintiffs have not pleaded (and cannot plead) facts that, if proven, would entitle them to relief on any of these claims.  The second amended complaint should therefore be dismissed.

## ARGUMENT

A motion to dismiss is proper under Rule 12(b)(6) where the pleadings "fail[ ] to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  The Court must dismiss the complaint when it fails to "state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) ("only a complaint that states a plausible claim for relief survives a motion to dismiss").  A plaintiff's "obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Twombly*, 550 U.S. at 555 (citation omitted).  This requirement serves a critical gate-keeping role, particularly in complex antitrust cases where the threat of vast and costly discovery can provide plaintiffs with significant leverage, regardless of the ultimate merits of their claims.  *Id.* at 557-59.[2]

## I.     PLAINTIFFS' SHERMAN ACT CLAIMS SHOULD BE DISMISSED.

### A.     *Plaintiffs Have Not Pleaded A Plausible Relevant Market.*

A properly defined relevant market—a prerequisite for claims under both Section 1 and Section 2 of the Sherman Act, 15 U.S.C. §§ 1, 2—"includes the pool of goods or services that enjoy reasonable interchangeability of use and cross-elasticity of demand."  *Colonial Med. Grp., Inc. v. Catholic Health Care W.*, 444 F. App'x 937, 938 (9th Cir. 2011) (citation omitted) (affirming dismissal of antitrust complaint because plaintiff's market definition was "underinclusive" and

---

[2] The Court need not accept as true allegations that are contradicted by documents subject to judicial notice.  *Mendes v. FedEx Ground Package Sys., Inc.*, No. 14-cv-03826-SI, 2015 WL 217920, at *2 (N.D. Cal. Jan. 15, 2015).

1   failed to "encompass the product at issue *as well as all economic substitutes for the product*" (cita-

2   tion omitted)); *Person v. Google, Inc.*, No. C 06-7297 JF (RS), 2007 WL 1831111, at *3 (N.D. Cal.

3   June 25, 2007) (dismissing complaint because there is "no basis for distinguishing the alleged

4   'search advertising market' from the larger market for Internet advertising . . . search-based adver-

5   tising is reasonably interchangeable with other forms of Internet advertising"), *aff'd*, 346 F. App'x

6   230 (9th Cir. 2009).  "Failure to identify a relevant market is a proper ground for dismissing a

7   Sherman Act claim." *Tanaka v. Univ. of S. Cal.*, 252 F.3d 1059, 1063 (9th Cir. 2001).

8       Plaintiffs claim that, in adopting the challenged policy, the TOUR has violated Sections 1

9   and 2 by monopolizing, attempting to monopolize, and conspiring to restrain trade in (i) "the na-

10  tional market for the endorsement of products and services by participants in professional golf

11  tournaments," and (ii) "the national (or, alternatively North American) market for in-play or in-

12  action commercial advertising at professional golf events between commercial breaks."  (SAC ¶¶

13  84, 88.)  Plaintiffs also assert that the TOUR "has monopoly power over the market for profession-

14  al golf tournaments" that it has organized, managed and promoted.  (*Id.* ¶ 116.)  Plaintiffs thus al-

15  lege that the TOUR has monopolized, attempted to monopolize, or conspired to restrain trade in the

16  markets for endorsements and advertising *at its own events*.  Such a claim should be rejected.

17      Plaintiffs' attempt to limit the scope of the relevant market to personal endorsements and

18  "in-play or in-action commercial advertising . . . between commercial breaks" during TOUR events

19  fails to account for the myriad other opportunities available for companies to advertise their prod-

20  ucts and services that are reasonably interchangeable with personal endorsements or in-play adver-

21  tising during TOUR events.  Plaintiffs' allegations are nearly identical to the allegations in *Adidas*

22  *America, Inc. v. NCAA*, 64 F. Supp. 2d 1097 (D. Kan. 1999), in which Adidas claimed that the

23  NCAA had restrained trade in the market for advertising on uniforms and equipment during NCAA

24  competitions.  The court rejected such a limited market definition and dismissed the complaint,

25  holding that "an antitrust plaintiff may not 'define a market so as to cover only the practice com-

26  plained of, this would be circular or at least result-oriented reasoning.'"  *Id.* at 1102 (citation omit-

27  ted).  The court held that Adidas had "fail[ed] to define the relevant market in terms of inter-

28  changeability and cross-elasticity of demand," and had not adequately explained "why other simi-

1  lar forms of advertising, namely sponsorship agreements with teams or individuals competing in

2  the National Football League, the National Basketball Association, the Women's National Basket-

3  ball Association, Major League Baseball, Major League Soccer, or the Olympics, are not reasona-

4  bly interchangeable with NCAA promotion rights or sponsorship agreements." *Id.* at 1103.

