1  **Lee Cirsch (CA State Bar No. 227668)**
   THE LANIER LAW FIRM, P.C.
2  10866 Wilshire Blvd., Suite 400
   Los Angeles, California   90024
3  Telephone:  310-277-5100
   Facsimile:   310-277-5103
4  lee.cirsch@lanierlawfirm.com

5  W. Mark Lanier *Admitted Pro Hac Vice*
   wml@lanierlawfirm.com
6  Eugene R. Egdorf  *Admitted Pro Hac Vice*
   gene.egdorf@lanierlawfirm.com
7  Benjamin T. Major  *Admitted Pro Hac Vice*
   ben.major@lanierlawfirm.com
8  Ryan D. Ellis  *Admitted Pro Hac Vice*
   ryan.ellis@lanierlawfirm.com
9  Jonathan P. Wilkerson *Admitted Pro Hac Vice*
   Jonathan.wilkerson@lanierlawfirm.com
10 THE LANIER LAW FIRM, P.C.
   6810 FM 1960 West
11 Houston, Texas 77069
   Telephone:   713-659-5200
12 Facsimile:   713-659-2204

13 Arthur R. Miller *Admitted Pro Hac Vice*
   Arthur.miller@lanierlawfirm.com
14 THE LANIER LAW FIRM, PLLC
   126 East 56th Street, 6th Floor
15 Tower 56
   New York, New York 10022
16 Telephone:  212-421-2800
   Facsimile:  212-421-2878

17

18 ***Attorneys for Class Representative***
   ***Plaintiffs, William Michael Hicks and***
   ***Kenneth Harms, et. al.***

19

20                UNITED STATES DISTRICT COURT

21              NORTHERN DISTRICT OF CALIFORNIA

22                 SAN FRANCISCO DIVISION

| | |
|---|---|
| 23  William Michael Hicks and Kenneth Harms, as ) Class Representative Plaintiffs, *et. al* ) | Case No. 3:15-cv-00489-VC |
| 24                     Plaintiffs, ) ) | PLAINTIFFS' RESPONSE TO DEFENDANT'S MOTION TO DISMISS |
| 25          vs. ) ) | [DOC. NO. 79] AND MEMORANDUM IN SUPPORT |
| 26  PGA TOUR, Inc., ) ) | Hearing Date:     October 29, 2015 |
| 27                 Defendant. ) ) | Time:                10:00 a.m. Courtroom:       Courtroom 4 |
| 28 ) | Before:             Hon. Vince Chhabria |

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

INDEX OF AUTHORITIES ........................................................................................................ 3

INTRODUCTION ...................................................................................................................... 1

ARGUMENT ............................................................................................................................. 1

   I. Plaintiffs Sufficiently Pleaded a Claim Under Section 1 of the Sherman Act ...................... 1

      A. Plaintiffs Properly Defined the Markets at Issue ................................................ 1

      B. Plaintiffs Sufficiently Alleged Violations of Section 1 of the Sherman Act ................... 4

   II. Plaintiffs Have Properly Pleaded Their Section 2 Claim ...................................... 6

   III. Plaintiffs Sufficiently Pleaded Their Right of Publicity Claim ........................... 8

   IV. Plaintiffs Sufficiently Pleaded Their Contract Claims ....................................... 9

   V. Plaintiffs Sufficiently Alleged Their Alternative Equitable Claims .................................. 11

   VI. Plaintiffs Sufficiently Alleged Lanham Act Claims ........................................ 11

   VII. Plaintiffs Sufficiently Alleged Economic Duress ........................................... 13

   VIII. Plaintiffs Sufficiently Pleaded Their Unfair Competition Claim .................................. 14

CONCLUSION ......................................................................................................................... 15

1

## INDEX OF AUTHORITIES

2

**Cases**

3

*Abdul-Jabbar v. Gen. Motors Corp.*
   85 F.3d 407 (9th Cir. 1996)............................................................................ 12, 13

4

*Am. Needle, Inc. v. Nat'l Football League*
5
   560 U.S. 183 (2010) .......................................................................................... 4, 5

6

*Betaseed, Inc. v. U & I Inc.*
   681 F.2d 1203 (9th Cir. 1982).......................................................................... 4, 6

7

*Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*
8
   20 Cal. 4th 163, 973 P.2d 527 (1999) ............................................................... 15

9

*Cohen v. Facebook, Inc.*
   798 F. Supp. 2d 1090 (N.D. Cal. 2011) ............................................................8-9

10

*Contra Costa Cnty. Flood Control & Water Conserv. Dist. v. U.S.*
11
   512 F.2d 1094 (Ct. Cl. 1975) ............................................................................ 10

12

*Copperweld Corp. v. Indep. Tube Corp.*
   467 U.S. 752 (1984) ...........................................................................................5-6

13

*Dang v. San Francisco Forty Niners*
14
   964 F. Supp. 2d 1097 (N.D. Cal. 2013) ..........................................................1-2, 3

15

*Davis v. HSBC Bank Nevada, N.A.*
   691 F.3d 1152 (9th Cir. 2012)........................................................................... 15

16

*Downing v. Abercrombie & Fitch*
17
   265 F.3d 994 (9th Cir. 2001).............................................................. 11, 12, 13

18

*Dreyer v. NFL*
   55 F. Supp. 3d 1181, 1186 (D. Minn. 2014) ..................................................... 12

19

*Ellsworth v. U.S. Bank, N.A.*
20
   908 F. Supp. 2d 1084 (N.D. Cal. 2012) ............................................................ 11

21

*Facenda v. NFL Films, Inc.*
   542 F.3d 1007 (3d Cir. 2008)..........................................................................11-12, 13

22

*Fifty-Six Hope Rd. Music, Ltd. v. A.V.E.L.A., Inc.*
23
   778 F.3d 1059 (9th Cir. 2015) .......................................................................... 13

24

*Fischer v. Forrest*
   No. 14 CIV. 1304 PAE, 2015 WL 195822 (S.D.N.Y. Jan. 13, 2015) ................... 12

25

*Fraley v. Facebook, Inc.*
26
   830 F. Supp. 2d 785 (N.D. Cal. 2011) ................................................................ 8

27

*F.T.C. v. Indiana Fed'n of Dentists*
   476 U.S. 447, 460 (1986) .................................................................................... 4

28

*IMO Dev. Corp. v. Dow Corning Corp.*
135 Cal. App. 3d 451, 185 Cal. Rptr. 341 (Ct. App. 1982) .................................................. 14

*Int'l Boxing Club of N.Y., Inc. v. U.S.*
358 U.S. 242 (1959) ................................................................................................................... 2

