UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

WILLIAM MICHAEL HICKS, et al.,

                  Plaintiffs,

        v.

PGA TOUR, INC.,

                  Defendant.

Case No.  15-cv-00489-VC

**ORDER GRANTING MOTION TO DISMISS, DENYING MOTION TO STRIKE**

Re: Dkt. Nos. 79, 80, 82

       This case is about the "bibs" caddies wear during golf tournaments sponsored by the PGA Tour.  These bibs display the name of the golf tournament, the name of the golfer for whom the caddie works (on the back), and often corporate logos.  The bibs generally look like this:



SAC ¶ 1.

Recently there has been great strife between the caddies and the Tour, with caddies complaining that their working conditions are poor and that the Tour does not treat them with common human decency. To use one high-profile example, at a tournament in February 2015, play was suspended because of a thunderstorm with high winds. Players and other people were permitted to go indoors, while caddies were left to seek refuge under an open metal shed or in their vehicles. This prompted ESPN analyst Scott Van Pelt to opine that the PGA Tour "treats its caddies like outside dogs."[1]

Caddies are now fighting back. As part of this fight, 168 caddies have sued the PGA Tour in federal court. The lawsuit is a proposed class action, in which the caddies seek to represent themselves and all other similarly-situated caddies. They contend that the Tour may not require them to wear the bibs during tournaments, or at least that the Tour must compensate them for wearing the bibs because of the publicity they provide for the Tour and its sponsors. Specifically, the caddies assert that the bib requirement violates the contracts they signed with the Tour, violates their "right of publicity," and violates the federal antitrust and trademark laws.

But caddies have been required to wear the bibs for decades. So caddies know, when they enter the profession, that wearing a bib during tournaments is part of the job. In other words, the bib is the primary part of a caddie's uniform. And the contracts the caddies signed with the Tour require them to wear the uniforms prescribed by the Tour. For that reason, there is no merit to the caddies' contention that the contracts somehow prevent the Tour from requiring them to wear bibs. Nor does the bib requirement implicate federal antitrust or trademark law. The complaint is therefore dismissed. Dismissal is with prejudice, because the caddies have been unable to identify a way (and the Court is unable to think of a way) they could cure the defects in their complaint, despite multiple rounds of briefing and a lengthy hearing on the Tour's most recent motion to dismiss. *Northstar Fin. Advisors, Inc. v. Schwab Invs.*, 781 F. Supp. 2d 926, 931 (N.D. Cal. 2011).

---

[1] SAC ¶ 17 (quoting Scott Van Pelt, *Scott's "One Big Thing"*, ESPN Radio, http://espn.go.com/espnradio/play?id=12409670).

# I. CONTRACTUAL CLAIMS
## A. BREACH OF CONTRACT

For each pro golf tournament in which caddies participate, they must sign a form contract with the Tour.[2]  The contract contains language imposing dress and uniform requirements on the caddies for each tournament.  But the language about dress and uniform requirements does not explicitly mention bibs.  The caddies seize on this silence to argue that the contract does not allow the Tour to make them wear bibs.  And they argue that the bib requirement interferes with their right to make money off endorsements, because the bib covers space on their shirts that could otherwise display endorsements.  The question, therefore, is whether the general contract language imposing dress and uniform requirements on the caddies at each tournament can be reasonably understood as precluding the Tour from requiring the caddies to wear bibs at those tournaments.

As a preliminary matter, it bears noting that the caddies signed these form contracts in the forty-two different states where the Tour's tournaments are held.  Although one might assume that interpretation of each contract should be governed by the law of the state in which it was signed, the parties agree that California law governs the caddies' breach of contract claim.  "[P]arties may, in absence of strong contrary public policy, choose which forum's law will govern an action," *Dimidowich v. Bell & Howell*, 803 F.2d 1473, 1477 n.1 (9th Cir. 1986) (citing *Lauritzen v. Larson*, 345 U.S. 571, 588-89 (1953)), including by agreement during litigation, *see id.* at 1477; *see also Isofoton, S.A. v. Giremberk*, No. CV-04-0798-PHX-ROS, 2006 WL 1516026, at *2 (D. Ariz. May 30, 2006).  Moreover, the parties both assert that there is no

