**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| WILLIAMS MICHAEL HICKS; KENNETH HARMS, as Class Representative Plaintiffs and Individual Plaintiffs; MATTHEW ACHATZ; BRANDON ANTUS; CHAD ANTUS; ANDREW BARNES; CHRIS BERRY; MICHAEL BESTOR; DUANE BOCK; DAVID BROOKER; MARK CARNES; STEVEN CATLIN; BRUCE CLENDENEN; GRAEME COURTS; MICHAEL DARBY; HENRY DIANA; DON DONATELLO; MICHAEL DORAN; JAMES EDMONDSON; DEAN ELLIOTT; JOSEPH ETTER; BRENT EVERSON; MICAH FUGITT; DAMON GREEN; JAY HAAS, JR.; STEVEN HALE; MATTHEW HAUSER; ADAM HAYES; WILLIAM HEIM; JONATHAN JAKOVAC; TOM JANIS; JIMMY JOHNSON; CHRIS JONES; NICK JONES; STEVE KAY; ANTHONY KNIGHT; SHAY KNIGHT; MITCH KNOX; KURTIS KOWALUK; RONALD LEVIN; JOHN LIMANTI; BRENNEN LITTLE; SCOTT MARTIN, Esquire, Attorney; RICH MAYO, JR.; DANIEL MCQUILKEN; ERIC | No. 16-15370<br><br>D.C. No. 3:15-cv-00489-VC<br><br><br>OPINION |

MELLER, Esquire, Attorney;
MATTHEW MINISTER; CHARLES
MOHR; TODD MONTOYA; TONY
NAVARRO; DONALD NELSON;
TRAVIS PERKINS; JOSEPH
PYLAND; BRIAN REED; CHAD
REYNOLDS; MIGUEL RIVERA;
DAVID ROBINSON; SCOTT
SAJTINAC; ANDREW SANDERS;
FRED SANDERS; CORBY SEGAL;
SHAWN SEGARS; BRIAN SMITH;
RUSSEL STARK; BRAD
SWEARINGEN; PAUL TESORI;
ROBERT THOMPSON; SCOTT
TWAY; STEVE UNDERWOOD;
MARK URBANEK; RUSTY URESTI;
BRETT WALDMAN; NEIL
WALLACE; AARON WARK;
JEFFERY WILLETT; BARRY
WILLIAMS; MICHAEL MAZZEO;
JOHN YARBROUGH; JUSTIN YORK;
DENNIS TURNING; STEPHEN
WILLIAMS; TERRY R. ENGLEMAN;
THOMAS FLETCHER; ALAN BOND;
EDWARD E. WILLIS; ROBERT J.
MCFADDEN; PETER AMBROSETTI;
KENNETH A. TOLLES; JOSEPH
DUPLANTIS; BRADLEY WHITTLE;
PETER JORDAN; WESTON SCOTT
WATTS; JOSHUA E. DICKINSON;
DAVID B. PARSONS; PETER
VANDERRIET; MARK CRUNDEN;
JOHN M. BUCHNA; COLIN BYRNE;

LINN STRICKLER; CHAD
ROSENAK; MATTHEW
BEDNARSKI; MARTIN COURTOIS;
KENNY BUTLER; JEFF DOLF;
MARCEL LABAS; RUSSELL
CRAVER; JAMES WALTERS; JAMES
SMITH; PATRICK V. ESWAY, JR.;
MARK HUBER; JON CUSTER;
LEWIS B. PULLER III; JIM
THOMAS; MARK E. MILLER,
Esquire, Attorney; MATTHEW
HALL; ERIC SCHWARZ; JOHN R.
ADCOX; JOHN VENN; JOHN EGAN;
MATTHEW TRITTON; JAMES
SPRINGER, Esquire, Attorney;
TERRY TRAVIS; RICHARD J.
MOTACKI; ROBERT DICKERSON;
TIM GOODELL; ROBERT VAIL;
TODD NEWCOMB; GREG W.
MARTIN; NOAH ZELNIK; BRENT
HENLEY; CHRISTOPHER S.
FIEDLER; PHILIP LOWE; DAVID
PATTERSON; KEVIN MCARTHUR;
RICHARD M. SCHLAACK; DAVID
H. RAWLS; BOB BURNS; MICHAEL
J. WAITE; HARRY BROWN; DAVID
A. KERR; BRIAN H. SULLIVAN;
ANDREW DAVIDSON; ALLAN
MELLAN; DAVID WOOSLEY;
RONALD MCCANN; DANIEL
SCHLIMM; STEVE GREENWOOD;
ANTHONY WILDS; MICHAEL
MARONEY; ANDREW MARTINEZ;

KYLE KOLENDA; DAVID LAWSON;
JOHN L. SMITH; MICHAEL
MIDDLEMO; SPENCER SEIFERT;
LADDEN CLINE; THOMAS G.
WILLIAMS; MICHAEL CARRICK;
CALVIN HENLEY; GEORGE
ASSANTE; WALTER WORTHERN,
JR.; TIMOTHY J. THALMUELLER;
WILLIAM POORE; NORMAN R.
BLOUNT, JR.; WILLIAM SPENCER;
MARK HAMILTON; CHRISTIAN
HEATH HOLT; DAMIAN LOPEZ,
            *Plaintiffs-Appellants*,


                v.


PGA TOUR, INC.,
            *Defendant-Appellee.*

Appeal from the United States District Court
for the Northern District of California
Vince Chhabria, District Judge, Presiding

Argued and Submitted October 12, 2017
San Francisco, California

Filed July 27, 2018

Before:  Sidney R. Thomas, Chief Judge, and Michael Daly Hawkins and Kathleen M. O'Malley,[*] Circuit Judges.