5       When plaintiffs do not "allege facts plausibly supporting the counterintuitive claim that [a

6  product] is so unique that it suffers *no* actual or potential competitors," then, "[e]ven where brand

7  loyalty is intense, courts reject the argument that a single branded product constitutes a relevant

8  market." *Apple, Inc. v. Psystar Corp.*, 586 F. Supp. 2d 1190, 1198 (N.D. Cal. 2008) (citation omit-

9  ted) (dismissing counterclaim and holding that "a manufacturer's own products do not themselves

10  comprise a relevant product market. . . .  [A] company does not violate the Sherman Act by virtue

11  of the natural monopoly it holds over its own product."  (citation omitted)).

12       Courts have frequently held that, as a matter of law, the interchangeability of various pro-

13  fessional sports and other entertainment products precludes the conclusion that a single profession-

14  al sport constitutes a relevant market for antitrust purposes.  *See, e.g.*, *Major League Baseball*

15  *Props.*, *Inc. v. Salvino, Inc.,* 542 F.3d 290, 328-31 (2d Cir. 2008) (rejecting, on summary judgment

16  motion, relevant market limited to licenses for Major League Baseball intellectual property that did

17  not include the available substitutes for baseball intellectual property, such as licenses for "football,

18  boxing, basketball, ice skating, hockey, and NASCAR" intellectual property); *Right Field Roof-*

19  *tops, LLC v. Chicago Baseball Holdings, LLC*, No. 15 C 551, 2015 WL 1497821, at *8 (N.D. Ill.

20  Apr. 2, 2015) (rejecting, on preliminary injunction motion, relevant market limited to live games of

21  the Chicago Cubs baseball team "because the Cubs necessarily compete with other Major League

22  Baseball teams, sporting events, and other live entertainment for revenue"); *Spinelli v. NFL*, No. 13

23  Civ. 7398 (RWS), 2015 WL 1433370, at *21 (S.D.N.Y. Mar. 27, 2015) (rejecting, on motion to

24  dismiss, relevant market limited to NFL-related photographs that excluded other sports-related

25  photographs where plaintiffs had not alleged facts to show "why the commercial licensing of

26  MLB- or NCAA-related photographs (or any other sports-related photographs) is not reasonably

27  interchangeable with the commercial licensing of NFL-related photographs").

28       In the instant case, plaintiffs predicate their relevant market definitions on the conclusory

1   allegation that professional golf tournament viewers are older, affluent white men who travel by

2   airplane, vacation at golf resorts, buy luxury goods and financial services, and might skip the

3   commercial breaks on television.  (SAC ¶¶ 85, 90, 93, 95.)  This allegation, even if taken as true, is

4   insufficient to plausibly support the counterintuitive claim that personal endorsements by profes-

5   sional golfers and caddies at TOUR tournaments are so unique that advertisers can find no reason-

6   ably interchangeable substitute means of advertising to their customers.  Plaintiffs allege no facts

7   that, if proven, would plausibly demonstrate why thousands of airlines, financial services compa-

8   nies, travel and entertainment companies, luxury goods manufacturers, automotive companies, golf

9   equipment manufacturers, and a host of other companies would not find the whole panoply of ad-

10   vertising media, such as the Internet, television, radio, billboards and print media, including other

11   golf-related media like the Golf Channel or golf-themed print media like Golf Digest, reasonably

12   interchangeable with endorsements by caddies at TOUR events.  *See, e.g.*, *America Online, Inc. v.*

13   *GreatDeals.Net*, 49 F. Supp. 2d 851, 858 (E.D. Va. 1999) (rejecting, on motion to dismiss, market

14   definition limited to e-mail advertising where there "are numerous substitutes for e-mail advertis-

15   ing, some of which are less expensive, including use of the World Wide Web, direct mail, bill-

16   boards, television, newspapers, radio, and leaflets, to name a few").  Nor have plaintiffs alleged

17   facts that, if proven, would plausibly show why these same advertisers would not find endorsement

18   agreements with athletes who participate in professional football, baseball, basketball, hockey, soc-

19   cer, tennis, horse racing, automobile racing, or any other sports competition or entertainment event

20   reasonably interchangeable with caddie endorsements at TOUR events.  Absent a plausible rele-

21   vant market definition, plaintiffs' Sherman Act claims should be dismissed.

22        **B.**    *Plaintiffs Have Not Pleaded A Plausible Section 2 Monopolization Claim.*

23        Even if, counterintuitively, plaintiffs were correct and the TOUR has created a product

24   whose fans are so uniquely attractive to advertisers that TOUR events constitute their own relevant

25   market for companies to advertise their products and services, plaintiffs still cannot state a viable

26   Section 2 claim.  Plaintiffs have alleged no facts even to suggest that, in developing, organizing,

27   managing and promoting its professional golf tournament product at which such advertising oc-

28   curs, the TOUR has engaged in exclusionary conduct "as distinguished from growth or develop-

1   ment as a consequence of a superior product, business acumen, or historic accident," *United States*

2   *v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966) (monopolization), or "predatory or anticompetitive

3   conduct" engaged in with "a specific intent to monopolize," *Spectrum Sports, Inc. v. McQuillan*,

4   506 U.S. 447, 456 (1993) (attempted monopolization).  Thus, even if plaintiffs were correct that the

5   TOUR's professional golf tournaments constitute a relevant market, the TOUR's exercise of power

6   in that market to control advertising at its own tournaments would not violate the antitrust laws.