*Kickflip, Inc. v. Facebook, Inc.*
999 F. Supp. 2d 677 (D. Del. 2013) ....................................................................................... 7-8

*Liveuniverse, Inc. v. Myspace, Inc.*
No. CV 06-6994AHMRZX, 2007 WL 6865852 (C.D. Cal. June 4, 2007) ........................... 7

*Liveuniverse, Inc. v. Myspace, Inc.*
304 F. App'x  554 (9th Cir. 2008)........................................................................................... 7

*McManus v. CIBC World Markets Corp.*
109 Cal. App. 4th 76, 134 Cal. Rptr. 2d 446 (2003) ............................................................ 14

*Monsanto Co. v. Spray-Rite Serv. Corp.*
465 U.S. 752 (1984) ................................................................................................................... 5

*Morris Commc'ns Corp. v. PGA Tour, Inc.*
364 F.3d 1288 (11th Cir. 2004)............................................................................................... 7

*Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Okla.*
468 U.S. 85 (1984) ...........................................................................................................2, 3-4, 6, 7

*Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Okla.*
546 F. Supp. 1276 (W.D. Okla. 1982). ................................................................................. 6-7

*O'Bannon v. NCAA*, ---F.3d---,
2015 WL 5712106 (9th Cir. Sep. 30, 2015)........................................................................ 1, 3

*O'Bannon v. Nat'l Collegiate Athletic Ass'n*
7 F. Supp. 3d 955 (N.D. Cal. 2014) ..................................................................................... 2-3

*Olin v. FTC.*
986 F.2d 1295 (9th Cir. 1993)................................................................................................. 2

*Parino v. BidRack, Inc.*
838 F. Supp. 2d 900 (N.D. Cal. 2011) ................................................................................. 11

*Perdue v. Crocker Nat'l Bank*
38 Cal. 3d 913, 702 P.2d 503 (1985) .................................................................................... 10

*Perkins v. LinkedIn Corp.*
53 F. Supp. 3d 1190 (N.D. Cal. 2014) .................................................................................... 8

*Perma Life Mufflers, Inc. v. Int'l Parts Corp.*
392 U.S. 134 (1968) ............................................................................................................... 5-6

*Persson v. Smart Inventions, Inc.*
125 Cal. App. 4th 1141, 23 Cal. Rptr. 3d 335 (2005) .......................................................... 14

*Re/Max Int'l, Inc. v. Realty One, Inc.*
173 F.3d 995 (6th Cir. 1999).................................................................................................... 4

*Rich & Whillock, Inc. v. Ashton Dev., Inc.*
    157 Cal. App. 3d 1154, 204 Cal. Rptr. 86 (Ct. App. 1984) ..................................... 14

*Ryan v. Volpone Stamp Co.*
    107 F. Supp. 2d 369 (S.D.N.Y. 2000) ...................................................................... 13

*Saint Alphonsus Med. Ctr.-Nampa Inc. v. St. Luke's Health Sys., Ltd.*
    778 F.3d 775 (9th Cir. 2015) .................................................................................... 1

*Sambreel Holdings, LLC v. Facebook, Inc.*
    906 F. Supp. 2d 1070 (S.D. Cal. 2012) .................................................................... 7

*Satterfield v. Simon & Schuster, Inc.*
    569 F.3d 946 (9th Cir. 2009) .................................................................................. 10

*Smith v. eBay Corp.*
    No. C 10-03825 JSW, 2012 WL 27718 (N.D. Cal. Jan. 5, 2012) ...........................7-8

*SOAProjects, Inc. v. SCM Microsystems, Inc.*
    No. 10-CV-01773-LHK, 2010 WL 5069832 (N.D. Cal. Dec. 7, 2010) .................... 11

*Toscano v. Prof'l Golfers Assoc.*
    258 F.3d 978 (9th Cir. 2001) .................................................................................... 5

*Toscano v. PGA Tour, Inc.,*
    70 F. Supp. 2d 1109 (E.D. Cal. 1999). ..................................................................... 5

*TYR Sport Inc. v. Warnaco Swimwear Inc.*
    679 F. Supp. 2d 1120 (C.D. Cal. 2009) ................................................................ 1, 4

*U.S. v. Microsoft Corp.*
    253 F.3d 34 (D.C. Cir. 2001) ............................................................................... 2, 6

*W. Duplicating, Inc. v. Riso Kagaku Corp.*
    No. CIV. S98-208 FCD GGH, 2000 WL 1780288 (E.D. Cal. Nov. 21, 2000) ........ 6

**Statutes and Rules**

15 U.S.C. § 1 .................................................................................................................... 4

15 U.S.C. § 1125 ............................................................................................................ 11

CAL. BUS. & PROF. CODE § 17200 ..............................................................................14-15

CAL. BUS. & PROF. CODE § 17500 ................................................................................... 15

CAL. CIV. CODE § 1599 .................................................................................................... 14

CAL. CIV. CODE § 1670.5 ................................................................................................. 14

FED. R. CIV. P. 8 ............................................................................................................. 11

# **INTRODUCTION**[1]

Defendant's Motion rests almost entirely on so-called "consent" and "uniform" provisions in contracts between Defendant and Plaintiffs. However, that foundation is fractured by the contracts' plain language, and Defendant's Motion simply lacks alternative support.

Additionally, Plaintiffs' Second Amended Complaint [Doc. No. 77] ("**SAC**") sufficiently alleges Plaintiffs' claims.  While Defendant seems to disagree, Defendant "is not above the antitrust laws, and courts cannot and must not shy away from requiring [it] to play by the Sherman Act's rules."[2] Plaintiffs have sufficiently alleged that Defendant violated Sections 1 and 2 of the Sherman Act by unlawfully limiting competition in the Relevant Markets. With respect to Plaintiffs' other claims, Defendant's "evidence" fails to resolve the issues of fact that preclude dismissal and fails to demonstrate that Defendant had a legal right to force Plaintiffs to provide endorsement services without remuneration. Thus, dismissal is improper.