---

[2] The Court grants the Tour's request for judicial notice of Exhibits A-R.  "The Court may take judicial notice of documents which are referenced in but not appended to the pleadings, and whose authenticity no party disputes."  *Northstar Fin. Advisors, Inc. v. Schwab Invs.*, 781 F. Supp. 2d 926, 942 (N.D. Cal. 2011) (citing *Branch v. Tunnell*, 14 F.3d 449, 454 (9th Cir. 1994), *overruled on other grounds by Galbraith v. Cty. of Santa Clara*, 307 F.3d 1119 (9th Cir. 2002)).  The complaint references these documents – form caddie registration agreements, caddie application forms, and player handbooks and regulations – and the caddies have stipulated that they do not contest the authenticity of these documents.  *See* Dkt. No. 78, at 2.  The caddies' motion to strike, Dkt. No. 82, is accordingly DENIED.

material difference between the laws of the forty-two states on this issue.  The Court will therefore apply California law.

Under California law, the general rule is that if the relevant contractual language is ambiguous, such that either side's interpretation is potentially reasonable, the dispute must be resolved by a jury.  *See Requa v. Regents of Univ. of Cal.*, 152 Cal. Rptr. 3d 440, 449 (Ct. App. 2012); *Aragon-Haas v. Family Sec. Ins. Servs.*, 282 Cal. Rptr. 233, 238 (Ct. App. 1991); *Marina Tenants Ass'n v. Deauville Marina Dev. Co.*, 226 Cal. Rptr. 321, 324 (Ct. App. 1986).   But even if disputed language might appear ambiguous when read in isolation, where the context reveals that the language is susceptible to only one reasonable interpretation, the ambiguity can be conclusively resolved in favor of that interpretation as a matter of law.  *See Kashmiri v. Regents of Univ. of Cal.*, 67 Cal. Rptr. 3d 635, 660 (Ct. App. 2007); *Boeing Co. v. Cont'l Cas.*, 69 Cal. Rptr. 3d 322, 326-27 (Ct. App. 2007).  This is true even on a motion to dismiss:  if the allegations in the complaint, viewed with other materials properly considered at the pleading stage, conclusively show that only the defendant's interpretation of the disputed contractual language is reasonable, the complaint must be dismissed.  *See Skilstaf, Inc. v. CVS Caremark Corp.*, 669 F.3d 1005, 1017 (9th Cir. 2012); *see also Boeing*, 69 Cal. Rptr. 3d at 326; *Lee v. City of L.A.*, 250 F.3d 668, 688 (9th Cir. 2001).

As mentioned, the question here is whether the language of the form contract imposing dress and uniform requirements on caddies can be reasonably interpreted as not authorizing the Tour to require them to wear bibs.  The pertinent paragraph states:

> Caddies shall wear uniforms and identification badges as prescribed by the host tournament and PGA TOUR. All caddies are required to wear solid-colored, Khaki-style long pants, which touch the top of the shoe, or solid-colored, knee-length, tailored shorts or skorts and a collared shirt while on club property. T-shirts, jeans, culottes, skirts, capris, cut-off shorts and cargo-style shorts are not permitted.  Acceptable colors shall be determined at the discretion of the Tournament Director.

Dkt. No. 80 Ex. F.  Although the caddie registration agreement has changed over time, the first sentence of this provision has remained identical since at least 2010, and is apparently used at all

events in all three of the Tour's pro golf tours.  Dkt. No. 80 Exs. A-R.  The remaining language has remained almost identical as well.  *See id.*

In isolation, this language might appear ambiguous.  On the one hand, a person might understand the first sentence of the paragraph to mean that caddies must wear whatever "uniforms" the host tournament and the Tour decide to "prescribe," without limitation.  That would, of course, include bibs.  On this interpretation, the second sentence would mean that, in addition to whatever uniform the host tournament and the Tour prescribe, caddies must limit themselves to wearing certain kinds of clothing (for example, solid-colored pants or knee-length shorts).

On the other hand, one might understand the second sentence of the paragraph to be modifying the first one, so that the kinds of "uniforms" a host tournament and the Tour may "prescribe" include the type and color of the pants and shirts caddies may wear, and nothing more.  On this interpretation, the paragraph does not authorize the Tour to require caddies to wear bibs.