Opinion by Chief Judge Thomas

## SUMMARY[**]

### Antitrust

The panel affirmed in part and vacated in part the district court's dismissal of antitrust and related state law claims of professional golf caddies who participate in golf tournaments run by the PGA Tour, arising out of the Tour's requirement that the caddies wear bibs containing advertisements at professional golfing events.

The panel held that the district court was not required to convert the Tour's Fed. R. Civ. P. 12(b)(6) motion to dismiss to a summary judgment motion because the court did not consider any material outside the pleadings.

The panel held that the district court properly concluded that the caddies had consented to wearing the bibs, based on the text of a tournament participation form, considered with the caddies' concession that the Tour had required them to

---

[*] The Honorable Kathleen M. O'Malley, United States Circuit Judge for the U.S. Court of Appeals for the Federal Circuit, sitting by designation.

[**] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

wear bibs for decades. The district court also did not err in concluding that the caddies failed to allege plausibly that the Tour secured their consent through economic duress. The caddies therefore failed to state claims for breach of contract and quasi-contract relief, California state law publicity claims, a Lanham Act false endorsement claim, or a plausible economic duress claim.

The panel held that the district court properly determined that the caddies had not alleged plausible product markets to support their antitrust claims. The panel held that, even if advertisements to golf fans constituted a unique product market, "in-play" or "in-action" advertising during professional golf tournaments—either in any format or endorsements alone—did not constitute a unique submarket. Agreeing with other circuits, the panel concluded that the caddies' proposed product markets were facially unsustainable because they failed to include many reasonably interchangeable products.

The panel held that the district court therefore correctly dismissed the caddies' antitrust claims, as well as their California unfair competition claim. The panel, however, vacated the dismissal with prejudice of these claims because the district court made a simple denial of leave to amend without adequate explanation. The panel remanded for the district court to reconsider its decision to deny the caddies leave to amend the antitrust and unfair competition claims.

**COUNSEL**

Arthur R. Miller (argued), The Lanier Law Firm P.C., New York, New York; Benjamin T. Major (argued), Kevin P. Parker, Richard D. Meadow, and W. Mark Lanier, The Lanier Law Firm P.C., Houston, Texas; for Plaintiffs-Appellants.

Jeffrey A. Mishkin (argued) and Anthony Dreyer, Skadden Arps Slate Meagher & Flom LLP, New York, New York; Raoul D. Kennedy, Skadden Arps Slate Meagher & Flom LLP, Palo Alto, California; for Defendant-Appellee.

---

**OPINION**

THOMAS, Chief Judge:

This appeal concerns various antitrust and related state law claims of professional golf caddies ("Caddies") who participate in golf tournaments run by the PGA Tour ("the Tour") arising out of the Tour's requirement that they wear bibs containing advertisements at professional golfing events. The district court dismissed all claims with prejudice. We affirm the dismissal, but remand the case to allow the district court to reconsider whether to grant the Caddies leave to amend their federal antitrust and California unfair competition claims.

I

Henry Longhurst, the renowned British golf writer and commentator, once wrote: "A good caddie is more than a mere assistant. He is a guide, philosopher, and friend." The professional caddie has evolved from simply carrying bags

8                HICKS V. PGA TOUR

and locating errant shots to providing valuable insights on course topography, club selection, and reading shots. Caddies serve as coaches, strategists, and counselors to professional golfers.

The Tour operates three tours of professional golf tournaments throughout the United States. It requires caddies to wear specified uniforms at the tournaments, including a "bib"—a loose-fitting sleeveless garment on the upper body used for identification. For each tournament, the Tour generally works with a local host ("Local Host"). The Local Hosts and Tour seek to secure and retain sponsors, including title sponsors for the tournaments. Sponsors pay Local Hosts and the Tour to secure advertising space at the tournaments. At issue in this case is the advertising space on the bibs worn by the Caddies during the tournaments.

Local Hosts and the Tour design the bibs. The bibs bear a tournament logo and sponsors' logos, which are often integrated together. With exposure to live tournament, television, and webcast audiences, advertising space on the bibs is valued at approximately $50 million annually. Local Hosts and the Tour receive the entirety of these revenues. The Caddies receive none.

Although individual professional golfers employ the Caddies as independent contractors, the Tour and Local Hosts require the Caddies to wear the bibs. The Caddies must sign a Caddie Registration and Regulations Form ("the Form") in order to participate in any Tour tournament. The Form notes that "[i]n consideration of PGA TOUR's services in cosponsoring the Tournament," the Caddies "grant and assign to PGA TOUR, without limitation, [their] individual television, radio, motion picture, photographic, electronic, . . .

and all other similar or related media rights with respect to [their] participation in the Tournament."

The Form also provides a list of regulations that the Caddies must adhere to, which in relevant part state:

> **2.** Caddies shall wear uniforms and identification badges as prescribed by the host tournament and PGA Tour. All caddies are required to wear solid-colored, Khaki-style long pants, which touch the top of the shoe, or solid-colored, knee-length, tailored shorts or skorts and a collared shirt while on club property. T-shirts, jeans, culottes, skirts, capris, cut-off shorts and cargo-style shorts are not permitted. Acceptable colors shall be determined at the discretion of the Tournament Director.

> **3.** Caddies shall wear smooth rubber-sole shoes, preferably tennis or basketball shoes. Permissible colors are limited to white and earth tones such as navy, blue, black, brown, tan, gray, dark green and the like. Bright colors that are intended to draw attention to a person's footwear are not acceptable. Footwear with a closed toe is required. Flip flops, open-toed sandals and other similar shoes are not permitted. Closed-toe Crocs are acceptable provided they conform with the colors described above. GOLF SPIKES are prohibited.