7   *See Apple, Inc.*, 586 F. Supp. 2d at 1198 ("[A] company does not violate the Sherman Act by virtue

8   of the natural monopoly it holds over its own product").  As the Supreme Court has made clear:

> The mere possession of monopoly power, and the concomitant charging of monopo-
> ly prices, is not only not unlawful; it is an important element of the free-market sys-
> tem.  The opportunity to charge monopoly prices—at least for a short period—is
> what attracts "business acumen" in the first place; it induces risk taking that produc-
> es innovation and economic growth.  To safeguard the incentive to innovate, the
> possession of monopoly power will not be found unlawful unless it is accompanied
> by an element of anticompetitive *conduct*.

*Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 407 (2004).

The TOUR legally created its professional golf tournament product through its own efforts

and has the right to deal, or refuse to deal, with whomever it likes, and to establish the terms on

which it will deal with others.  *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 761 (1984).

Subject to narrow exceptions not applicable here, the Sherman Act "does not restrict the long rec-

ognized right of [a] trader or manufacturer engaged in an entirely private business, freely to exer-

cise his own independent discretion as to parties with whom he will deal."  *Trinko*, 540 U.S. at 408.

The TOUR also has the right to prevent others from "free riding" on its investment and in-

novation.  *See, e.g., LiveUniverse, Inc. v. MySpace, Inc.*, No. CV 06-6994 AHM (RZx), 2007 WL

6865852, at *13 (C.D. Cal. June 4, 2007) (defendant's refusal to allow competitor to advertise for

free on its social networking site did not, as a matter of law, constitute exclusionary conduct, but

was legitimate exercise of defendant's right to prevent its rival from "free riding" on defendant's

investment and innovation), *aff'd*, 304 F. App'x 554 (9th Cir. 2008).  In *Sambreel Holdings LLC v.

Facebook, Inc.*, 906 F. Supp. 2d 1070 (S.D. Cal. 2012), the court dismissed the plaintiffs' antitrust

challenge to defendant Facebook's refusal to allow its rival to advertise on Facebook.  The court

---

1   held that "Facebook has a right to control its own product, and to establish the terms with which its

2   users, application developers, and advertisers must comply in order to utilize [the] product." *Id.* at

3   1075. "There is no fundamental right to use Facebook," the court continued, and "users may only

4   obtain a Facebook account upon agreement that they will comply with Facebook's terms, which is

5   unquestionably permissible under the antitrust laws." *Id.* at 1080; *see also Facebook, Inc. v. Power*

6   *Ventures, Inc.*, No. C08-05780 JW, 2010 WL 3291750, at *13 (N.D. Cal. July 20, 2010) (dismiss-

7   ing Section 2 claim and holding that the antitrust laws do not obligate Facebook "to allow third-

8   party websites unfettered access to its own website").

9         In *Morris Communications Corp. v. PGA TOUR, Inc.*, 364 F.3d 1288 (11th Cir. 2004), the

10   court affirmed the grant of summary judgment in favor of the TOUR, and held that the TOUR did

11   not violate Section 2 when it refused to permit a rival website to sell scoring information from the

12   TOUR's real-time scoring system feed while in the media center at TOUR events. The court held

13   that the TOUR was entitled to impose terms and conditions on those attending TOUR events and to

14   prevent rivals from "free riding" on its technology investment and innovation, explaining that "re-

15   fusal to deal that is designed to protect or further the legitimate business purposes of a defendant

16   [*i.e.*, preventing "free riding"] does not violate the antitrust laws, even if that refusal injures compe-

17   tition." *Id.* at 1295; *see also id.* at 1298.

18         Here, the TOUR has a legitimate business interest in preserving its investment in the crea-

19   tion, organization, promotion and operation of its golf tournaments. To protect that legitimate in-

20   terest, and to prevent others from "free riding" on that investment, the TOUR has the clear legal

21   right to establish the terms, including restrictions, on which caddies—as well as professional golf-

22   ers, spectators, advertisers, the media, and anyone else—will be permitted access to a TOUR event.