# **ARGUMENT**

## I. PLAINTIFFS SUFFICIENTLY PLEADED A CLAIM UNDER SECTION 1 OF THE SHERMAN ACT.

### *A. Plaintiffs Properly Defined the Markets At Issue.*

There is no requirement that the relevant market "be pled with specificity." *TYR Sport Inc. v. Warnaco Swimwear Inc.*, 679 F. Supp. 2d 1120, 1129 (C.D. Cal. 2009) (approving market definition as "high-end competitive swimwear" because "it seems plausible that competitive swimmers would not switch to casual swimsuits simply because of a price increase in high-end swimwear."). Further, the "[d]efinition of the relevant market is a factual question dependent upon the special characteristics of the industry involved." *Saint Alphonsus Med. Ctr.-Nampa Inc. v. St. Luke's Health Sys., Ltd.*, 778 F.3d 775, 783 (9th Cir. 2015). Thus, a market definition warrants

---

[1] Plaintiffs object to Exhibits A-S in support of Defendant's Motion to Dismiss [Doc. No. 79] because (1) extrinsic evidence must be considered to determine the enforceability of the so-called "consent" and "uniform" provisions under Defendant's proposed construction; (2) Defendant uses those exhibits and its Request for Judicial Notice to improperly augment the page limit applicable to its Motion and (3) Plaintiffs' claims do not necessarily rely on those agreements. Plaintiffs detail their objections in their Response to Defendant's Request for Judicial Notice, filed contemporaneously with this Response. Without waiving their objections, Plaintiffs' response addresses Defendant's "evidence."

[2] *See O'Bannon v. Nat'l Collegiate Athletic Ass'n*, ---F.3d---, 2015 WL 5712106, at *26 (9th Cir. Sept. 30, 2015) (holding NCAA rules and regulations subject to antitrust scrutiny).

1   12(b)(6) dismissal only if it is "facially unsustainable." *Dang v. San Francisco Forty Niners*, 964

2   F. Supp. 2d 1097, 1104 (N.D. Cal. 2013). A plaintiff may limit the market to "the group of sellers

3   or producers who have the actual or potential ability to deprive each other of **significant** levels of

4   business." (emphasis added, quotes omitted). Also, a plaintiff may establish the relevant market

5   with evidence that the defined market is the smallest grouping of products in which a monopolist

6   can **profitably** impose a small but significant and nontransitory price increase of its own product.

7   *Olin v. FTC.*, 986 F.2d 1295, 1299-1303 (9th Cir. 1993) (applying traditional and hypothetical

8   monopolist tests). Thus, Plaintiffs have sufficiently defined the Relevant Markets. SAC ¶¶ 82-97.

9      Defendant argues that Plaintiffs' market definitions "fail[] to account for the myriad other

10  opportunities" for companies to advertise their products. Defendant confuses "interchangeability"

11  with "supplementation." Case law demonstrates that it is at least "plausible" that the "myriad other

12  opportunities" are not interchangeable with advertising in the Relevant Markets—despite their

13  similarities—because the professional golf audiences are uniquely attractive to advertisers. The

14  mere fact that "other opportunities" for advertising exist does not establish interchangeability in

15  light of other factors such as the target audience. *See NCAA v. Bd. of Regents of Univ. of Okla.*,

16  468 U.S. 85, 111 (1984) (college football broadcasts comprise a separate market because they

17  "generate an audience uniquely attractive to advertisers"); *Int'l Boxing Club of N.Y., Inc. v. U.S.*,

18  358 U.S. 242, 249-252 (1959) (holding that relevant market was "promotion of championship

19  boxing" and not promotion of "all professional boxing"); *U.S. v. Microsoft Corp.*, 253 F.3d 34, 52

20  (D.C. Cir. 2001) (approving finding that, while Apple's Mac OS and Microsoft's Windows are

21  operating systems, they are not in the same market given different costs in hardware to run each

22  system and the effort involved in learning a new system and transferring files to a compatible

23  format); *Dang*, 964 F. Supp. 2d at 1107-1110 (holding cap bearing Disney logo is not

24  interchangeable with a cap bearing an NFL team logo). Thus, while print advertising, television

25  commercial advertising, non-golf endorsers, and advertising during other sports broadcasts may

26  **supplement** the Relevant Markets, they do not compete in the Relevant Markets. SAC ¶¶ 82-97.

27      Other case law is instructive. In *O'Bannon v. NCAA*, 7 F. Supp. 3d 955 (N.D. Cal. 2014) a

28  group of current and former NCAA Division I football and basketball players challenged the

NCAA's rule against paying players a share of licensing revenue. *Id.* at 963, 965.[3] In the relevant market, colleges compete to "sell" scholarships for school tuition, room and board, and books in exchange for student-athletes' "athletic service and acquiesce[nce] in the use of their names, images, and likenesses for commercial and promotional purposes." *Id.* at 965-66. The court approved a "college education market," which was **limited to Division I FBS football and Division I basketball** despite the fact that (1) the NCAA governed "two dozen sports"; (2) the "NCAA's schools have been organized into three divisions—Divisions I, II, and III"; and (3) Division I football actually had another subdivision known as the "FCS." *Id.* at 963-968.

In *Dang* a purchaser of NFL-licensed apparel sued Reebok, the NFL, and NFL teams, challenging the exclusive license granted to Reebok by the NFL defendants. 964 F. Supp. 2d at 1101-02. The defendants challenged plaintiff's market definitions, which plaintiff defined as the markets (1) for licensing of intellectual property "of individual NFL teams for use in apparel" and (2) "for apparel bearing the Intellectual Property of any NFL team." *Id.* at 1104. Defendants argued that the relevant market was the "market for sports apparel or apparel in general" and should include other sports and entertainment providers like Disney. *Id.* at 1104-05, 1107. Judge Davila rejected the defendants' argument, concluding that NFL-licensed apparel is "uniquely attractive" to purchasers, analogizing the circumstances to an NCAA Football audience who is "uniquely attractive" to advertisers. *Id.* at 1108-1110.

In *University of Oklahoma*, universities challenged the NCAA's cap on the number of football games each university could televise. 468 U.S. at 91-94. The Court rejected the NCAA's argument that "college football broadcasts" do not comprise a separate antitrust market:

> Petitioner's argument that it cannot obtain supracompetitive prices from broadcasters since advertisers, and hence broadcasters, can switch from college football to other types of programming simply ignores the findings of the District Court. **It found that intercollegiate football telecasts generate an audience uniquely attractive to advertisers** and that competitors are unable to offer programming that can attract a similar audience. These findings amply support its conclusion that the NCAA possesses market power. Indeed, the District Court's subsidiary finding that advertisers will pay a premium price per viewer to reach audiences watching college football **because of their demographic characteristics is vivid evidence of the uniqueness of this product**.

---

[3] The Ninth Circuit affirmed with the exception of the quantum of relief. *See generally*, *O'Bannon*, 2015 WL 5712106 at *26.

1  *Id.* at 111-12 (emphasis added). Other courts have held that a single sport can support a Sherman

2  Act market definition. *See TYR Sport*, 679 F. Supp. 2d at 1128-29 (competitive swimming).

3  Plaintiffs have properly defined the Relevant Markets using the concepts of cross-elasticity of

4  demand, interchangeability of use, and the hypothetical monopolist. SAC ¶¶ 82-97.