But even if this contract language might appear susceptible to two different interpretations when considered in isolation, there is only one reasonable interpretation when the language is considered in the context of this case.  As the plaintiffs themselves concede in their briefing, "the PGA Tour has required caddies to wear bibs for decades."[3]  Dkt. No. 98 at 6. Moreover, each caddie is, according to the complaint, "forced to wear identical bibs during a given tournament."  SAC ¶ 103.  In other words, for decades, the bib has been the primary part of the "uniform" that the Tour requires caddies to wear.  This context, which is established by the allegations in the complaint and facts that the caddies have conceded in their papers, shows that the caddies' proposed interpretation is not reasonable, because no reasonable person signing the

---

[3] A concession like this is appropriately considered on a motion to dismiss.  *See Scognamillo v. Credit Suisse First Bos. LLC*, No. C03-2061 TEH, 2005 WL 2045807, at *9 (N.D. Cal. Aug. 25, 2005); *see also Brown v. Philip Morris Inc.*, 250 F.3d 789, 795, 797 (3d Cir. 2001); *cf. Soto-Negrón v. Taber Partners I*, 339 F.3d 35, 38 (1st Cir. 2003) (quoting *Chongris v. Bd. of Appeals*, 811 F.2d 36, 37 (1st Cir.1987)).

contract after 2010 could believe he retained the right not to wear a bib during a tournament. The only reasonable interpretation of the contract is that the caddies agreed the Tour could make them wear bibs.

It follows that the caddies have no claim for breach of contract. *See, e.g.*, *Burke v. TV Guide Magazine Grp., Inc.*, 442 F. App'x 356, 358 (9th Cir. 2011) (unpublished) (no breach where "the conduct of which [a] plaintiff complains . . . is specifically authorized by the contract"). And by definition, by consenting to wear bibs, the caddies relinquished any right they otherwise would have had to display endorsements on the parts of their shirts covered by the bibs. Their lawsuit therefore  does not state a claim for breach of contract.

The only remaining question is whether the caddies should be given leave to amend their breach of contract claim. The only conceivable way the caddies could state a claim for breach of contract in the face of this language permitting the Tour to require them to wear bibs would be through a plausible allegation that the Tour had somehow relinquished this contractual right. *Cf. Waller v. Truck Ins. Exch., Inc.*, 900 P.2d 619, 637 (Cal. 1995). Although the caddies make an ephemeral assertion that the Tour has at times "suggested that caddies are not actually required to wear the bibs," SAC ¶ 12, every concrete factual allegation they make on this issue is to the contrary and indicates that the Tour has regularly enforced its contractual rights. For example, the caddies allege the Tour "has fined Plaintiff Steve Williams numerous times for removing bibs," and that "Local Hosts have similarly forced caddies to wear the bibs . . . by threatening to report caddies to [the Tour] for discipline, by not permitting a caddie to participate in a tournament and carry out his duties for his professional golfer, and by threatening to prohibit the caddie from participating in a tournament unless the caddie wears the bib." *Id.* The caddies also complain the Tour has "obstinately refused to change its practice" of requiring them to wear bibs. SAC ¶ 11. And plaintiff James Edmonson declared under oath, in support of an earlier-filed motion for a preliminary injunction: "During my career, [the Tour] has *always* threatened to exclude caddies from working at a tournament if they refuse to wear the bibs." Dkt. 3 Ex. 1 at ¶

12 (emphasis added).[4]  Given these allegations, it is clear amendment would be futile.  *See, e.g.*, *Stone v. Travelers Corp.*, 58 F.3d 434, 437 n.1 (9th Cir. 1995) (leave to amend need not be given where a plaintiff cannot cure defects in his complaint without alleging facts inconsistent with prior iterations of the complaint).  The caddies' breach of contract claim is therefore dismissed with prejudice.

## B. DURESS

Perhaps anticipating the conclusion that the language of the contract allows the Tour to require them to wear bibs, the caddies alternatively argue they agreed to this contract language under duress.  SAC ¶ 155.  The caddies note that they are employed by the individual golfers who participate in Tour events, not by the Tour itself.  *Id.*; *see also id.* ¶¶ 6, 69.  The caddies allege that the Tour "threatened to and attempted to interfere with [the caddies'] business relationships with their respective players and individual sponsors" if they would not agree to wear the bibs.  SAC ¶ 155.  The Tour also allegedly "threatened to or did in fact preclude caddies from working for their golfer [at Tour events] if they refused to" wear the bibs.  *Id.*  The caddies assert that, because they "lack viable alternative employment," they had no choice but to agree to wear the bibs at the Tour's insistence.  *Id.*

If a party to a contract signs it under economic duress, a court has discretion to rescind it.  *Rich & Whillock, Inc. v. Ashton Dev., Inc.*, 204 Cal. Rptr. 86, 89 (Ct. App. 1984).  "The doctrine of 'economic duress' can apply when one party has done a wrongful act which is sufficiently coercive to cause a reasonably prudent person, faced with no reasonable alternative, to agree to an unfavorable contract."  *CrossTalk Prods., Inc. v. Jacobson*, 76 Cal. Rptr. 2d 615, 622-23 (Ct.