**4.** Caddies' clothing must conform to the Player Endorsement Policy as stated in the PGA TOUR Player Handbook and Tournament Regulations.[1]

The Player Endorsement Policy ("Endorsement Policy") referenced in Regulation Four prohibits endorsing specific categories of products, places limitations on the size and location of endorsements, and specifies that "[a]ll sponsorships, endorsements and promotional activities by members, whether during or outside PGA TOUR competitions, are subject to the approval of the PGA TOUR."[2]

The Tour and Local Hosts have threatened to prevent caddies who refuse to wear the bibs from participating in tournaments. They have also directly contacted golfers to determine whether the golfers would decline to hire caddies who refused to wear the bibs. These tactics, combined with the Tour's requirement that each golfer have a caddy to participate in a tournament, maximize the value of bib advertising during tournament play.

The Caddies contend that the Tour and Local Hosts cannot compel them to wear the bibs. Relatedly, they allege that by requiring the Caddies to wear the bibs, the Tour and

---

[1] The excerpted text comes from the version of the Form used for the 2014–2015 Tour season. The Tour added Regulation Four concerning the Player Endorsement Policy during the 2012 Tour season. Otherwise, the Tour has made no relevant changes to the excerpted text since 2010.

[2] The Caddies do not dispute the authenticity of the Form or Endorsement Policy, which are referenced in the operative complaint and were submitted to the district court by the Tour.

Local Hosts have inhibited their endorsement rights under the Endorsement Policy.[3]   Based on these allegations, the Caddies assert contract, equitable quasi-contract, economic duress, publicity, and unfair competition claims under California law.[4]   *See, e.g.*, Cal. Civ. Code § 3344(a) (discussing publicity claims); Cal. Bus. & Prof. Code § 17200 (defining "unfair competition").   They also allege a false endorsement claim under the Lanham Act.  15 U.S.C. § 1125. Finally, the Caddies assert antitrust claims under Sections 1 and 2 of the Sherman Act.  15 U.S.C. §§ 1, 2.

For their antitrust claims, the Caddies allege two relevant product markets: the Endorsement Market and the Live Action Advertising Market.  They define the Endorsement Market as "the national market for the endorsement of products and services by participants in professional golf tournaments."  Without the Tour's requirement that the Caddies wear bibs, the Caddies and golfers would be the only sellers in this market.  Indeed, the Caddies and golfers are the only visible and recognizable individuals who participate in golf tournaments.

According to the Caddies, the Tour's audience is a distinct advertising market given its unique demographic. The majority of Tour fans are older, Caucasian, travel via airplane for business, and are interested in products such as financial planning and vacation traveling.   These

---

[3] The Caddies' operative complaint names the Tour as the only defendant.

[4] The parties agree that California law applies to all of the state law claims.

characteristics allegedly distinguish the average Tour fan from the average fan of other major sports.

Moreover, endorsements from the Caddies and golfers during tournament play are purportedly more effective than other forms of golf-related advertising. A golf fan can ignore other forms of advertising by flipping the page of a magazine, clicking away from an online advertisement, or fast-forwarding through television commercials with a DVR. In contrast, a golf fan cannot ignore an in-action endorsement from a caddy or golfer. The Caddies contend that this enhanced effectiveness, combined with a unique degree of price-flexibility provided by the possibility of hiring golfers and caddies of varying skill levels, establishes the plausibility of the Endorsement Market.

The Caddies define the slightly more expansive Live Action Advertising Market as "the national . . . market for in-play or in-action commercial advertising at professional golf events between commercial breaks." In addition to endorsements from the Caddies and golfers, this market includes advertising space on and around the golf course that live tournament, television broadcast, and webcast audiences can see during in-play tournament action. The Tour and Local Hosts provide the advertising space on and around the course. The Caddies contend that the Live Action Advertising Market constitutes a plausible product market for similar reasons as above.

The Caddies allege three antitrust claims reliant on these proposed product markets. First, they contend that the Tour and Local Hosts violate Section 1 of the Sherman Act by agreeing to require the Caddies to wear the bibs, which unreasonably restrains trade by reducing the product supply

Case: 3:15-cv-00489-VC Document 105-1430 Filed 07/30/18-1 Page 13 of 32

in the relevant markets. Second, the Caddies allege that the Tour violates Section 2 of the Sherman Act by monopolizing or attempting to monopolize the relevant markets through the use of coercive and threatening conduct. Finally, the Caddies allege that the Tour also violates Section 2 by engaging in coercive reciprocal dealing—a variant of tying. Specifically, the Caddies contend that the Tour leverages monopoly power in the market for professional golf tournaments by selling the right to participate in golf tournaments to the Caddies on the condition that the Caddies sell their endorsement services to the Tour.

In February 2015, the Caddies first raised these claims and sought class certification in district court. The Caddies amended their complaint as of right in response to a motion to change venue and amended again with the Tour's consent. The Tour then filed a motion to dismiss the Caddies' Second Amended Complaint. It argued that the Caddies failed to plead any plausible claims for relief because the Caddies consented to wearing the bibs and the proposed antitrust product markets were implausible. The district court agreed.

The district court concluded that Regulation Two in the Form was unambiguous and authorized the Tour to require the Caddies to wear bibs. It focused specifically on the italicized language below:

> **2.** *Caddies shall wear uniforms and identification badges as prescribed by the host tournaments and PGA Tour.* All caddies are required to wear solid-colored, Khaki-style long pants, which touch the top of the shoe, or solid-colored, knee-length, tailored shorts or skorts and a collared shirt while on club

> property.  T-shirts, jeans, culottes, skirts,
> capris, cut-off shorts and cargo-style shorts
> are not permitted.  Acceptable colors shall be
> determined at the discretion of the
> Tournament Director.