23   Plaintiffs have no fundamental right to work at a TOUR event, let alone the right to promise expo-

24   sure to third-party sponsors and advertisers during TOUR-arranged telecasts, unless the TOUR

25   permits plaintiffs to do so. And while the TOUR could ban all caddie endorsements altogether dur-

26   ing a TOUR event without violating the antitrust laws, it has adopted a policy that, provided that

27   the caddies adhere to the requirement that they wear the caddie bib, permits caddies to display

28   sponsor logos that conform to the same guidelines as those applicable to professional golfers. Such

1  a policy is unquestionably permissible under Section 2.

2      **C.**    ***Plaintiffs Have Not Pleaded A Plausible Section 1 Conspiracy Claim.***

3      The TOUR's lawful unilateral conduct does not become an unlawful conspiracy to restrain

4  trade when, having unilaterally adopted the challenged policy, the TOUR insists that others adhere

5  to that policy as a condition of participating in a TOUR event.  For an alleged agreement to consti-

6  tute a violation of Section 1, an antitrust plaintiff must allege facts to establish that the parties to

7  the agreement had a "conscious commitment to a common scheme designed to achieve an unlawful

8  objective." *Monsanto*, 465 U.S. at 764 (citation omitted).  As a matter of law, however, there is no

9  such "conscious commitment to a common scheme designed to achieve an unlawful purpose"

10 where one party establishes the terms on which it is willing to deal with others, and others acqui-

11 esce in, or agree to comply with, those terms as a condition of dealing.

12     More than thirty years ago, the Supreme Court made clear that a manufacturer "has a right

13 to deal, or refuse to deal, with whomever it likes, as long as it does so independently . . . [a]nd a

14 distributor is free to acquiesce in the manufacturer's demand in order to avoid termination." *Id.* at

15 761 (citations omitted).  Courts have consistently applied that principle.  In *Toscano v. Profession-*

16 *al Golfers' Association*, 258 F.3d 978 (9th Cir. 2001), the court rejected the conspiracy allegation

17 of a golfer who claimed that the TOUR had conspired with local host organizations by agreeing to

18 operate tournaments in accordance with the TOUR's rules.  The court held that the local host or-

19 ganizations' agreement to adhere to the TOUR's rules established "only that the local [host organi-

20 zations] accepted the fact that the tournaments would be operated according to the [TOUR's] rules

21 and regulations, not that they agreed to use those rules to restrain trade." *Id.* at 984.  There was

22 simply no cognizable conspiracy in violation of Section 1 where the TOUR "independently set the

23 terms of the contracts, and the local [host organizations] merely accepted them." *Id.*[3]

24 _____

[3] *See also American Airlines v. Christensen*, 967 F.2d 410, 413-14 (10th Cir. 1992) (no conspiracy

25 where airline independently set the terms of its travel awards program and members merely accept-
ed those terms); *Beutler Sheetmetal Works v. McMorgan & Co.*, 616 F. Supp. 453, 456 (N.D. Cal.

26 1985) (no conspiracy where investment company unilaterally established its "union-only" invest-
ment policy and real estate developers and mortgage lenders acquiesced in that policy); *Rio Grande*

27 *Royalty Co. v. Energy Transfer Partners, L.P.*, 786 F. Supp. 2d 1190, 1199 (S.D. Tex. 2009) ("the
fact that a person accepts the terms of a contract does not, without more, generate the type of con-

28 certed action necessary to violate Section 1").

1    In the instant case, the TOUR independently established the challenged policy requiring

2   plaintiffs to wear the caddie bib, and plaintiffs plead no facts to suggest otherwise.  Plaintiffs simp-

3   ly allege that each local host organization—which, in general, operates a single TOUR tournament

4   (SAC ¶¶ 68, 99)—has agreed to adhere to, and to enforce, the TOUR's rules at its tournament.  In

5   addition, plaintiffs allege that the TOUR has conspired with plaintiffs themselves by coercing

6   plaintiffs to adhere to the challenged policy, and that they have "unwillingly acquiesced" in the

7   policy as a condition of their participation in TOUR events.  (*Id.* ¶ 109.)  But adherence to, or ac-

8   quiescence in, the TOUR's unilaterally developed terms and conditions is not cognizable as a con-

9   spiracy in violation of federal antitrust law.[4]

10    Plaintiffs' vague assertion that some unidentified local host organizations agreed to enforce

11   the challenged policy by reporting infractions to the TOUR or threatening to eject a caddie who

12   refused to abide by the policy (*id.* ¶¶ 12, 68, 75, 108) does not suffice to state a conspiracy claim in

13   violation of Section 1.  As an initial matter, this assertion does not identify a single local host or-

14   ganization or provide any factual allegations to support the conclusory claim that any local organi-

15   zation took any action with respect to the challenged bib policy.  As such, it is insufficient to with-

16   stand a motion to dismiss under *Twombly*, 550 U.S. at 555, and *Iqbal*, 556 U.S. at 679.  Moreover,

17   as explained above, plaintiffs must plead facts that, if true, show that the TOUR and each local host

18   organization had a "conscious commitment to a common scheme designed to achieve an unlawful

19   objective."  *Monsanto*, 465 U.S. at 764 (citation omitted).  At best, plaintiffs' allegations suggest

20   that the TOUR and the local host organization shared a common plan to achieve the entirely lawful

21   purpose of organizing a professional golf tournament in accordance with the TOUR's rules.  Such

22   an agreement, even if proven, does not constitute an unlawful conspiracy in violation of Section 1.