5      Finally, the purported lack of market definition does not require dismissal given Plaintiffs'

6  allegations that Defendant's conduct and combinations with other parties have harmed the markets

7  at issue. *See F.T.C. v. Indiana Fed'n of Dentists*, 476 U.S. 447, 460-61 (1986) ("Since the purpose

8  of the inquiries into market definition and market power is to determine whether an arrangement

9  has the potential for genuine adverse effects on competition, proof of actual detrimental effects . . .

10 can obviate the need for an inquiry into market power, which is but a surrogate for detrimental

11 effects."); *Re/Max Int'l, Inc. v. Realty One, Inc.*, 173 F.3d 995, 1018 (6th Cir. 1999) ("We agree

12 that an antitrust plaintiff is not required to rely on indirect evidence of a defendant's monopoly

13 power, such as high market share within a defined market, when there is direct evidence that the

14 defendant has actually set prices or excluded competition."); SAC ¶¶ 98-129.

15 **B. Plaintiffs Sufficiently Alleged Violations of Section 1 of the Sherman Act.**

16     Section 1 prohibits unreasonable restraints on trade by concerted action. 15 U.S.C. § 1.

17 One relevant question is whether concerted action between Defendant and others "joins together

18 separate decisionmakers" who are "separate economic actors" in a way that "deprives the

19 [Relevant Markets] of independent centers of decisionmaking." *Am. Needle, Inc. v. Nat'l Football

20 League*, 560 U.S. 183, 195 (2010). Another is whether Defendant used its leverage in the

21 professional golf tournament market to exert improper control over the Relevant Markets and their

22 participants. *See Betaseed, Inc. v. U & I Inc.*, 681 F.2d 1203, 1215-16 (9th Cir. 1982) (describing

23 two types of tie-in arrangements). Both questions are answered "yes." *See* SAC ¶¶ 68-121.

24     First, Defendant violated Section 1 through concerted action with Local Hosts. Defendant

25 argues it "independently established" the so-called Uniform Policy and Local Hosts merely agreed

26 to "adhere" to it. But as noted below there is no "Uniform Policy," and even if there were, it does

27 not even tangentially relate to Defendant's and Local Hosts' concerted efforts to restrain

28 competition by forcing caddies to wear the bibs. *Infra* Part IV.

In support of its First Motion to Dismiss [Doc. No. 71] Defendant proffered form agreements that support Plaintiffs' claim of concerted action. *See* First Mot. Exs. A-C;[4] *Am. Needle*, 560 U.S. at 199 ("[A] nut and a bolt can only operate together, but an agreement between nut and bolt manufacturers is still subject to § 1 analysis."). Here, Defendant is the nut, and each Local Host is a bolt because golf tournaments require their cooperation. First Mot. Exs. A-C. The agreements establish that Local Hosts and Defendant (1) are independent, autonomous entities, First Mot. Ex. A at Recitals, §§ 1.1-1.2, 3.4(a); (2) work in concert to co-sponsor a tournament, *id.* at Recitals; (3) have independent financial interests in controlling the Relevant Markets, *id.* at §§ 1.1-1.2, 2.4(b), 3.6(d), 6.4(b); (3) are each party to the "Title Sponsor Agreement," which Defendant failed to attach but likely references the bibs and limitation of caddies' competition in the Relevant Markets, *id.* §§ 2.3, 10.1(d); (4) are natural competitors in the Relevant Markets, *id.* §§ 2.5, 3.4, 3.9; and (5) work together to limit competition in the Relevant Markets, *id.* §§ 3.9(a), 4.15(b), p. 39 (referencing bib logos), pp.51-52 (same). Defendant's agreements merely affirm Plaintiffs' claim that this case involves concerted action proscribed by Section 1. SAC ¶¶ 68-115.

Defendant's case law provides no refuge from Plaintiffs' allegations and the language of Defendant's agreements. *Compare Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764-68 (1984) (emphasizing the factual nature of the inquiry and finding sufficient evidence of concerted action between manufacturer and distributors where manufacturer threatened to terminate distributorships for discount pricing, and acquiescing distributors reported noncompliant distributors to manufacturer) and *Toscano v. Prof'l Golfers Assoc.*, 258 F.3d 978, 982 (9th Cir. 2001) (finding lack of concerted action because there was no evidence that local hosts enforced Defendant's rules, and the district court had found that local hosts had no economic interest in the enforcement of the subject rules, 70 F. Supp. 2d 1109, 1117 n.10 (E.D. Cal. 1999)) *with* SAC ¶¶ 68-115 (emphasizing Local Hosts' independent intent, enforcement, and financial motive to limit competition in the Relevant Markets). These cases therefore do not support dismissal.

Plaintiffs also alleged Defendant coerced Plaintiffs and advertising consumers to join its unlawful conduct. SAC ¶¶ 107-115. Section 1 prohibits such combinations. *Perma Life Mufflers,*

---

[4] Interestingly, Defendant omitted any reference to these exhibits in its present motion.

1   *Inc. v. Int'l Parts Corp.*, 392 U.S. 134, 139-142, (1968) *overruled on other grounds by*

2   *Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752 (1984); *W. Duplicating, Inc. v. Riso*

3   *Kagaku Corp.*, No. CIV. S98-208 FCD GGH, 2000 WL 1780288, at *6 (E.D. Cal. Nov. 21, 2000).

4        Second, Defendant violated Section 1 with illegal tie-in arrangements. SAC ¶¶ 116-121.

5   Plaintiffs sufficiently alleged that Defendant possesses unfettered monopoly power in the

6   professional golf tournament market and (1) ties players' purchase of access to tournaments to

7   players' purchase of services by caddies who must promote Defendant's sponsors; (2) forces

8   Plaintiffs into a reciprocal arrangement where Defendant will only sell access to tournaments if

9   Plaintiffs "sell" their advertising services to Defendant; and (3) ties Defendant's "purchase" of

10  caddie services to Defendant's "purchase" of endorsement services. SAC ¶¶ 117-119; *Betaseed,*

11  681 F.2d at 1208-09, 1215-16, 1221-23, 1228, 1230 (Ninth Circuit found fact issue regarding

12  whether sugar beet processor with monopoly power engaged in unlawful conduct by conditioning

13  its purchase of beets from farmers on farmers' purchase of seed from processor).

14  **II. PLAINTIFFS HAVE PROPERLY PLEADED THEIR SECTION 2 CLAIM.**

15       Section 2 requires proof of two elements: actual or attempted monopoly power and a

16  restraint of trade that is not merely the product of successful competition. *Microsoft*, 253 F.3d at

17  50. Plaintiffs have sufficiently alleged that Defendant possesses monopoly power in the market for

18  professional golf tournaments, and Defendant uses that power to erect a barrier to competition in

19  the Relevant Markets. SAC ¶¶ 68-70, 74-129; *supra* Part I.B. (citing Local Host agreements).