---

[4] The complaint expressly references exhibits attached to Edmonson's declaration, and impliedly incorporates the substance of Edmonson's declaration itself.  "[A] court may consider documents which are not physically attached to the complaint but 'whose contents are alleged in [the] complaint and whose authenticity no party questions.'"  *Van Winkle v. Allstate Ins. Co.*, 290 F. Supp. 2d 1158, 1162 (C.D. Cal. 2003) (quoting *eCash Techs., Inc. v. Guagliardo*, 127 F. Supp.2d 1069, 1074 (C.D. Cal. 2000) (second alteration original)).  Because the plaintiffs offered Edmonson's declaration themselves and the defendant does not dispute its authenticity, the Court will consider the declaration in ruling on the motion to dismiss.  *See Appling v. Wachovia Mortg., FSB*, 745 F. Supp. 2d 961, 968 (N.D. Cal. 2010).

App. 1998).  A wrongful act does not necessarily mean a tortious or "unlawful act" but encompasses a greater range of unethical behavior.  *Tarpy v. Cty. of San Diego*, 1 Cal. Rptr. 3d 607, 614 (Ct. App. 2003) (citing *CrossTalk Prods.*, 76 Cal. Rptr. 2d at 622-23).  In addition to showing that the wrongful act was objectively coercive, the party seeking rescission must also show that it actually was coerced, i.e. that it had no reasonable alternative but to agree. *CrossTalk Prods.*, 76 Cal. Rptr. 2d at 623.  California courts have held a person had no reasonable alternative "when the only other alternative is bankruptcy or financial ruin." *Rich & Whillock*, 204 Cal. Rptr. at 89.  The doctrine does not allow for rescission of contracts that are merely the result of "[h]ard bargaining," as opposed to the kind of extreme financial coercion that leaves a person with no real choice but to agree.  *Id.*

The allegations in this lawsuit cannot support a theory of economic duress.  It might be one thing if someone became a professional caddie in reliance on the notion that a significant portion of his income would come from logos displayed on shirts he wore during tournaments, only later to be forced to choose either to stop making that money or to stop practicing his trade. It is another thing for someone embark upon a profession whose practitioners have long been required to wear bibs, and who therefore have not been able to display logos on the part of the shirt covered by the bib.  The caddies allegation that they were coerced into this arrangement on threat of extreme economic hardship is not plausible, and this claim is dismissed with prejudice.

## C.  UNJUST ENRICHMENT

There is no "standalone cause of action for 'unjust enrichment'" in California.  *Astiana v. Hain Celestial Grp., Inc.*, 783 F.3d 753, 762 (9th Cir. 2015) (citing *Durell v. Sharp Healthcare*, 108 Cal. Rptr. 3d 682, 699 (Ct. App. 2010)).  However, "[w]hen a plaintiff alleges unjust enrichment, a court may 'construe the cause of action as a quasi-contract claim seeking restitution.'"  *Id.* (citing *Rutherford Holdings, LLC v. Plaza Del Rey*, 166 Cal. Rptr. 3d 864, 872 (Ct. App. 2014)).  In this case, because the caddies agreed to wear the bibs in an express contract and the complaint does not plausibly allege the contract was procured by fraud or duress or is otherwise unenforceable, even if the Court were to construe the caddies' unjust enrichment claim

as a claim for restitution, that claim would fail as a matter of law.  *See Durell*, 108 Cal. Rptr. 3d at 700.  It is therefore dismissed with prejudice.

## II. RIGHT OF PUBLICITY

The caddies also allege the Tour is violating their "right of publicity" by using them as "human billboards."  They contend the Tour makes money by requiring the caddies to wear bibs, because the bibs display corporate logos and the names of corporate sponsors.