The district court recognized that "[i]n isolation" the italicized "language might appear ambiguous."  The court elaborated:

> On the one hand, a person might understand
> the first sentence of the paragraph to mean
> that caddies must wear whatever 'uniforms'
> the host tournament and the Tour decide to
> 'prescribe,' without limitation . . . .  On the
> other hand, one might understand the second
> sentence of the paragraph to be modifying the
> first one, so that the kinds of 'uniforms' a host
> tournament and Tour may 'prescribe' include
> the type and color of the pants and shirts
> caddies may wear, and nothing more.

It noted that the former interpretation authorizes the Tour to require the Caddies to wear bibs, but the latter does not.

However, the district court determined that in the "context of this case," the contractual provision was unambiguous.  It relied on the Caddies' concession in their supplemental brief opposing the Tour's motion to dismiss that "the PGA Tour has required caddies to wear bibs for decades."  This "context," along with the operative complaint's allegation that the Caddies "are forced to wear identical bibs during a given tournament," confirmed that the contractual provision has a single reasonable interpretation: "[T]he caddies agreed

the Tour could make them wear bibs." In light of this conclusion, and the fact that the operative complaint confirmed that the Tour had not relinquished this contractual right, the district court dismissed the breach of contract claim with prejudice.

The district court's conclusion that the Caddies' had consented to wear the bibs led it to dismiss with prejudice the unjust enrichment, publicity, and Lanham Act false endorsement claims as well because each claim required a lack of consent. The Caddies' claim that they signed the Form under economic duress was similarly dismissed with prejudice because the Caddies "embark[ed] upon a profession whose practitioners have long been required to wear bibs."

The district court also dismissed with prejudice the Caddies' antitrust claims for failure to plead a plausible product market. It assumed when considering the Endorsement Market and the Live Action Advertising Market that professional golf fans constituted a unique market for certain advertisers. Even so, the court reasoned that while the various forms of advertisements aimed at this demographic have their differences, the Caddies failed to allege facts "from which one could plausibly conclude that these different methods of advertising to golf fans are not reasonably interchangeable." For example, "[i]f it became too expensive to put a logo on a bridge" or a bib, "there is no logical reason a company wouldn't decide instead to put its logo on a magazine ad, or on a wall in golf course clubhouses, or any number of other places." It concluded that the proposed markets were "artificial [and] contorted to meet [the Caddies'] litigation needs."

Finally, the district court dismissed the Caddies' remaining California unfair competition claim with prejudice given its resolution of other related claims. The Caddies timely appealed the district court's dismissal of all claims.

We review de novo the district court's dismissal of the Caddies' complaint under Rule 12(b)(6) for "failure to state a claim upon which relief can be granted." *Vega v. United States*, 881 F.3d 1146, 1152 (9th Cir. 2018). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). Applying this standard is a "context-specific task" that requires drawing on "judicial experience and common sense." *Id.* at 679.

## II

The district court properly concluded that the Caddies had consented to wearing the bibs and that they did not do so under economic duress.

## A

As an initial matter, the district court was not required to convert the Tour's Rule 12(b)(6) motion to a summary judgment motion, as the Caddies allege, because it did not consider any material outside the pleadings.

Case: 15-70048, 07/30/18, ID: 10951430, DktEntry: 48-1, Page 17 of 32

When ruling on a Rule 12(b)(6) motion, if "matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56. All parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." Fed. R. Civ. P. 12(d).

The "pleadings" include more than just the complaint. We can consider "exhibits attached to the Complaint or matters properly subject to judicial notice." *Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir. 2010). Moreover, "[w]e may also consider documents whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the [plaintiff's] pleading." *Northstar Fin. Advisors Inc. v. Schwab Invs.*, 779 F.3d 1036, 1043 (9th Cir. 2015) (brackets in original) (internal quotations and citation omitted). "[T]hose 'facts' [in a plaintiff's complaint] which have since been conclusively contradicted by plaintiffs' concessions" are also appropriate for consideration. *Chongris v. Bd. of Appeals of Town of Andover*, 811 F.2d 36, 37 (1st Cir. 1987); *see also, e.g.*, *McCorkle v. Bank of Am. Corp.*, 688 F.3d 164, 170, 172 (4th Cir. 2012) (affirming the district court's dismissal of a claim based on a "concession made at oral argument [before the district court] by counsel for Plaintiffs").

Here, the district court did not consider any matters requiring conversion under Rule 12(d). The Caddies' concession in their motion to dismiss briefing that "the PGA Tour has required caddies to wear bibs for decades" was appropriate to consider when ruling on the Rule 12(b)(6) motion. *See, e.g.*, *Chongris*, 811 F.2d at 37; *McCorkle*, 688 F.3d at 170, 172. In relying on this concession, the

district court did not "pull[ ] a single statement out of [the
Caddies'] argument and interpret[ ] it as vitiating all the
factual allegations made in [their] complaint." *Campanelli v.
Bockrath*, 100 F.3d 1476, 1481 (9th Cir. 1996). Instead, this
concession is entirely consistent with the allegations in the
operative complaint that the Tour has "nett[ed] millions of
dollars *each year* from bib advertising," that the Caddies
"could have collectively earned over $50 million during the
2013–2014 golf season and similar sums *during other
seasons* at issue in this lawsuit," and that the Tour has
"justif[ied] the practice because '*that is the way it has been*.'"
The Caddies fail to direct us to any factual allegations
inconsistent with its concession.