23    **D.    Plaintiffs Have Not Pleaded A Plausible Section 1 Tying Claim.**

24    Finally, plaintiffs' novel effort to survive the TOUR's motion to dismiss by pleading that

25   the TOUR has engaged in illegal tying (SAC ¶¶ 116-21) should be rejected.  As a matter of law,

26   "[t]ying is defined as an arrangement where a supplier agrees to sell a buyer a product (the tying

27

28   _____

[4] Importantly, plaintiffs make no allegations even to suggest that the scores of independent local host organizations have agreed with one another about anything.

1  product), but 'only on the condition that the buyer also purchases a different (or tied) product.'"

2  *Brantley v. NBC Universal, Inc.*, 675 F.3d 1192, 1199 (9th Cir. 2012) (citation omitted); *accord*

3  *Universal Grading Serv., LLC v. eBay, Inc.*, 563 F. App'x 571, 572 (9th Cir. 2014).  Plaintiffs' al-

4  legations are wholly untethered to any legally cognizable theory of tying.  Rather, they describe an

5  arrangement pursuant to which the TOUR allegedly "sells" caddies access to its golf tournaments

6  in exchange for "the purchase of" advertising services.  That description bears no resemblance to

7  an unlawful tying arrangement.

8         In short, the complaint simply does not plausibly plead a violation of federal antitrust law.

9  The TOUR has a right to establish the terms for the operation and promotion of, and participation

10  in, its own tournaments and to insist that plaintiffs adhere to those terms as a condition of their par-

11  ticipation in a TOUR event.  The TOUR has the right to regulate and control the exposure provided

12  to third parties at its own tournaments to preserve its image and reputation, as well as to maximize

13  the value of the tournament.  It has, as an accommodation to the players and their caddie employ-

14  ees, permitted plaintiffs to utilize the TOUR-arranged telecasts to provide exposure to their spon-

15  sors, but only to the extent that plaintiffs' conduct does not interfere with the TOUR's own objec-

16  tives and efforts to maximize the value of its product for itself, its fans and those sponsors with

17  which it has contracted for exposure at TOUR tournaments.  None of the TOUR's alleged conduct

18  violates federal antitrust law, and plaintiffs' Sherman Act claims should be dismissed.

19  **II.      PLAINTIFFS' RIGHT OF PUBLICITY CLAIM SHOULD BE DISMISSED.**

20         Plaintiffs' claim for violation of their right of publicity and misappropriation of their like-

21  nesses (SAC ¶¶ 130-35) cannot succeed.  Plaintiffs acknowledge that they have entered into en-

22  forceable agreements with the TOUR governing plaintiffs' participation in TOUR events.  (SAC ¶¶

23  137-40.)  In those agreements, plaintiffs have agreed both (i) to "wear uniforms and identification

24  badges as prescribed by the host tournament and the [TOUR]," which includes the caddie bib (RJN

25  Exs. A-K § 2; L-O § 4; P-Q § 3; R at 58 § 2) and (ii) to assign to the TOUR "without limitation,

26  [their] individual television, radio, motion picture, photographic, electronic, 'Interactive Applica-

27  tions' . . . and all other similar or related media rights with respect to [their] participation in the

28  Tournament, Pro-Am or any other golf event conducted in conjunction with the Tournament or any

---

MEMORANDUM OF POINTS AND AUTHORITIES IN                                    Case No. 3:15-cv-00489-VC
SUPPORT OF DEFENDANT'S MOTION TO DISMISS

1   portion thereof." (RJN Exs. A-K.)  It is well settled that consent to the challenged use is an abso-

2   lute bar to a right of publicity claim.  *See*, *e.g.*, *Newton v. Thomason*, 22 F.3d 1455, 1460-61 (9th

3   Cir. 1994); Cal. Civ. Code § 3344(a); Restatement (Third) of Unfair Competition § 46 cmt. f (Am.

4   Law Inst. 1995) ("Conduct that would otherwise infringe the personal or commercial interests pro-

5   tected by the rights of privacy and publicity is not actionable if the conduct is within the scope of

6   consent given by the holder of the right.").  Having consented to wear the caddie bib and to the

7   TOUR's use of their images and likenesses as they incidentally occur in the broadcasts of TOUR

8   golf tournaments, plaintiffs cannot state a claim for violation of their right of publicity or misap-

9   propriation of their likenesses.  That claim should therefore be dismissed.