20       As noted above, Plaintiffs properly defined the Relevant Markets. *Supra* Part I.A.

21  Defendant does not deny having monopoly power; instead, Defendant appears to claim that its

22  illegal attempt to control the Relevant Markets is necessary to protect its "legitimate business

23  interest in its investment in the creation, organization and operation of its golf tournaments." The

24  Supreme Court rejected a similar argument. *See Univ. of Okla.*, 468 U.S. at 111-112. The district

25  court had detailed the NCAA's history. 546 F. Supp. 1276, 1282 *et seq.* (W.D. Okla. 1982). The

26  NCAA, a nonprofit governing body of college sports, had limited each member university's right

27  to televise football games. *Id.* at 1282-84. When colleges challenged those limitations, the district

28  court found (1) that the defendant had monopoly power over the market "almost from the moment

1   the market came into being," (2) that the defendant had illegally restricted output, and (3) that

2   television networks seemed willing to permit the defendant to dictate the terms of their broadcast

3   agreements. *Id.* at 1286, 1320, 1323. The court found that the NCAA had erected an

4   "insurmountable barrier" to competition in violation of Section 2 by limiting competition with

5   "threat of sanctions." *Id.* at 1323. The Supreme Court echoed the district court's concerns,

6   explaining that member universities "have no real choice but to adhere to the NCAA's television

7   controls." 468 U.S. at 106. The Court affirmed the district court's holding that the defendant

8   possessed adequate market power and that the "television plan on its face constitutes a restraint

9   upon the operation of a free market." *Id.* at 113.

10   Similarly, caddies help create the game that sustains the Relevant Markets, so Defendant's

11   allegation of "free loading" should be rejected. And like the NCAA, Defendant to some degree

12   governs its participants and has enjoyed a monopoly in the Relevant Markets from their inception.

13   While merely possessing a monopoly is not unlawful, Defendant, like the NCAA, has unlawfully

14   constructed "insurmountable barriers" to competition through "threat[s] of sanctions" and

15   adhesion contracts. Even if the caddies acquiesced to Defendant's misconduct, "they have no real

16   choice but to adhere to [Defendant's] controls." *See id.* at 106; SAC ¶¶ 68-70, 74-129.

17   Additionally, as demonstrated by Defendant's case law, Defendant's "free-loading"

18   allegations rely on the false premise that Defendant owns the advertising mediums at issue here.

19   *See Liveuniverse, Inc. v. Myspace, Inc*. No. CV 06-6994AHMRZX, 2007 WL 6865852, at *1, *13

20   (C.D. Cal. June 4, 2007) *aff'd*, 304 F. App'x 554 (9th Cir. 2008) (website owner prohibited

21   competitor's use of owner's site to link users to competitor's site); *Sambreel Holdings, LLC v.*

22   *Facebook, Inc.,* 906 F. Supp. 2d 1070, 1082 (S.D. Cal. 2012) (website owner's refusal to permit

23   third party advertising on its website); *Morris Commc'ns Corp. v. PGA Tour, Inc.*, 364 F.3d 1288,

24   1294-95 (11th Cir. 2004) (plaintiff sought unfettered right to distribute information obtained solely

25   from defendant's electronic scoring system); *but see Kickflip, Inc. v. Facebook, Inc.*, 999 F. Supp.

26   2d 677, 688 (D. Del. 2013) (stating, "The Court is also unpersuaded by Facebook's argument that

27   its conduct cannot be deemed anticompetitive because it occurred within the Facebook platform,"

28   and citing *Smith v. eBay Corp*., No. C 10-03825 JSW, 2012 WL 27718, at *4 (N.D. Cal. Jan. 5,

2012)). Here, the advertising mediums in the Relevant Markets include the caddies' and players' likenesses and clothing, none of which is owned or employed by Defendant. And to the extent television is considered a relevant medium, Defendant does not own or operate the networks. Unlike the circumstances in Defendant's "free-loader" cases, if you take away Defendant here, the mediums still exist. *See id.*. Thus, if anyone is "free-loading," it is Defendant who is free-loading off of the recognition earned by professional golfers and caddies.

### III. PLAINTIFFS SUFFICIENTLY PLEADED THEIR RIGHT OF PUBLICITY CLAIM

Defendant merely alleges that its exhibits prove consent as a matter of law.[5] However, the "consents" do not include **commercial use** proscribed by § 3344(a), and Defendant's proposed construction of the consents creates an ambiguity that precludes dismissal.

Courts in this District narrowly construe the scope of consent—especially at the 12(b)(6) stage. *Cohen v. Facebook, Inc.*, 798 F. Supp. 2d 1090 (N.D. Cal. 2011) (discussed below); *Fraley v. Facebook, Inc.*, 830 F. Supp. 2d 785, 805-06 (N.D. Cal. 2011) (Facebook users' grant of "permission to use [their] name and [Facebook] profile picture in connection with that content" did not operate as consent for the use of users' likeness and photos to promote sponsors' products to users' Facebook "friends"); *Perkins v. LinkedIn Corp.*, 53 F. Supp. 3d 1190, 1216 (N.D. Cal. 2014) (LinkedIn's authorization to invite users' contacts "to connect" *via* LinkedIn operated as consent to initial email sent by LinkedIn but not to two follow-up emails).

Defendant's "exhibits" quickly end the inquiry because they limit any consent to "media rights." Exs. A-K. The portion of the Player Handbook Defendant failed to attach as exhibit R makes clear that "media rights" and "marketing rights"—or commercial rights—are separate concepts requiring separate authorizations. Mot. Prelim. Injunction [Doc. No. 3] at ex. 1-A pp. 139-140; First Mot. Ex. A § 7.2, sched. 7.2(a). Plaintiffs never assigned "marketing rights."

Further, the consent language itself excludes commercial use. In *Cohen*, Facebook users sued Facebook because it used their names and profile pictures to promote a service called "Friend Finder." 798 F. Supp. 2d at 1094. Facebook sought dismissal based on the following contract

---

[5] As noted below, any consent is not valid because it was obtained by coercion and is unconscionable in light of the circumstances. SAC ¶¶ 10, 81, 131-32, 154-58; *infra* Part VII.

provisions: (1) plaintiffs granted Facebook a "worldwide license to use any IP content that [users] post on or in connection with Facebook ('IP License')" and (2) an acknowledgement that "your name and profile picture do not have privacy settings. If you are uncomfortable with sharing your profile picture, you should delete it (or not add one)." *Id.* at 1094-95. Denying Facebook's motion, Judge Seeborg noted that these provisions did not support dismissal of plaintiffs' publicity claims. *Id.* at 1095.