California recognizes both a statutory and common law right of publicity.  *Cohen v. Facebook, Inc.*, 798 F. Supp. 2d 1090, 1093 (N.D. Cal. 2011).  "To state a claim for common law misappropriation [in violation of the right of publicity], plaintiffs must allege '(1) the defendant's use of the plaintiff's identity; (2) the appropriation of plaintiff's name or likeness to defendant's advantage, commercially or otherwise; (3) lack of consent; and (4) resulting injury.'  For a claim under Civil Code § 3344, plaintiffs must additionally allege '(1) a "knowing" use; (2) for purposes of advertising, and (3) a direct connection between the use and the commercial purpose.'"  *Id.* at 1093-94 (quoting *Newcombe v. Adolf Coors Co.*, 157 F.3d 686, 692 (9th Cir. 1998)).

Both the common law and statutory causes of action for misappropriation require lack of consent.  *Id.*  As previously explained, the contracts the caddies sign before participating in tournaments allow the Tour to require them to wear bibs.  By definition, therefore, the caddies have consented to the use of their images at tournaments to display what is on the bibs.  Further, in that same agreement, the caddies granted and assigned to the Tour their "individual television, radio, motion picture, photographic, electronic, . . . and all other similar or related media rights with respect to" their participation in Tour events.  Dkt. No. 80 Ex. F.  It is therefore implausible that the caddies did not consent to the Tour's commercial use of their likenesses in televising and otherwise depicting the caddies participating in Tour events wearing the bibs.

The caddies note that the Tour's *player* handbook distinguishes between "media rights" and "marketing rights," and that the provision on "marketing rights" expressly protects the players' right to seek endorsements.  Dkt. No. 3 Ex. 1-A at 150-51.  Then they argue that this

distinction should be read into their contract as well, even though their contract says nothing about "marketing rights."  Even assuming they are correct, it does nothing to save their "right of publicity" claim.  There is no inconsistency between consent by a caddie to wear a bib and retention by the caddie of "marketing rights."  The caddies can still seek to promote or endorse products, regardless of whether they also consented to allowing the Tour to use their likenesses in the limited manner described by the contract (i.e. to depict the caddies participating in Tour events while wearing the bibs).

The caddies' right of publicity claims are dismissed with prejudice.

## III. ANTITRUST CLAIMS

The caddies assert various claims under Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2.  As a threshold matter, "to state a valid claim under the Sherman Act, a plaintiff must allege that the defendant has market power within a 'relevant market,'" and must provide a facially plausible definition of that market.  *Newcal Indus., Inc. v. Ikon Office Sol.*, 513 F.3d 1038, 1044, 1045 (9th Cir. 2008); *see also id.* at 1044 n.3; *Tanaka v. Univ. of S. Cal.*, 252 F.3d 1059, 1063 (9th Cir. 2001); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007).  Defining the relevant market requires plausibly alleging both "a relevant product market and a relevant geographic market."  *Sidibe v. Sutter Health*, 4 F. Supp. 3d 1160, 1174 (N.D. Cal. 2013); *see also Newcal*, 513 F.3d at 1045 n.4.  The relevant product market "must encompass the product at issue as well as all economic substitutes for the product."  *Newcal*, 513 F.3d at 1045.  That is, the market must include all products for which there is "reasonable interchangeability of use or . . . cross-elasticity of demand."  *Id.* (quoting *Brown Shoe v. United States*, 370 U.S. 294, 325 (1962)).  If a plaintiff "alleges a proposed relevant market that clearly does not encompass all interchangeable substitute products even when all factual inferences are granted in plaintiff's favor, the relevant market is legally insufficient and a motion to dismiss may be granted."  *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 436 (3d Cir. 1997).

This threshold requirement exists to prevent the antitrust laws from applying too broadly. Antitrust law is not intended to reach all potentially objectionable conduct by economic

competitors; it is intended to protect *consumers* from the anticompetitive effects of wrongful monopolization or restraints of trade. *See, e.g.*, *NCAA v. Bd. of Regents of Univ. of Okla.*, 468 U.S. 85, 107 (1984). The theory is that in a functioning competitive market, if one seller raises the price of its product, consumers will turn to other sellers of similar products to avoid paying the higher price. The conduct of a seller (or group of sellers) only implicates the antitrust laws if it allows the seller (or group of sellers) to charge artificially high prices in a scenario where consumers have no reasonable opportunity to turn to another product. *See id.* To determine whether that kind of harm is likely to happen or has happened, it is necessary to examine the entire product market, i.e. all products a consumer would consider reasonably interchangeable and would turn to if there were a significant price increase in the original product. If consumers are not precluded from responding to the defendant's conduct simply by turning to reasonable alternatives in the market, the conduct of the defendant (even if otherwise wrongful) was not meant to be covered by the antitrust laws. *See Adidas Am., Inc. v. NCAA*, 64 F. Supp. 2d 1097, 1101-02 (D. Kan. 1999).