The district court's request for, and the parties' joint
submission of, "judicially noticeable facts . . . about when the
PGA Tour started requiring caddies to wear bibs during
tournaments" and when the tournaments began having
"sponsored" names also did not result in consideration of
materials outside the pleadings. The Caddies admit that "the
district court did not directly cite th[is] evidence." We need
not consider whether the materials in these submissions were
judicially noticeable at the pleading stage because the district
court "excluded" the materials by failing to rely on them
when ruling on the motion to dismiss. Fed. R. Civ. P. 12(d).

B

The district court properly concluded that the Caddies had
consented to wear the bibs. The text of the Form, considered
with the Caddies' concession that "the PGA Tour has
required [them] to wear bibs for decades," confirms the
Caddies' unambiguous consent to wearing bibs.

"Whether language in a contract is ambiguous is a question of law." *Daniel v. Ford Motor Co.*, 806 F.3d 1217, 1224 (9th Cir. 2015) (quoting *Producers Dairy Delivery Co. v. Sentry Ins. Co.*, 718 P.2d 920, 925 (Cal. 1986)). If a contract is ambiguous, it presents a question of fact inappropriate for resolution on a motion to dismiss. *ASARCO, LLC v. Union Pac. R.R. Co.*, 765 F.3d 999, 1008–09 (9th Cir. 2014).

We attempt to "ascertain [the parties'] intention solely from the written contract, if possible." *Starlight Ridge S. Homeowners Ass'n v. Hunter-Bloor*, 99 Cal. Rptr. 3d 20, 25 (Ct. App. 2009). We begin by assuming contract terms have their "plain, ordinary, popular or legal meaning." *Hayter Trucking, Inc. v. Shell W. E&P, Inc.*, 22 Cal. Rptr. 2d 229, 238 (Ct. App. 1993). If the "ordinary and popular sense" leaves doubt regarding a word's meaning, we "consider the circumstances under which the contract was made[,] the matter to which it relates[,] . . . [and any] special meaning [ ] given to [words] by usage." *Starlight Ridge*, 99 Cal. Rptr. 3d at 25.

The parties' "prior course of dealings" is relevant in this regard. *Marin Storage & Trucking, Inc. v. Benco Contracting & Eng'g, Inc.*, 107 Cal. Rptr. 2d 645, 652 (Ct. App. 2001). Considering the parties' course of dealing advances California law's "fundamental goal of contract interpretation," namely "to give effect to the mutual intent of the parties as it existed at the time of contracting." *Skilstaf, Inc. v. CVS Caremark Corp.*, 669 F.3d 1005, 1014–15 (9th Cir. 2012) (internal alterations and citation omitted); *see also Kashmiri v. Regents of Univ. of Cal.*, 67 Cal. Rptr. 3d 635, 660 (Ct. App. 2007) (noting that contract law aims to "protect the reasonable expectations of the parties" (quoting *Ben-Zvi*

*v. Edmar Co.*, 47 Cal. Rptr. 2d 12, 15 (Ct. App. 1995))). After all, a term is not ambiguous "because of '[d]isagreement concerning the meaning of a phrase,' or 'the fact that a word or phrase isolated from its context is susceptible of more than one meaning.'" *State v. Cont'l Ins. Co.*, 281 P.3d 1000, 1004 (Cal. 2012) (quoting *Castro v. Fireman's Fund Am. Life Ins. Co.*, 253 Cal. Rptr. 833, 836 (Ct. App. 1988)); *id.* at 1004–05 (A contract "cannot be found to be ambiguous in the abstract." (quoting *Bank of the West v. Superior Court*, 833 P.2d 545, 552 (Cal. 1992))).

With these principles in mind, the district court correctly concluded that Regulation Two provides unambiguous authorization for the Tour to require that the Caddies wear bibs. Regulation Two states that "[c]addies shall wear uniforms and identification badges as prescribed by the host tournament and PGA Tour." Both ordinary usage and the parties' course of dealing confirm that the Tour's ability to "prescribe[ ] . . . *uniforms* . . . [that] [c]addies shall wear" authorizes the bib requirement.

A uniform is commonly understood as a "dress of a distinctive design or fashion worn by members of a particular group and serving as a means of identification." Merriam-Webster's Collegiate Dictionary 1292 (10th ed.1996). The identical bibs that the Tour requires fall within this common definition because individuals watching Tour tournaments are able to identify the Caddies by the bibs they wear. Indeed, a caddy simply wearing khaki pants and a collared blue polo shirt would satisfy the Tour's leg wear and shirt requirement, but the individual would be indistinguishable from many golf fans on the course. Placing a bib on the same caddy "serv[es] as a means of identif[ying]" the individual as a caddy, rather than a golf spectator. *Id.*

The Caddies' concession that "the PGA Tour has required caddies to wear bibs for decades" further confirms that the bibs fall within Regulation Two's use of the word "uniforms." In the context of the parties' course of dealing, a reasonable caddy signing the Form would reach a single conclusion: Regulation Two's reference to "uniforms" included the bibs that the Tour "prescribed."[5]

## C

The district court also did not err in concluding that the Caddies failed to allege plausibly that the Tour secured their consent through economic duress.