10  ## III.   PLAINTIFFS' BREACH OF CONTRACT CLAIM SHOULD BE DISMISSED.

11      Plaintiffs predicate their breach of contract claim on the provision in their agreements with

12  the TOUR that "[c]addies' clothing must conform to the Player Endorsement Policy." (SAC ¶ 73.)

13  But, as explained above, those same agreements also provide that "Caddies shall wear uniforms

14  and identification badges as prescribed by the host tournament and [the TOUR]." (RJN Exs. A-K §

15  2; L-O § 4; P-Q § 3; R at 58 § 2.)

16      It is a well settled canon of contract interpretation that a contract must be read as a whole

17  and should not be construed in a manner that ignores specific provisions of the agreement or ren-

18  ders them superfluous.  *See*, *e.g.*, *Logan v. Union Sec. Ins. Co.*, No. 14-1174 DMG (Ex), 2015 WL

19  3745047, at *11 (C.D. Cal. Mar. 31, 2015).  Yet plaintiffs' construction of the agreements—that

20  they permit caddies to display sponsors' logos to the same extent as golfers (SAC ¶¶ 138, 140)—

21  would improperly nullify the provisions that require caddies to wear prescribed uniforms.  Moreo-

22  ver, to the extent the Player Endorsement Policy can be construed as granting caddies the right to

23  display sponsors' logos on their clothing at all—rather than as regulating sponsorship substance,

24  size, and placement—such rights are plainly subject to those provisions of the agreements that re-

25  quire caddies to wear uniforms and identification badges, including the caddie bibs, as prescribed

26  by the TOUR.  Accordingly, plaintiffs' contract claim fails.  *See Burke v. TV Guide Magazine*

27  *Grp., Inc.*, 442 F. App'x 356, 358 (9th Cir. 2011) (affirming dismissal of breach of contract claim

28  where challenged conduct was specifically authorized by the parties' contract).

1  **IV.    PLAINTIFFS' UNJUST ENRICHMENT CLAIM SHOULD BE DISMISSED.**

2          As a matter of law, the contractual relationships between plaintiffs and the TOUR that gov-

3  ern the very matter in dispute here preclude any claim for unjust enrichment, quantum meruit or

4  money had and received.  *See, e.g.*, *U.S. Capital Partners, LLC v. AHMSA Int'l, Inc.*, No. 12-6520

5  (JSC), 2013 WL 594285, at *5 (N.D. Cal. Feb. 14, 2013) ("[A] plaintiff may not maintain quasi-

6  contract claims such as unjust enrichment [and] money had and received . . . 'if the parties have an

7  enforceable agreement regarding a particular subject matter.'" (citation omitted)); *Hedging Con-*

8  *cepts, Inc. v. First Alliance Mortgage Co.*, 41 Cal. App. 4th 1410, 1419-20 (1996) (no quantum

9  meruit claim in face of valid contract).  Accordingly, plaintiffs' claim for unjust enrichment, quan-

10 tum meruit or money had and received (SAC ¶¶ 143-47) should be dismissed.

11 **V.     PLAINTIFFS' LANHAM ACT CLAIM SHOULD BE DISMISSED.**

12         Plaintiffs' Lanham Act claim for false endorsement (*id.* ¶¶ 148-53) requires an *unauthor-*

13 *ized* use of plaintiffs' identity that is likely to confuse consumers as to plaintiffs' sponsorship or

14 approval of a product.  *See Troyer v. Shrider*, No. CV 08-5042 PSG (JWJx), 2008 WL 4291450, at

15 *4 (C.D. Cal. Sept. 15, 2008); *Cairns v. Franklin Mint Co.*, 107 F. Supp. 2d 1212, 1214 (C.D. Cal.

16 2000).  Plaintiffs consented both to wearing the caddie bibs and to the TOUR's use of their like-

17 nesses, and thus cannot establish a false endorsement claim as a matter of law.  *See Madama v.*

18 *Genesis Rehab Servs.*, No. 12-1451 (MLC), 2014 WL 3695976, at *8 (D.N.J. July 24, 2014) (re-

19 jecting false endorsement claim where plaintiff "was filmed and photographed, all while knowing

20 that her likeness would be used by Defendant in commerce"); *Hart v. World Wrestling Entm't,*

21 *Inc.*, No. 3:10-cv-0975 (SRU), 2012 WL 1233022, at *10 (D. Conn. Apr. 10, 2012) (dismissing

22 false endorsement claim where defendant had contractual right to use name and likeness).

23         The claim fails for the independent reason that plaintiffs cannot show the TOUR's "uses of

24 their likenesses was in any way false or misleading."  *Dryer v. NFL*, 55 F. Supp. 3d 1181, 1203 (D.