Here, Defendant relies on the following language: that caddies "grant and assign to PGA TOUR, without limitation, [their] individual television, radio, motion picture, photographic, electronic, 'Interactive Applications' . . . and all **other** similar or related **media rights with respect to [their] participation in the Tournament, Pro-Am or any other golf event** conducted in conjunction with the Tournament or any portion thereof." Exs. A-K (emphasis added).[6] This language expressly limits any assignment to "media rights," which are further limited by the clause "with respect to [their] participation in the Tournament . . . or any other golf event." Certainly, in light of *Cohen*, *Fraley*, and *Perkins*, the limitation to "participation" in "golf events" cannot reasonably be construed to authorize Defendant's conduct at issue here.

Additionally, Defendant's broad construction of this language creates an ambiguity. If Defendant owns the right to use Plaintiffs' likenesses for advertising, then why do exhibits A-K also direct caddies to conform to the "Endorsement Policy," which undisputedly permits caddies to endorse products during tournaments **for their own benefit**? If Defendant owned the right to use Plaintiffs' likenesses and images for **commercial** use as Defendant alleges here, references to the Endorsement Policy become mere surplusage because Plaintiffs would no longer have any right to endorse products—they would have assigned those rights. Such a strained reading of the agreements cannot support dismissal.

## IV. PLAINTIFFS SUFFICIENTLY PLEADED THEIR CONTRACT CLAIMS

Defendant argues that the contracts "require the caddies to wear prescribed uniforms." Defendant's agreements with caddies do not even mention the bibs, so Defendant's contention that

---

[6] Exhibits L-Q's assignment language is even more narrow, limiting assignment to the use of Plaintiffs' likeness and images only to the extent it is "incidental" to tournament broadcasts.

1    bibs comprise part of a "uniform" is puzzling. Additionally, "uniform" is not defined, but the

2    contract language confirms that Defendant's use of the term "uniform" does not refer to a uniform

3    at all. *See Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946, 955 (9th Cir. 2009) (applying the

4    plain meaning of "brand" when consent agreement did not define the term and holding consent did

5    not apply). The agreements generally call for caddies to wear "solid-colored, Khaki-style long

6    pants, which touch the top of the shoe, **or** solid-colored, knee-length, tailored shorts and a collared

7    shirt. . . . **Acceptable colors shall be determined at the discretion of the Tournament**

8    **Director**." *See* Ex. A § 2 (emphasis added). Further, "Caddies shall wear smooth rubber-sole

9    shoes, **preferably** **tennis or basketball shoes. Permissible colors are limited to white and earth**

10   **tones such as navy, blue, black, brown, tan, gray, dark green and the like**." *Id.* § 3 (emphasis

11   added). Additionally, some caddies wear Nature Valley caps while others do not. SAC ¶ 79. This

12   language allows too many variables to be deemed a "uniform policy."[7]

13       The contract language also makes clear that Plaintiffs' endorsement rights and "uniform"

14   provisions are distinct. Language incorporating the Endorsement Policy stands by itself, and under

15   no reading of the contracts can the word "uniform" require caddies to endorse Defendant's

16   sponsors without remuneration. The contracts do not define "uniform," and the term's ordinary

17   definition cannot support this construction. And to any extent Defendant had discretion to approve

18   Plaintiffs' attire and endorsement activities, Defendant owed a duty to exercise that discretion in

19   good faith and could not disregard Plaintiffs' rights under the Endorsement Policy. *See Perdue v.*

20   *Crocker Nat'l Bank*, 38 Cal. 3d 913, 923-24, 702 P.2d 503, 510 (1985) (explaining that such open-

21   ended terms granting one party discretion to make decisions affecting rights of other party subject

22   to duty of good faith); *Contra Costa Cnty. Flood Control & Water Conserv. Dist. v. U.S.*, 512 F.2d

23   1094, 1097 (Ct. Cl. 1975) ("The usual standard is that concurrence or approval is not left to

24   unbridled discretion but can be withheld only if objectively reasonable . . . .").

25       Further, Defendant's construction creates an ambiguity. Even assuming Defendant's

26   construction is reasonable, the provisions could still be read in at least two ways: (1) Plaintiffs'

---

[7]  Merriam Webster's dictionary defines "uniform" as "presenting an unvaried appearance of surface, pattern, or color <uniform red brick houses>." http://www.merriam-webster.com/dictionary/uniform, last visited August 28, 2015.

1   proposed construction that the agreements require Plaintiffs to wear clothes sharing general

2   qualities while recognizing that the separate Endorsement Policy grants Defendant the right to

3   govern the appearance of logos in good faith, and (2) Defendant's construction that the passing

4   reference to "uniform" imposes a duty upon caddies to endorse Defendant's sponsors for free,

5   notwithstanding the clear statement that the Endorsement Policy applies to the caddies.

6   Accordingly, dismissal is inappropriate. *See Ellsworth v. U.S. Bank, N.A.*, 908 F. Supp. 2d 1063,

7   1084 (N.D. Cal. 2012) (no dismissal "[w]here the language leaves doubt as to the parties' intent").

8   **V. PLAINTIFFS SUFFICIENTLY ALLEGED THEIR ALTERNATIVE EQUITABLE CLAIMS.**

9        Defendant denies that the contracts at issue give caddies the right to endorse their own

10  sponsors. And as noted above, the contracts do not impose a duty on Plaintiffs to endorse bib

11  sponsors without pay. *Supra* Parts III-IV. Yet, Defendant seeks dismissal of Plaintiffs' equitable

12  claims because Plaintiffs allege the existence of a valid contract. Under Rule 8(d)(3), Plaintiffs

13  may request equitable relief even though it is inconsistent with their contract claims. FED. R. CIV.