The caddies allege there are two relevant product markets in which the Tour has committed antitrust violations: the "Endorsement Market" and the "Live Action Advertising Market." SAC ¶ 82. In these markets, the caddies allege, advertisers of certain products seek the attention of pro golf fans. With regard to both markets, the caddies allege that pro golf fans are unique – that they tend to be older, wealthier, and more privileged than fans of other sports. Therefore, according to the caddies, it is not merely companies that advertise golf-specific products that wish to reach golf fans in particular. It is also companies that advertise luxury goods and services that fans of other sports will be less interested in, or less able to purchase. SAC ¶ 95.

The caddies describe the endorsement market as "the national market for the endorsement of products and services by participants in professional golf tournaments." SAC ¶ 84. According to the lawsuit, endorsements by pro golfers and caddies displayed during golf tournaments are not reasonably interchangeable with other forms of advertising to golf fans, such

as television ads, magazine ads, internet ads, or posters displayed at golf course clubhouses. SAC ¶ 85.  This is so, the caddies allege, because golf fans cannot ignore, say, a Nike hat worn by a golfer during a tournament in the same way they could ignore a Nike ad in a magazine.  *Id.* And this is true, the caddies allege, even if the Nike ad has a picture of the same golfer wearing the same hat.  *Id.*  In other words, the caddies allege that the in-tournament endorsement market is distinct from all other forms of advertising to golf fans, including but not limited to other ways of communicating to golf fans that a player or caddie endorses a product.[5]

The caddies describe the live action advertising market as "the national . . . market for in-play or in-action commercial advertising at professional golf events between commercial breaks."  SAC ¶ 88.  This is different from the endorsement market in one sense: with the live action advertising market, it does not matter whether the advertisement of a product comes in the form of an endorsement.  But it is similar to the endorsement market in another sense: the live action advertising market is limited to things people see when they're watching the golf "action" on TV.  Beyond a display on the shirt or hat of a golfer or caddie, this might include the display of a sign on a bridge on the golf course, or the display of a logo on a graphic that appears on screen during tournament play (like when the leaderboard is shown).  The caddies allege that these advertisement opportunities are sold to sponsors, whose logos "are inserted subtly but effectively in the field of play where they can be viewed by the live golf tournament audience and by the broadcast audiences between commercial breaks."  *Id.*  As with the endorsement market, the caddies allege that these forms of advertisement are unique and not reasonably interchangeable with other forms of advertising to golf fans, because broadcast viewers can fast-forward through commercials, or ignore magazine ads or posters, but cannot readily avoid observing a logo that appears on screen during tournament play.  SAC ¶ 90.

These allegations – that advertising in the "Endorsement Market" and the "Live Action

---

[5] The Court assumes, for the sake of argument and for purposes of this motion to dismiss only, that fans of pro golf are uniquely attractive to certain advertisers in a way that fans of other sports (such as tennis) are not.  *Cf. NCAA v. Bd. of Regents of Univ. of Okla.*, 468 U.S. 85, 111 (1984).