Economic duress can excuse an innocent party's contractual obligations when the other contracting party does "a wrongful act which is sufficiently coercive to cause a reasonably prudent person faced with no reasonable alternative to succumb to the perpetrator's pressure." *Rich & Whillock, Inc. v. Ashton Dev., Inc.*, 204 Cal. Rptr. 86, 89 (Ct. App. 1984). The doctrine only applies when the party seeking relief "had no 'reasonable alternative' to the action it now seeks to avoid (generally, agreeing to contract)." *CrossTalk Prods., Inc. v. Jacobson*, 76 Cal. Rptr. 2d 615, 623 (Ct. App. 1998). No reasonable alternative may exist "when the only other alternative is bankruptcy or financial ruin." *Rich & Whillock*, 204 Cal. Rptr. at 89. "If a reasonable

---

[5] The Caddies' contention that the Player Endorsement Policy alters this conclusion is also incorrect. The Form notes that "[c]addies' clothing must conform to the Player Endorsement Policy." However, under the Player Endorsement Policy all "endorsements . . . are subject to approval by the PGA Tour." The Player Endorsement Policy—a policy referenced in the Form—would not allow endorsements to the extent they conflict with the Form's requirement that the Caddies wear bibs.

alternative was available, and there hence was no compelling necessity to submit to the coercive demands, economic duress cannot be established." *CrossTalk Prods.*, 76 Cal. Rptr. 2d at 623.

The Caddies failed to allege a "wrongful act which [was] sufficiently coercive" or that they faced "no reasonable alternative [but] to succumb to the perpetrator's pressure." *Rich & Whillock*, 204 Cal. Rptr. at 89. As the district court noted, the Caddies "embark[ed] upon a profession whose practitioners have long been required to wear bibs, and who therefore have not been able to display logos on the part of the shirt covered by the bib." In these circumstances, "the caddies['] allegation that they were coerced into this arrangement on threat of extreme economic hardship is not plausible."

## D

In sum, the Caddies failed to state claims for breach of contract and quasi-contract relief because they consented to wearing the bibs.[6] The Caddies also fail to state California

---

[6] The Caddies' quasi-contract claims include unjust enrichment, quantum meruit, and money had and received. The Caddies' consent to wearing the bibs in exchange for participation in the tournaments defeats these claims. *See, e.g.*, *Durell v. Sharp Healthcare*, 108 Cal. Rptr. 3d 682, 699 (Ct. App. 2010) ("[A]n unjust enrichment claim does not lie where the parties have an enforceable express contract."); *Newport Harbor Ventures, LLC v. Morris Cerullo World Evangelism*, 212 Cal. Rptr. 3d 216, 228 (Ct. App. 2016) ("Quantum meruit recovery that is contrary to an express contractual term is not allowed."); *Rutherford Holdings, LLC v. Plaza Del Rey*, 166 Cal. Rptr. 3d 864, 871 (Ct. App. 2014) ("In an action on an express contract, a claim for money had and received is permitted where there has been a total failure of consideration.").

state law publicity claims or a Lanham Act false endorsement claim because they consented to wearing the bibs and assigned to the Tour their "individual television, radio, motion picture, photographic, electronic, . . . and all other similar or related media rights with respect to [their] participation in the Tournament[s]." *Newcombe v. Adolf Coors Co.*, 157 F.3d 686, 691–92 (9th Cir. 1998) (noting that publicity claims under both California common law and California Civil Code § 3344 require lack of consent); *Abdul-Jabbar v. Gen. Motors Corp.*, 85 F.3d 407, 410 (9th Cir. 1996) (indicating that a Lanham Act false endorsement claim requires the "unauthorized" use of someone's identity). Finally, as discussed above, the Caddies fail to excuse their consent by pleading a plausible economic duress claim.

III

The district court also properly determined that the Caddies had not alleged plausible product markets to support their antitrust claims.

A

Plaintiffs must plead a relevant market to state an antitrust claim under the Sherman Act, unless they assert a per se claim. *Newcal Indus., Inc. v. Ikon Office Sol.*, 513 F.3d 1038, 1044–45 (9th Cir. 2008). While plaintiffs need not plead a relevant market with specificity, "[t]here are . . . some legal principles that govern the definition of an antitrust 'relevant market,' and a complaint may be dismissed under Rule 12(b)(6) if the complaint's 'relevant market' definition is facially unsustainable." *Id.* at 1045.

The relevant market must include both a geographic market and a product market. *Big Bear Lodging Ass'n v. Snow Summit, Inc.*, 182 F.3d 1096, 1104 (9th Cir. 1999). The latter, which is relevant to the present appeal, "must encompass the product at issue as well as all economic substitutes for the product." *Newcal Indus.*, 513 F.3d at 1045. Economic substitutes have a "reasonable interchangeability of use" or sufficient "cross-elasticity of demand" with the relevant product. *Id.* (quoting *Brown Shoe v. United States*, 370 U.S. 294, 325 (1962)). Including economic substitutes ensures that the relevant product market encompasses "the group or groups of sellers or producers who have actual or potential ability to deprive each other of significant levels of business." *Id.* (quoting *Thurman Indus., Inc. v. Pay 'N Pak Stores, Inc.*, 875 F.2d 1369, 1374 (9th Cir. 1989)).

Within a general product market, "well-defined submarkets may exist which, in themselves, constitute product markets for antitrust purposes." *Brown Shoe*, 370 U.S. at 325. To plead an antitrust claim based on a submarket, "the plaintiff must be able to show (but need not necessarily establish in the complaint) that the alleged submarket is economically distinct from the general product market." *Newcal Indus.*, 513 F.3d at 1045. "In *Brown Shoe*, the Supreme Court listed several 'practical indicia' of an economically distinct submarket: 'industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors.'" *Id.* (quoting 370 U.S. at 325).

## B

Applying these principles here, the district court properly concluded that the Caddies had failed to plead any plausible product markets.[7] The plausibility of the Caddies' proposed markets depends on two assumptions: (1) that advertisements to golf fans constitute a unique product market and (2) that "in-play" or "in-action" advertising during professional golf tournaments (i.e., between commercial breaks)—either in any format or endorsements alone—constitutes a unique submarket. Even if we accept the former assumption, "judicial experience and common sense" require rejecting the latter. *Iqbal*, 556 U.S. at 679. As the district court noted, the Caddies' proposed submarkets[8] are "not natural," "artificial," and "contorted to meet their litigation needs."