25 Minn. 2014).  The caddie bibs about which plaintiffs complain merely identify the player for

26 whom, and the golf tournament at which, plaintiffs are caddying (*see, e.g.*, SAC ¶ 1); the complaint

27 does not allege that there is anything untrue or misleading about what is displayed on the bibs.  Be-

28 cause the caddie bibs accurately identify the player for whom, and the tournament at which, each

1  caddie is working, "a Lanham Act claim simply does not lie." *Dryer*, 55 F. Supp. 3d at 1203 (foot-

2  age of plaintiffs playing NFL football games in their NFL uniforms was not "in any way false or

3  misleading" and could not, "as a matter of law, cause confusion or mistake or deceive anyone as to

4  Plaintiffs' affiliation with the NFL"); *see also Marshall v. ESPN Inc.*, No. 3:14-1945, 2015 WL

5  3606645, at *17-18 (M.D. Tenn. June 8, 2015) (dismissing false endorsement claim based upon

6  sporting event broadcasts in which plaintiffs participated); *Madama*, 2014 WL 3695976, at *8 (no

7  false endorsement where "there was nothing 'false' about Defendant's use of her likeness").

8       Moreover, plaintiffs cannot plausibly claim that the TOUR's requirement that all caddies

9  wear identical caddie bibs identifying the caddie's employer and the name of the tournament con-

10  fuses viewers into believing that each caddie has personally endorsed the title sponsor or its prod-

11  ucts.  It is common knowledge that sports organizations from the Premier League to the Little

12  League display their sponsor's name or logo on the participants' uniforms.  Such an arrangement

13  cannot plausibly be claimed to convey the notion that each participant wearing the uniform has

14  personally endorsed the products of the team's sponsor, just as the movie product placement ar-

15  rangements to which plaintiffs analogize (SAC ¶ 90 n.6) cannot plausibly be alleged to convey the

16  notion that the actors and others associated with the film personally endorse the displayed product.

17  Plaintiffs' agreement to wear the caddie bibs as a condition of their engagement by a player partic-

18  ipating in a TOUR event simply does not plausibly mislead consumers or sponsors, and such an

19  implausible claim should be dismissed.  *See Twombly*, 550 U.S. at 570; *Ketab Corp. v. Mesriani*

20  *Law Grp.*, No. 2:14-cv-7241-RSWL (MRW), 2015 WL 2084469, at *4 n.8 (C.D. Cal. May 5,

21  2015) (Lanham Act claim previously dismissed for failure to plead plausible confusion).

22       Finally, the Lanham Act claim fails for the independent reason that, despite having now

23  filed three separate complaints, plaintiffs still have not alleged facts sufficient to show that their

24  likenesses in a TOUR telecast operate as a source identifier akin to a trademark.  *See* 15 U.S.C. §

25  1125(a)(1); *Condit v. Star Editorial, Inc.*, 259 F. Supp. 2d 1046, 1054 (E.D. Cal. 2003).

26  **VI.    PLAINTIFFS' DURESS CLAIM SHOULD BE DISMISSED.**

27       Plaintiffs also have failed to plead a plausible claim of duress or business compulsion (SAC

28  ¶¶ 154-58).  Under California law, "it does not constitute duress or coercion to threaten to do that

---

MEMORANDUM OF POINTS AND AUTHORITIES IN                                    Case No. 3:15-cv-00489-VC
SUPPORT OF DEFENDANT'S MOTION TO DISMISS

1    which a party has a legal right to do." *Marshall v. Packard-Bell Co.*, 106 Cal. App. 2d 770, 774

2    (1951).  Because, as explained above, the TOUR has the clear legal right to establish the terms and

3    conditions for attendance and participation at its own events, plaintiffs' claim for duress or busi-

4    ness compulsion is unsupportable as a matter of law.  *See Groth-Hill Land Co. v. General Motors*

5    *LLC*, No. C 13-1362 TEH, 2013 WL 3853160, at *13 (N.D. Cal. July 23, 2013) (granting motion

6    to dismiss because defendant's threat to terminate plaintiff's financing was a "threat to do that

7    which [defendant] had a contractual right to do").

8           Moreover, although plaintiffs assert that they agreed to wear the bibs under duress, they do

9    not seek rescission of the contractual arrangements between them and the TOUR that permit them

10   to work for players as caddies during TOUR events.  Indeed, plaintiffs concede that they and the

11   TOUR "mutually assented to all relevant terms in the subject contracts" and that, as consideration

12   for plaintiffs' agreement to those terms, the TOUR "permitted Plaintiffs to caddie on the Three

13   Tours . . . and issued Plaintiffs credentials for those tournaments."  (SAC ¶ 139.)  Having accepted

14   these contractual benefits from the TOUR, plaintiffs cannot now assert duress to avoid the provi-

15   sions of the contracts that they do not like.  *See IMO Dev. Corp. v. Dow Corning Corp.*, 135 Cal.