14  P. 8(d)(3). Thus, the Court should not dismiss Plaintiffs' alternative claims. *Parino v. BidRack,*

15  *Inc.*, 838 F. Supp. 2d 900, 908 (N.D. Cal. 2011); *SOAProjects, Inc. v. SCM Microsystems, Inc.*,

16  No. 10-CV-01773-LHK, 2010 WL 5069832, at *9 (N.D. Cal. Dec. 7, 2010).

17  **VI. PLAINTIFFS SUFFICIENTLY ALLEGED LANHAM ACT CLAIMS.**

18       Plaintiffs have properly alleged the following essential elements of their claim: (1) that

19  Defendant has "on or in connection with any goods or services . . . use[d] in commerce a[] word,

20  term, name, symbol, or device . . . **or** any . . . false **or misleading description** of fact, or false **or**

21  **misleading representation** of fact," which (2) "is **likely** to cause confusion, **or** to cause mistake,

22  **or** to deceive as to the affiliation, connection, or association of [Defendant] with [Plaintiffs], **or** as

23  to the origin, sponsorship, or approval of [Defendant's] goods, services, or commercial activities

24  by another person," **or** (2) "in commercial advertising or promotion, misrepresents the nature,

25  characteristics, qualities, or geographic origin of [Defendant's] or [bib sponsors'] goods, services,

26  **or** commercial activities." SAC ¶¶ 1, 10-14, 68-105, 148-153; 15 U.S.C. § 1125(a)(1)(A)-(B)

27  (emphasis added); *Downing v. Abercrombie & Fitch*, 265 F.3d 994, 1007-09 (9th Cir. 2001);

28  *Facenda v. NFL Films, Inc.*, 542 F.3d 1007, 1021 (3d Cir. 2008) ("[P]laintiffs could bring false

1   endorsement claims under either (a)(1)(A) or (a)(1)(B).").

2          Defendant argues that Plaintiffs "consented" to Defendant's misconduct. Plaintiffs have

3   negated this argument. *Supra* Part III; *see also Fischer v. Forrest*, No. 14 CIV. 1304 PAE, 2015

4   WL 195822, at *7 (S.D.N.Y. Jan. 13, 2015) ("[I]t is black-letter law that a claim for copyright

5   infringement lies when a party's use of copyrighted material exceeds the scope of its license.").

6          Defendant also alleges that the bib is not false or misleading. The Court should reject this

7   argument because it relies on facts outside of Plaintiffs' pleadings and on the unsubstantiated

8   assumption that bibs merely "identify the player for whom, and the tournament at which, each

9   caddie is working." Further, Defendant's argument distorts Plaintiffs' allegations. Plaintiffs allege

10  that bibs bear the logos of Defendant's sponsors, whether isolated or incorporated in another logo.

11  As shown by exhibit 31 to Plaintiffs' venue response [Doc. No. 49], Defendant has testified that

12  "the title sponsor gets their corporate logo incorporated into the tournament logo," so the bib does

13  not "merely" identify the tournament or player. *See also* First Mot. Ex. A § 7.1(b). The evidence

14  will demonstrate that the title sponsor's logo is the dominant component of the tournament logo.

15  *See* SAC ¶ 1. Thus, Plaintiffs have properly alleged that—at the very least—the bibs are

16  "misleading" because they suggest that caddies willingly endorse Defendant's sponsors. *Downing*,

17  265 F.3d at 1009 (although photos of plaintiffs accurately depicted them as surfers, holding fact

18  issue precluded summary judgment in case arising from clothing store's use of surfers' photos in

19  catalog); *Abdul-Jabbar v. Gen. Motors Corp.*, 85 F.3d 407, 413 (9th Cir. 1996) (TV car ad's

20  statement that Lew Alcindor won awards, while true, supported Lanham Act claim).

21         Defendant's case law is inapposite. *See Dryer v. NFL*, 55 F. Supp. 3d 1181, 1186, 1190-92

22  (D. Minn. 2014) (plaintiffs approved the use of their interviews in production, conceded that the

23  "productions do not offer anything for sale or encourage viewers to buy something," and the

24  production merely showed them playing football without reference to any product); *Marshall v.*

25  *ESPN, Inc.*, No. 3:14-01945, 2015 WL 3606645, at *17-18 (M.D. Tenn. June 8, 2015) (production

26  merely showed former NCAA athletes competing in their sport, plaintiffs pled "no specific facts"

27  connecting their image to a product and seemed to only complain that randomly-placed graphics

28  promoting TV programs appeared on screen during play). Here, Defendant undeniably linked

1 Plaintiffs to products by draping logos on their bodies to promote the products those logos

2 represent and to promote Defendant's advertising services. SAC ¶¶ 1, 68-129, 140-153.

3       In attacking the likely-to-confuse element, Defendant tries to convert a fact question into a

4 legal question and improperly relies on assumptions about the Premier League and Little League.

5 *See Abdul-Jabbar*, 85 F.3d at 413 ("Likelihood of confusion as to endorsement is therefore a

6 question for the jury."); *Downing*, 265 F.3d at 1008 (question is "predominantly factual in nature"

7 and rarely suitable for summary judgment). Instead of relying merely upon Defendant's

8 speculation and *ipse dixit*, this Court must perform a fact intensive inquiry that weighs factors

9 including (1) the caddies' level of recognition among fans; (2) the relationship between Plaintiffs'

10 success and the products advertised on bibs; (3) the similarity between images used by Defendant

11 and actual Plaintiffs; (4) evidence of consumer confusion; (5) the marketing channels where

12 confusion occurs; (6) whether professional golf audiences are particularly careful when

13 determining who endorses products advertised on the bibs; and (7) whether Defendant intended to

14 profit by confusing viewers concerning Plaintiffs' endorsement of bib sponsors. *Downing*, 265

15 F.3d at 1008. Plaintiffs sufficiently pleaded these factors. SAC ¶¶ 1, 68-129, 140-153.[8]

16       Finally, Plaintiffs have alleged sufficient facts to demonstrate that they are proper plaintiffs

17 for purposes of their false endorsement claims. SAC ¶¶ 1-7, 81, 85, 97-98; *Fifty-Six Hope Rd.*

18 *Music, Ltd. v. A.V.E.L.A., Inc.*, 778 F.3d 1059, 1069 (9th Cir. 2015) (level of recognition is one

19 factor and takes into consideration the "target market"); *Downing*, 265 F.3d at 1008 (former

20 surfers sufficiently recognizable). Thus, dismissal is improper.

21     **VII. PLAINTIFFS SUFFICIENTLY ALLEGED ECONOMIC DURESS.**

22       In support of their economic duress claim, Plaintiffs have properly alleged "the doing of a

23 wrongful act which is sufficiently coercive to cause a reasonably prudent person faced with no

24

---

25 [8] Further, Plaintiffs' historic participation in tournaments co-sponsored by Defendant increases the likelihood that Defendant's use of caddies will confuse consumers. *Facenda*, 542 F.3d at 1011-12,
26 1020-24 (applying variation of Ninth Circuit's *Downing* factors and holding fact issue precluded summary judgment on likelihood-of-confusion element where plaintiff's celebrity status was
27 attributable to his voice work for NFL, and NFL used plaintiff's old voice work in documentary about a video game that depicts NFL play); *Ryan v. Volpone Stamp Co.*, 107 F. Supp. 2d 369, 380-
28 81 (S.D.N.Y. 2000) (refusing to dismiss plaintiff's claim and noting that this previous licensor-licensee relationship could increase chance for confusion).