Advertising Market" is meaningfully distinct from other forms of advertising to golf fans – are not plausible.  Companies that wish to advertise things like golf balls or luxury watches to fans of pro golf can do so in a variety of ways: television ads, magazine ads, internet ads, posters at golf course clubhouses, and more.  To be sure, not all forms of advertising are the same, and some forms have benefits that others don't.  For example, with a television ad, a company can communicate a detailed verbal and visual message about its product (including but not limited to an endorsement by a golfer, or an actor, or a caddie, or some other figure).  With a magazine ad, the company cannot communicate verbally, but it can communicate visually, and the ad might be hard to ignore if it appears on the page opposite an article someone is reading.  With a logo being worn by a caddie or a golfer during a tournament, the company's communication capabilities are far more limited, but perhaps the communication is more likely to catch someone's eye.  However, it's not enough to allege that these forms of advertising have differences.  *See, e.g.*, *United States v. E. I. du Pont de Nemours & Co.*, 351 U.S. 377, 394 (1956).  To implicate the antitrust laws, the caddies must allege facts from which one could plausibly conclude that these different methods of advertising to golf fans are not reasonably interchangeable, such that even if the price of one advertising method went up in a meaningful way, companies would not switch to another method of advertising.  The caddies have alleged no such facts.  Even assuming the caddies are correct that an endorsement of a product by a golfer or caddie is sufficiently different from an advertisement without an endorsement, the endorsement market cannot be so narrowly defined as to include only in-play endorsements and not also endorsements communicated via other media, because it isn't plausible that an increase in the price of in-play endorsements would have no effect on the demand for other types of endorsements, or vice versa.  Likewise, with respect to the live action advertising market, while it may be true that the advent of DVRs has rendered in-play advertisement opportunities more attractive than they previously were, it does not plausibly follow that a price increase in in-play advertisement opportunities would have no effect on the demand for other forms of advertisement to golf fans.  If it became too expensive to put a logo on a bridge, there is no logical reason a company wouldn't decide instead to put its

logo on a magazine ad, or on a wall in golf course clubhouses, or any number of other places.

In sum, the product markets proposed by the caddies are not natural. They are artificial, contorted to meet their litigation needs. *Cf. Adidas Am.*, 64 F. Supp. 2d at 1102. Nor have the caddies been able to explain how they could state an antitrust claim using a plausible product market definition. Accordingly, their Sherman Act claims are dismissed with prejudice.

## IV.  LANHAM ACT

The Lanham Act creates a cause of action against a defendant who, "in connection with any goods or services . . . uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which . . . is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person." 15 U.S.C. § 1125(a)(1)(A).

The caddies' Lanham Act claim is essentially a false endorsement claim: they allege the Tour "used the likenesses and images of Plaintiffs to endorse the products and services of bib sponsors," thereby misleading golfing audiences into believing that the caddies themselves endorse those products and services. SAC ¶¶ 150, 151. But a plaintiff can only state a "false endorsement claim" if the use of his identity is "unauthorized." *Waits v. Frito-Lay, Inc.*, 978 F.2d 1093, 1110 (9th Cir. 1992), *abrogated on other grounds by Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377 (2014); *see also Abdul-Jabbar v. Gen. Motors Corp.*, 85 F.3d 407, 410 (9th Cir. 1996). As previously explained, the only plausible interpretation of the parties' agreements is that the caddies consented to the very thing they now complain of – namely, the Tour's right to make the caddies wear bibs at tournaments and to televise and otherwise accurately depict the caddies participating in those tournaments. The caddies' Lanham Act claim therefore also fails as a matter of law and is dismissed with prejudice.

## V.  UNFAIR COMPETITION

Finally, the caddies allege that the Tour's conduct violates California's unfair competition

law ("UCL"), Cal. Bus. & Prof. Code § 17200.  Section 17200 allows a cause of action for "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising."  The California Supreme Court has held that "a practice may be deemed unfair even if not specifically proscribed by some other law."  *Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*, 973 P.2d 527, 540 (Cal. 1999).  However, where the same conduct alleged to be unfair under the UCL is also alleged to be a violation of another law, the UCL claim rises or falls with the other claims.  *DocMagic, Inc. v. Ellie Mae, Inc.*, 745 F. Supp. 2d 1119, 1146 (N.D. Cal. 2010).  That is because "[t]o permit a separate inquiry into essentially the same question under the unfair competition law would . . . invite conflict and uncertainty."  *Chavez v. Whirlpool Corp.*, 113 Cal. Rptr. 2d 175, 184 (Ct. App. 2001).  Because the conduct the caddies assert is unfair under the UCL overlaps completely with the allegations the Court has held fails to state a claim for breach of contract, misappropriation of likeness, and antitrust violations, the caddies' UCL claim fails as a matter of law too.  *See DocMagic*, 745 F. Supp. 2d at 1146; *Chavez*, 113 Cal. Rptr. 2d at 184.  This claim is therefore also dismissed with prejudice.

## VI.  CONCLUSION

The caddies' overall complaint about poor treatment by the Tour has merit, but this federal lawsuit about bibs does not.  The complaint is dismissed with prejudice.

**IT IS SO ORDERED.**

Dated: February 9, 2016

_____
VINCE CHHABRIA
United States District Judge