---

[7] The Caddies conclusorily allege that at least some of the Tour's conduct constitutes a per se antitrust violation, which would excuse the requirement to plead a relevant product market. *Big Bear Lodging*, 182 F.3d at 1104. However, they do not challenge on appeal the district court's failure to consider their claims under the per se framework. We also are unpersuaded that the Caddies' antitrust claims, as currently pleaded, reveal the type of conduct "that courts' 'considerable experience' has revealed to have 'manifestly anti-competitive effects,' and no 'redeeming virtue,' such that judges can 'predict with confidence that it would be invalidated in all or almost all instances under the rule of reason.'" *Cal. ex rel. Harris v. Safeway, Inc.*, 651 F.3d 1118, 1147 (9th Cir. 2011) (quoting *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 886–87 (2007)).

[8] The Caddies' proposed markets are actually sub-submarkets. Advertising to golf fans is a submarket of the general advertising market. Advertising during live golf tournaments, whether through endorsements alone or all means, is a further submarket of the submarket of advertising to golf fans.

The Caddies' submarkets—the Endorsement Market and the Live Action Advertising Market—omit many economic substitutes. Companies aiming to target professional golf fans can do so by airing commercials during golf-related television programs, radio broadcasts, or podcasts. They can advertise on golf-related websites or social media pages. They can also directly target golf fans by advertising through a search engine or social media platform that provides advertisers insights on users' online history. As the district court noted, "[i]f it became too expensive to put a logo on a bridge" during a golf tournament, "there is no logical reason a company wouldn't decide instead to put its logo on a magazine ad, or on a wall in golf course clubhouses, or any number of other places."

The Caddies offer four arguments to contest this conclusion. First, they note that advertising during the live-action of golf tournaments cannot be avoided by "flipping the page, clicking out of an ad, . . . fast[ ] forwarding with [a] DVR," or leaving the room during a commercial break. Second, they claim that "endorsements made by the endorser during competition provides a unique, exponentially more effective opportunity to improve brand recognition and validity when compared to endorsements made in print or in television commercials." Third, they contend that advertising during live golf tournament action provides an element of price flexibility because "the vast majority of companies purchasing live action advertisements are smaller companies who cannot or do not want to pay for advertising *via* television commercials." Finally, they claim that "econometric studies . . . will demonstrate that purchasers in the [proposed markets] will not switch to products outside of th[ose] market[s] in response to a small but significant and non-transitory price increase by [the Tour] . . . to such a

degree that the price increase is unprofitable." None of these arguments withstand modest scrutiny.

The fact that golf fans can avoid some forms of advertising fails to indicate that these advertising formats are not "reasonabl[y] interchangeab[le]" with the products in the proposed markets. *Newcal Indus.*, 513 F.3d at 1045. The Caddies' alternative conclusion rests on the implausible assumption that a distinct group of golf fans watches tournament broadcasts but either consumes no other forms of golf media or is uninfluenced by advertisements in all other forms of golf media. The vast majority of golf fans who watch tournament broadcasts certainly consume other forms of golf media. Although these fans likely avoid some advertisements in other golf media, the assumption that they are not influenced by one or more of the diverse forms of advertisements discussed above is implausible. Moreover, even if a distinct group of golf fans exists that is only influenced by live action advertising, for whatever reason, the Caddies provide no explanation why this group of fans is distinct for advertising purposes from the typical group of golf fans.

The Caddies' claims of increased effectiveness and price flexibility also fail to support their proposed markets. The price of endorsement advertising during golf tournaments would reflect any increased effectiveness compared to other forms of advertising. This increased effectiveness would not place the advertising format in a distinct market because, as discussed above, companies can reach golf consumers through other formats. The price flexibility in the proposed markets also fails to demonstrate their plausibility. Although small companies can advertise in the proposed markets by hiring a lone little-known player or caddy, these same

companies could advertise through smaller golf periodicals, less frequented websites, and radio programs.

Finally, the Caddies' last claim is a legal conclusion veiled as a factual allegation that we do not consider when ruling on a motion to dismiss. *Navajo Nation v. Dep't of the Interior*, 876 F.3d 1144, 1163 (9th Cir. 2017) ("We do not . . . assume the truth of legal conclusions merely because they are cast in the form of factual allegations . . . ." (citation omitted)). The Caddies merely restate a test for market definition without any factual elaboration. *Theme Promotions, Inc. v. News Am. Mktg. FSI*, 546 F.3d 991, 1002 (9th Cir. 2008) (noting that one method of determining whether a proposed market is viable is assessing "whether a monopolist in the proposed market could profitably impose a small but significant and nontransitory price increase").

In sum, the district court properly concluded that the Caddies' proposed product markets are "facially unsustainable" because they fail to include many "reasonabl[y] interchangeab[le]" products. *Newcal Indus.*, 513 F.3d at 1045.

## C

Our conclusion is consistent with the opinions of our sister circuits. In *Chapman v. New York State Division for Youth*, 546 F.3d 230, 237–38 (2d Cir. 2008), the Second Circuit affirmed the dismissal of antitrust claims because the plaintiffs' proposed product market of "restraint training services to private child care providers" did not "encompass all interchangeable substitute products." The plaintiffs "failed to show how the market for restraint training services *to child care providers* is any different from the larger market

Case: 3:15-cv-00489-VC Document 51-1 Filed 07/30/18 Page 29 of 32

for restraint training services to other businesses, agencies, and organizations." *Id.* at 238 (emphasis in original). Even after granting all factual inferences in the plaintiffs' favor, the court affirmed the dismissal of the claims because "[t]he unifying characteristic of th[e] market is that each purchaser needs to restrain *individuals*, not just *children*." *Id.* (emphasis added).