16   App. 3d 451, 458 (Cal. App. 1982) (a party may not use a duress claim to "retain the rights under

17   [a contract] which he deems desirable and repudiate the remainder" (citation omitted)).

18          Finally, a claim for duress should be dismissed where the plaintiff cannot allege facts

19   which, if true, "would show that it was deprived of its free will" and had no reasonable alternative

20   but to succumb to the terms or face bankruptcy or financial ruin.  *B&O Mfg., Inc. v. Home Depot*

21   *U.S.A., Inc.*, No. C07-02864 JSW, 2007 WL 3232276, at *5 (N.D. Cal. Nov. 1, 2007) (granting

22   motion to dismiss duress claim).  Merely desiring the benefits of the contract or even suffering

23   some financial difficulty in the absence of the contract is insufficient to show a deprivation of free

24   will or a threat of financial ruin.  *Id.*  Plaintiffs make the conclusory—and factually unsupporta-

25   ble—allegation that, if they do not agree to the bib policy, they would "become unemployed, de-

26   fault on financial commitments, be at risk for imminent bankruptcy, and generally fall into finan-

27   cial ruin."  (SAC ¶ 155.)  This allegation assumes that TOUR events offer plaintiffs their only pos-

28   sible employment opportunities, and ignores the hundreds (perhaps thousands) of golf resorts

1   where "nearly half of golf fans vacation . . . each year." (*Id.* ¶ 93.)  Plaintiffs' desire—even strong

2   desire—to work as caddies for players participating in TOUR events does not establish that they

3   have no other employment opportunities (as caddies or otherwise) and is insufficient to show that

4   their agreement to adhere to the challenged bib policy was made under duress or business compul-

5   sion.  This claim should therefore be dismissed.

6   **VII.   PLAINTIFFS' UCL CLAIM SHOULD BE DISMISSED.**

7         Finally, plaintiffs fail to plead any predicate acts legally capable of constituting unlawful,

8   unfair or fraudulent conduct under California's Unfair Competition Law, Cal. Bus. & Prof. Code §

9   17200, *et seq.* ("UCL").  (SAC ¶¶ 159-70.)  Plaintiffs' allegations under the fraud prong of the

10   UCL—that the TOUR "misled bib sponsors" (*id.* ¶ 164-66)—fail (i) to plead fraud with the par-

11   ticularity required by Fed. R. Civ. P. 9(b), *see Randhawa v. Skylux Inc.*, No. CIV. 2:09-02304 WBS

12   DAD, 2013 WL 178182, at *3 (E.D. Cal. Jan. 16, 2013), and (ii) to allege reliance by plaintiffs on

13   the purported misrepresentations, *see O'Connor v. Uber Techs, Inc..*, 58 F. Supp. 3d 989, 1002-03

14   (N.D. Cal. 2014) ("UCL fraud plaintiffs must allege their *own* reliance—not the reliance of third

15   parties—to have standing under the UCL.").

16         Furthermore, where, as here, plaintiffs' alleged predicate for its UCL claim is a meritless

17   claim that does not qualify as "unlawful" conduct, plaintiffs may not manufacture a UCL claim

18   simply by calling the underlying conduct "unfair."  *See DocMagic, Inc. v. Ellie Mae, Inc.*, 745 F.

19   Supp. 2d 1119, 1146-47 (N.D. Cal. 2010); *Chavez v. Whirlpool Corp.*, 93 Cal. App. 4th 363, 374-

20   75 (2001).  Because plaintiffs' other challenges to the caddie bib policy should be dismissed for the

21   reasons explained above, their UCL claim should be dismissed as well.  *See LiveUniverse, Inc. v.*

22   *MySpace, Inc.*, 304 F. App'x 554, 557-58 (9th Cir. 2008).

23                              **CONCLUSION**

24         For the foregoing reasons, defendant's motion to dismiss plaintiffs' second amended com-

25   plaint in this action should be GRANTED with prejudice and without leave to amend.  *See, e.g.*,

26   *Bloom v. Martin*, 77 F.3d 318, 321 (9th Cir. 1996) (dismissal without leave to amend is appropriate

27   where amendment would be futile); *McCollum v. Blue Shield of Cal. Life & Health Ins. Co.*, No.

28   12-01650-PSG, 2012 WL 5389711, at *4 (N.D. Cal. Nov. 2, 2012) (same).

---

1  DATED: September 25, 2015

2                                **SKADDEN, ARPS, SLATE, MEAGHER**
                                **& FLOM LLP**

3

4                        By:   _____/s/ Jeffrey A. Mishkin_____

5                                Jeffrey A. Mishkin (admitted *pro hac vice*)
                                Anthony J. Dreyer (admitted *pro hac vice*)
6                                      Raoul D. Kennedy

7                                  Attorneys for Defendant
                                     PGA TOUR, INC.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28