1    reasonable alternative to succumb to the perpetrator's pressure." *Rich & Whillock, Inc. v. Ashton*

2    *Dev., Inc.*, 157 Cal. App. 3d 1154, 1158, 204 Cal. Rptr. 86, 89 (Ct. App. 1984); SAC ¶¶ 68-105,

3    154-58 (including allegations that Defendant interfered and threatened to interfere with the

4    contractual relationship between Plaintiffs and players to compel Plaintiffs to wear the bibs, and if

5    Plaintiffs do not comply, they face imminent bankruptcy and financial ruin because they will not

6    only lose their job—they will be locked out of their occupation altogether). There is no

7    requirement that the "wrongful act" be criminal or tortious in nature, and facing "bankruptcy and

8    financial ruin" is not a "reasonable alternative." *Id.*

9        Plaintiffs have already dispensed with Defendant's argument that it "has a clear legal

10   right" to force Plaintiffs to endorse bib sponsors without pay. *Supra* Parts III-IV. Further, contrary

11   to Defendant's proclaimed understanding of the law, Plaintiffs need not attempt to rescind a

12   contract *in toto* if the contract is divisible and the clause to be severed is the product of fraud,

13   coercion, adhesion, or is otherwise illegal. *See McManus v. CIBC World Markets Corp.,* 109 Cal.

14   App. 4th 76, 102, 134 Cal. Rptr. 2d 446 (2003) (severing unconscionable contract provision); *IMO*

15   *Dev. Corp. v. Dow Corning Corp.,* 135 Cal. App. 3d 451, 458, 185 Cal. Rptr. 341 (Ct. App. 1982)

16   (cited by Defendant and stating that "total rescission is not required where a contract is divisible or

17   severable."); *Persson v. Smart Inventions, Inc.*, 125 Cal. App. 4th 1141, 1153, 23 Cal. Rptr. 3d

18   335, 344 (2005) ("Courts have long had the authority to set aside unconscionable or illegal

19   contractual provisions, for example, while enforcing the remainder of a contract."); Cal. Civ.

20   Code §§ 1599, 1670.5. Thus, the Court should not dismiss Plaintiffs' claim for coercion and

21   economic duress.

22   **VIII. PLAINTIFFS SUFFICIENTLY PLEADED THEIR UNFAIR COMPETITION CLAIM.**

23       California's unfair competition law ("UCL") prohibits the employment of "unfair

24   competition" and grants standing to a violator's competitors to sue under the UCL. *Law Offices of*

25   *Mathew Higbee v. Expungement Assistance Servs.*, 214 Cal. App. 4th 544, 547, 153 Cal. Rptr. 3d

26   865, 868 (2013) ("[W]e conclude that the lack of direct dealings between two business

27   competitors is not necessarily fatal to UCL standing, provided the plaintiff competitor has suffered

28   injury in fact and lost money or property as a result of the defendant competitor's unfair

competition."); CAL. BUS. & PROF. CODE § 17200 *et seq.* "[U]nfair competition shall mean and include any unlawful, unfair or fraudulent business act or practice **and** unfair, deceptive, untrue or misleading advertising and any act prohibited by [§ 17500]." *Id.* Section 17500 generally prohibits "untrue or misleading" statements about goods or services in "any advertising device." Plaintiffs have satisfied the pleading requirement by demonstrating the many ways that Defendant's conduct is unlawful and unfair. *Supra* Parts I-VII; SAC ¶¶ 68-170. Further, "[w]hether an advertisement is 'misleading' must be judged by the effect it would have on a reasonable consumer." *Davis v. HSBC Bank Nevada, N.A.*, 691 F.3d 1152, 1161 (9th Cir. 2012) (applying California law). Plaintiffs have properly alleged that Defendant performed unlawful acts through violations of various state and federal law, and that Defendant's conduct was unfair and misleading. *Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal. 4th 163, 180, 973 P.2d 527, 540 (1999) ("Because [§] 17200 is written in the disjunctive, it establishes three varieties of unfair competition—acts or practices which are unlawful, or unfair, or fraudulent. In other words, a practice is prohibited as 'unfair' or 'deceptive' even if not 'unlawful' and vice versa."). Plaintiffs have sufficiently alleged that the public at large—including golf fans and potential bib sponsors—mistakenly believe that Plaintiffs voluntarily endorse the products represented by the bib logos. SAC ¶¶ 1, 68-170. Plaintiffs have also alleged that these consumers would base their purchasing decisions in part on the misleading nature of the bibs. *Id.* With respect to their fraud-based claims, Plaintiffs have sufficiently alleged reliance by consumers. *See Heartland Payment Sys., Inc. v. Mercury Payment Sys.*, LLC, No. C 14-0437 CW, 2015 WL 3377662, at *7 (N.D. Cal. Feb. 24, 2015) ("The Court agrees that Heartland's allegations are sufficient. Heartland has also stated facts sufficient to plead **consumer reliance**." (emphasis added)); *VP Racing Fuels, Inc. v. Gen. Petroleum Corp.*, 673 F. Supp. 2d 1073, 1087 (E.D. Cal. 2009) (sufficient allegation under fraud prong when plaintiff alleged that competitor **misled consumers** by overstating the octane level of its fuel). SAC ¶¶ 164-67.

### CONCLUSION

Plaintiffs respectfully ask that the Court Deny Defendant's Motion or, in the alternative, permit Plaintiffs to further amend their pleadings to cure any deficiency.

1   Dated:  October 9, 2015                **THE LANIER LAW FIRM, P.C.**

2
                                  By:      _____*/s/ Eugene R. Egdorf*_____
3                                          Eugene R. Egdorf  *Admitted  Pro Hac Vice*
                                           Lee Cirsch (CA State Bar No. 227668)
4                                          W. Mark Lanier *Admitted Pro Hac Vice*
                                           Benjamin T. Major  *Admitted Pro Hac Vice*
5                                          Jonathan P. Wilkerson *Admitted Pro Hac Vice*
                                           Ryan D. Ellis  *Admitted Pro Hac Vice*
6                                          Arthur R. Miller *Admitted Pro Hac Vice*
                                           ***Attorneys for Class Representative Plaintiffs,***
7                                          ***William Michael Hicks and Kenneth Harms, et. al.***

8

9

10                              <u>**ECF CERTIFICATION**</u>

11
            I hereby certify that a true and correct copy of the foregoing document was filed
12
     electronically on this 9th day of October 2015. As of this date, all counsel of record have
13
     consented to electronic service and are being served with a copy of this document through the
14
     Court's CM/ECF System.
15

16
                                  By:      __*/s/ Eugene R. Egdorf*_____
17                                         Eugene R. Egdorf

18

19

20

21

22

23

24

25

26

27

28