Similarly, in *PSKS, Inc. v. Leegin Creative Leather Products, Inc.*, 615 F.3d 412, 417–19 (5th Cir. 2010), the Fifth Circuit affirmed the dismissal of the plaintiff's claim that vertical resale price maintenance agreements violated the Sherman Act because neither of the two proposed product markets "encompasse[d] interchangeable substitute products or recognize[d] the cross-elasticity of demand." The first proposed market—limited to a specific brand of women's accessories—was implausible because there was "no structural barrier to the interchangeability of [the specific brand of] products with goods produced by competing manufacturers." *Id.* at 418. The second proposed market for "brand-name women's accessories" was also implausible because the plaintiff failed to allege why name brand goods "are not interchangeable with non-brand name" women's accessories. *Id.* at 416, 418.

Moreover, many courts have rejected antitrust claims reliant on proposed advertising markets limited to a single form of advertising. *See, e.g.*, *Am. Online, Inc. v. GreatDeals.Net*, 49 F. Supp. 2d 851, 858 (E.D. Va. 1999) (dismissing the plaintiff's monopolization claim in part because it attempted to "restrict the market to e-mail advertising [even though] [t]here are numerous substitutes for e-mail advertising, some of which are less expensive, including use of the World Wide Web, direct mail, billboards,

television, newspapers, radio, and leaflets, to name a few"); *Huron Valley Publ'g Co. v. Booth Newspapers, Inc.*, 336 F. Supp. 659, 662 (E.D. Mich. 1972) (denying the plaintiff's motion for a preliminary injunction on monopolization claims in part because "the relevant market includes all modes of retail advertising" and not just "newspaper advertising alone" as the plaintiff argued); *see also AD/SAT, Div. of Skylight, Inc. v. Associated Press*, 181 F.3d 216, 228–29 (2d Cir. 1999) (affirming grant of summary judgment for the defendant in part because "the market for rush electronic delivery of advertisements to newspapers is not a viable one" because "there is significant cross-elasticity of demand for rush and non-rush delivery services").

### D

In sum, the district court correctly dismissed the Caddies' antitrust claims for failure to allege a relevant product market. *Newcal Indus.*, 513 F.3d at 1044; *see also Freeman v. San Diego Ass'n of Realtors*, 322 F.3d 1133, 1146 n.14 (9th Cir. 2003) ("[D]istinct product markets are crucial to a tying claim.").

This conclusion also confirms that the district court properly dismissed the Caddies' California unfair competition claim that the Tour's conduct was "unlawful, unfair or fraudulent." Cal. Bus. & Prof. Code § 17200. The Caddies failed to plead that any of the Tour's conduct was unlawful or unfair. *Berryman v. Merit Prop. Mgmt., Inc.*, 62 Cal. Rptr. 3d 177, 185 (Ct. App. 2007) ("[A] violation of another law is a predicate for stating a cause of action under the [unfair competition law's] unlawful prong."); *Chavez v. Whirlpool Corp.*, 113 Cal. Rptr. 2d 175, 184 (Ct. App. 2001) ("If the same conduct is alleged to be both an antitrust violation and

an 'unfair' business act or practice for the same reason . . . the determination that the conduct is not an unreasonable restraint of trade necessarily implies that the conduct is not 'unfair' towards consumers."). Their allegations that the Tour "misled bib sponsors into believing that Plaintiffs voluntarily consented to wearing the bibs without compensation" also fail under the fraud prong because the Caddies did consent to wearing the bibs.

E

While we agree with the district court that the Caddies failed to plead a plausible product market, we vacate the dismissal *with prejudice* of the antitrust and California unfair competition law claims.[9] "Dismissal with prejudice and without leave to amend is not appropriate unless it is clear on de novo review that the complaint could not be saved by amendment." *Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003). "A simple denial of leave to amend without any explanation by the district court is subject to reversal." *Id.* "Such a judgment is 'not an exercise of discretion; it is merely abuse of that discretion and inconsistent with the spirit of the Federal Rules.'" *Id.* (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962)).

The district court made a "simple denial of leave to amend" here without adequate explanation. *Id.* It only noted that the Caddies were not "able to explain how they could state an antitrust claim using a plausible product market definition." This insufficient consideration of the factors

---

[9] As discussed above, if the Caddies plead facts that support an antitrust claim, these facts may also support a valid California unfair competition claim.

discussed in *Foman* constitutes an abuse of discretion considering that the district court only dismissed the complaint once, the Tour fails to identify any specific prejudice it would experience, and we cannot conclude that amendment would be futile. *See, e.g.*, *id.* ("[P]rejudice to the opposing party . . . carries the greatest weight" when deciding whether to grant leave to amend.). Therefore, we remand this issue for the district court to reconsider its decision to deny the Caddies leave to amend the antitrust and unfair competition claims.

IV

In summary, because the Caddies consented to wearing the bibs while not in a state of economic duress, the district court properly dismissed with prejudice the contract, quasi-contract, California publicity, Lanham Act false endorsement, and economic duress claims. The district court properly dismissed the antitrust claims for failure to state a relevant market and the California unfair competition claims for failure to plead that any of the Tour's conduct was unlawful, unfair, or fraudulent. However, we remand the case to the district court to reconsider its decision to deny the Caddies leave to amend their federal antitrust and California unfair competition claims.

**AFFIRMED in part; VACATED in part; and REMANDED.**

Each party to bear its own costs.